UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| ULYSSES RODRIGUEZ CHARLES, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF BOSTON; JOHN MULLIGAN, in | ) |
| his individual capacity; WILLIAM KEOUGH, | ) |
| in his individual capacity; PAUL RUFO, in his | ) |
| individual capacity; KATHLEEN HANLEY | ) |
| JOHNSON, in her individual capacity; | ) |
| STANLEY BOGDAN, in his individual | ) |
| capacity; JOHN DOE and JANE DOE, | ) |
| supervisors in the Boston Police Department, in | ) |
| their individual capacities; CHARLES CAMPO, | ) |
| in his individual capacity; JOHN ZANINI, in | ) |
| his individual capacity; SUFFOLK COUNTY | ) |
| and SUFFOLK COUNTY DISTRICT | ) |
| ATTORNEY'S OFFICE, | ) |
| | ) |
| Defendants | ) |

CASE NO. 04-10986-NG

_____)

**MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT
CHARLES CAMPO TO DISMISS PLAINTIFF'S COMPLAINT
PURSUANT TO FED. R. CIV. P. 12(b)(6)**

Defendant Charles Campo has moved to dismiss the complaint of Plaintiff

Ulysses Rodriguez Charles ("Charles") on the grounds the complaint fails to state

a claim upon which relief can be granted for the following reasons: (a) Mr. Campo

possesses absolute immunity against all Counts and claims set forth in the

complaint; (b) Counts IV (malicious prosecution under 42 U.S.C. § 1983) and the

second count labeled VII [1] (state law claim for malicious prosecution) fail as a matter of law as Charles's criminal action was not terminated in his favor; (c) Counts I, II, and III are barred by the applicable statute of limitation; (d) Counts V and the first count labeled VII only state *Monell* claims against other governmental Defendants and (e) Count VI only states individual claims against unknown "supervisory" personnel in the Suffolk County District Attorney's Office and the City of Boston Police Department.  In support of his motion, Mr. Campo files this memorandum of law and has attached copies of the following documents: Superior Court docket (**Tabs A1-A8**); indictments (**Tab B**); portions of the trial transcript (**Tab C**) and the *Nolle Prosequi* (**Tab D**) which were filed in the underlying state criminal action for the Court's consideration. [2]

## *FACTS AS ALLEGED IN THE PLAINTIFF'S COMPLAINT* [3]

Mr. Campo categorically denies each and every allegation of misconduct made by the Plaintiff.  The Plaintiff's allegations are not only baseless but are a fabrication made up of distortions and outright misrepresentations of the record.

---

[1] The complaint contains two counts labeled number "VII".

[2]   The Court may consider these documents and the information contained therein without converting Mr. Campo's motion to dismiss into a motion for summary judgment.  See *Watterson v. Page,* 987 F.2d 1, 4 (1st Cir. 1993)(In considering materials outside the pleadings on a motion to dismiss, courts have made narrow exceptions for documents whose authenticity are not disputed by the parties; for official public records; for documents central to the plaintiff's claim; or for documents sufficiently referred to in the complaint).  The documents attached to this memorandum meet the *Watterson* criteria as each document is an official public record taken from the state court criminal proceedings upon which Charles's claims are based.  These documents will assist the court in filling in gaps in the sequence of events leading to Charles's arrest, indictment and conviction on multiple rape charges as well as providing the grounds upon which those charges were dismissed by the Commonwealth in the *Nolle Prosequi.*

[3]   References to the complaint are cited as ("Comp. ¶_"); references to the Superior Court docket in the underlying criminal case are referred to as ("Sup. Docket at p._"); references to the Trial transcript are referred to as  ("Tr. _/_/84 at p_" ).  The three rape victims are referred to by first name only.

For example, his claim that DNA testing produced indisputable evidence that exonerated him of the crimes is not true as evidenced by the *Nolle Prosequi* (**Tab D**).

Nonetheless, for purposes of this motion only, Mr. Campo accepts the Plaintiff's version of the facts as set forth in his complaint. Mr. Campo submits that even viewing the facts in the light most favorable to the Plaintiff, all counts of the complaint against Mr. Campo must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).[4]

The following allegations, in support of the Plaintiff's claims, are taken directly from the complaint. The complaint alleges, inter alia, that on December 8, 1980, [Karen, Valerie and Shannon], all white, were raped and robbed in their Brighton apartment by an unknown black man (Comp. ¶ 20). The assailant raped two of the women vaginally, one anally and one orally (Comp. ¶ 24).

The Plaintiff alleges that the complainants initial description of the suspect was of a 5'10" black man with a thin build, medium complexion (as opposed to dark) and straggly beard. At the hospital [Karen] described the assailant to Doctor Batzofin[5] as a black male, 5'10" tall, 165 pounds with husky voice, beard and moustache (Comp. ¶ 33, 34).

---

[4] The acceptance of the Plaintiff's version of the facts, for purposes of this motion only, does not constitute an admission by Mr. Campo as to the truth of any of the allegations in the complaint.

[5] Dr. Batzofin was the examining physician.

The complaint alleges [Shannon] told the doctor, who is white south African, the suspect had an American accent (Comp. ¶ 35). Charles claims the complainants initial description of the suspect made no mention of peculiar identification characteristics of Caribbean accent, dread locks hair and two front teeth, that Charles claims he possessed that ruled him out as a suspect (Comp. ¶ 36).

The complaint alleges Detectives William Keough and Paul Rufo[6] were assigned the case and on December 9, 1980, the complainants were separately interviewed by Defendant Keough regarding the identity of the suspect (Comp. ¶ 37). Defendant Keough compiled a special group of about 200 photographs for their viewing (Comp. ¶ 38). On December 9, 1980 the victims viewed about 200 photographs that included two photos of Charles (Comp. ¶ 39). Charles was arrested "base[sic] on the Boston Police claim that [Karen and Shannon] identified Charles' photo from the selected group of photographs" (Comp. ¶ 39).

The complaint alleges Karen was allowed to identify Charles as the assailant at the trial (Comp. ¶ 40). Charles alleges this identification was expected since he was the only black person sitting in the courtroom. The complaint alleges Karen then testified she initially identified Charles from the group of photographs

---

[6] Detective Rufo is deceased.

shown her on December 9, 1980 and added: "The pictures I picked out - had dreads"(Comp. ¶ 40).   The complaint alleges this testimony was the product of suggestive identification procedures because it was impossible for her to view Mr. Charles photograph depicting his dread locks on December 9, 1980.   Only Mr. Charles photograph taken at time of arrest on June 1, 1981 depicted his dread lock hair (Comp. ¶ 40).

A probable cause hearing was held on June 9, 1981 (Complaint ¶ 42). Charles was bound over to Superior Court and subsequently indicted on July 21,1981 (Sup. Docket at p.1, **Tab A1**).   At all times relevant to the complaint Mr. Campo was an assistant district attorney for the Suffolk County District Attorney's Office (Comp. ¶ 15).[7]

On September 2 1981 Charles failed to appear in Superior Court for arraignment and a default warrant was issued that same day for his arrest (Sup. Docket at p.1, **Tab A1**).  The indictments were placed on file until after Charles's arrest and the case lay dormant until 1983 (Sup. Docket at p.1, **Tab A1**). Charles was re-arrested on the default warrant and arraigned in Superior Court on May 19, 1983 (Sup. Docket at p.2, **Tab A1**).   Charles claims Mr. Campo disclosed that Defendant Mulligan knew Charles prior to the rape crimes and was one of the Boston Police looking for Mr. Charles (Comp. ¶ 32).[8]

---

[7] Charles correctly does not claim that Mr. Campo had any involvement in his criminal case prior to Charles being indicted in Superior Court.

[8] Defendant Mulligan is deceased.

Charles alleges Mr. Campo conducted two improper identification procedures. The first being a post indictment line up procedure which took place on November 3, 1983 and the second being an in court identification which took place during the criminal trial.

The complaint alleges that on November 3, 1983, Mr. Campo and Detective Keough arranged for a line up parade at Boston Police Headquarters (Comp. ¶ 47). Charles claims he stood number two (#2) during the "actual" line up parade (Comp. ¶ 47). The complaint alleges [Karen, Shannon and Valerie] all viewed the actual line up parade and declared they can't make an identification. The parade ended (Comp. ¶ 47). Charles claims that about thirty minutes after he was placed in a waiting [room], his then defense counsel, James Gilden, came into the room and told him the prosecutor, Mr. Campo, wanted a photograph of the line up participants to "show that the procedure was fair." Charles claims he remained skeptical since the complainants did not make an identification (Comp. ¶ 48).

Charles claims that to allay his fears, Mr. Gilden told Charles he did not have to use the same #2 he stood in the actual line up. Charles claims Mr. Gilden held out the card numbers facing down and told him he could take any card. Charles claims he randomly selected card #4 and then reassembled with the other participants and Mr. Campo took a photograph (Comp. ¶ 49).

The complaint alleges that weeks after the line up Mr. Campo "negligently told then defense counsel he confronted [Karen] alone after the line up ended and she said 'I think it's number four (#4)'" (Comp. ¶ 50). Charles claims Mr. Campo

"negligently offered the photograph of the participants wherein Charles stood #4 as if it represented the actual line up, and falsely testified to the jury of what [Karen] purportedly encounter between [Mr. Campo] and [Karen]" (Comp. ¶ 50).

Charles claims he was not "#4" in the actual line up.  He claims he only stood #4 for the photograph of the participants that he alleges was taken long after the line up parade (Comp. ¶ 51).[9]  The complaint alleges that this shows Mr. Campo negligently showed [Karen] the photograph of the line up participants without the presence of counsel (Comp. ¶ 51).

The complaint also alleges irregularities with respect to the collection of forensic evidence at the crime scene and the presentation of evidence at trial (Comp. ¶ 52-56).  The complaint alleges Mr. Campo obtained a court order for Charles's "blood sample based on the fact that Defendant[10] found seminal stains on the bed sheet and robe" (Comp. ¶ 53).  Charles claims he was excluded as the depositor of the alleged seminal stains (Comp. ¶ 53).  Charles claims "Defendant Campo and Defendant Bogdan tested and excluded [Shannon's] boyfriend as the depositor of the seminal stains, prior to trial.  But Mr. Campo withheld this evidence from Mr. Charles" (Comp. ¶ 54).

---

[9] Attorney Gilden, who represented Charles at the line up, was also trial counsel.   Attached at **Tab C** is Karen's trial testimony (including Mr. Gilden's cross examination) relating to the November 3,1983 line up procedure and Karen's identification of Charles as number four in the line up (Tr. 2/7/84 at pgs. 25-29, 42-48, 62-63).

[10] Charles does not identify who he means by "Defendant" in ¶ 53.

The complaint alleges Mr. Campo "examined the hospital medical records and knew Doctor Batzofin collected vaginal swabs of sperm from [Karen and Shannon]" (Comp. ¶ 55). Charles claims defendant Bogdan tests also confirmed stains on the bed sheet and robe were seminal in origin (Comp. ¶ 55). The complaint alleges that "because the tests excluded Mr. Charles, Defendant Campo knowingly presented false evidence at trial that doctor Batzofin found no sperm upon examination of [Karen and Shannon]" (Comp. ¶ 55).

The complaint alleges Mr. Campo "also elicited false testimony from the Defendant Bogdan [that] the stains on [the] bed sheet and robe were not seminal in origin, and argued the rapist did not ejaculate with the sole intent to injure Mr. Charles" (Comp. ¶ 55). Charles alleges "Defendant Campo's false representations that doctor Batzofin found no sperm upon examination of [Karen and Shannon], and that the rapist did not ejaculate interfered with Mr. Charles' ability to earlier prove his innocence as he was misled to believe no evidence existed that could conclusively establish his innocence" (Comp. ¶ 56). Charles claims the "primary evidence" against him was [Karen, Shannon and Valerie's] testimony that included the photo identification corroborated by Defendant Keough, the line up identification corroborated by Defendant Campo, and [Karen's] in court identification (Comp. ¶ 57).

Charles also claims Mr. Campo interjected Charles's national origin (presumably improperly) into the trial when he offered Charles's birth certificate

into evidence "to corroborate his knowing false stipulation that [Shannon] told doctor Batzofin the assailant had a 'non-American accent,'" since Charles was born in Trinidad (Comp. ¶ 57).

The complaint alleges on May 14, 2001, the Superior Court granted Charles a new trial (Comp. ¶ 66).[11]   On May 17, 2001, the Suffolk County District Attorney's Office filed a *Nolle Prosequi* (**Tab D**)*,* dismissing the indictments (Comp. ¶ 66). [12]

## LAW AND ARGUMENT

### A.    *Mr. Campo possesses absolute immunity against all claims asserted by Charles in the complaint.[13]*

Under *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984 (1976), the Supreme Court held prosecutors possess the same absolute immunity from actions arising under 42 U.S.C. §1983 as they have under the common law for other claims. *Imbler,* 424 U.S. at 27, 96 S.Ct. at 993.  A prosecutor possesses absolute immunity from suit under § 1983 for claims arising out of those activities which are intimately associated with the judicial phase of the criminal process.  *Imbler,* 424 U.S. at 430, 96 S.Ct. at 995.  "In initiating a prosecution and in presenting the

---

[11] The Court filed its order granting Charles a new trial on May 11, 2001 (Sup. Docket at p.18, **Tab A1**).

[12]  Paragraphs 58-76 do not relate to Mr. Campo.   In brief these paragraphs allege facts relating to Charles's claims against Defendants Zanini, the Suffolk County District Attorney's Office, the City of Boston and two John Doe supervisory defendants. Accordingly, these claims are not addressed by this motion and memorandum.

[13]  Mr. Campo does not waive any additional defenses he possesses including those under the doctrine of qualified  immunity.

State's case, the prosecutor is immune from a civil suit for damages under § 1983. *Id.*

The Supreme Court has noted that the scope of absolute immunity under *Imbler* encompasses "not only a charge that the prosecution had been wrongfully commenced, but also a charge that false testimony had been offered as well as a charge that exculpatory evidence had been suppressed". *Kalina v. Fletcher*, 522 U.S. 118, 125, 118 S.Ct. 502, 506 (1997);  see *Reid v. State of New Hampshire,* 56 F.3d 332, 336 (1ˢᵗ Cir. 1995)(it is a well established rule that a prosecutor can not be held personally liable for the knowing suppression of exculpatory information). Prosecutors retain discretion to determine what evidence is to be disclosed under *Brady* and absolute immunity attaches to the exercise of this discretion. *Reid,* 56 F.3d at 337.

Absolute immunity for prosecutors applies even if the allegedly exculpatory evidence was specifically requested by the defense.  See *Jones v. Shankland,* 800 F.2d 77, 78-80 (6ᵗʰ Cir. 1986), *cert. denied*, 481 U.S. 1048, 107 S.Ct. 2177 (1987).  Absolute immunity has been applied in instances where prosecutors misled the court in order to conceal their failure to disclose exculpatory evidence.  See *Wilkinson v. Ellis*, 484 F. Supp. 1072, 1082 (E.D. Pa. 1980).  It also has been applied where an assistant district attorney presented evidence to the grand jury where it was alleged he possessed prior knowledge about a victim's video statement that contained exculpatory information. *Jones v.*

*City of Boston,* 2004 WL 1534206 at p. 4 (D. Mass. 2004) (Stearns, J.) (a copy of which is attached at **Tab E**).

The Supreme Court has held that absolute immunity prevents an action against prosecutors even under circumstances where the prosecutor made false or defamatory statements in judicial proceedings (so long as the statements relate to the proceeding) and also for "eliciting false and defamatory testimony from witnesses". *Burns v. Reed,* 500 U.S. 478, 489-490, 111 S.Ct. 1934, 1941 (1991). Absolute immunity also extends to instances where prosecutors withhold exculpatory evidence long after the defendant's conviction. *Reid,* 56 F.3d at 338.

Absolute immunity from personal liability under § 1983 claims applies to a prosecutor's conduct in "initiating a prosecution and in presenting the State's case . . . insofar as that conduct is intimately associated with the judicial phase of the criminal process". *Burns,* 500 U.S. at 486, 111 S.Ct. at 1939 . The judicial phase of the criminal process has been held to include: (a) participating in a probable cause hearing; *Burns,* 500 U.S. at 492, 111 S.Ct. at 1942.; (b) out-of-court actions including the preparation for a probable cause hearing; *Buckley v. Fitzsimmons,* 509 U.S. 259, 271-273, 113 S.Ct. 2606, 2615 (construing *Imbler* and *Burns*); (c) the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation in an official proceeding; *Burns,* 500 U.S. at 273, 113 S.Ct. at 2615; (d) speaking to testifying witnesses before a probable cause hearing, *Miller v. City of Boston,* 297 F. Supp.2d 361, 371

(D. Mass. 2003)(Tauro, J.); (e) appearing in court in application of a search warrant, *Burns,* 500 U.S. at 492; 111 S.Ct. at 1942-1943.

For the reasons set forth below, absolute immunity applies to all of the claims made against Mr. Campo.

### 1.    Count I – Unduly suggestive identification procedures.

Under Count I, Charles seeks recovery against Mr. Campo under § 1983 for "unduly suggestive identification procedures".   Although Charles groups all of the individual defendants together in asserting this claim, only paragraphs 78C and 79 of Count I contain allegations against Mr. Campo.   Under this count Charles alleges "Defendant Campo, conducted a suggestive line up when he photographed Mr. Charles after the line up parade and showed the photo to [Karen] encouraging her to falsely testify she identified Mr. Charles after the line up parade ended, and identified Charles  the only black person in the courtroom" (Comp. ¶ 78C). Charles further alleges that "Defendant Campo was acting in his investigative capacity when he photographed Charles after the line up parade ended and showed [Karen] the photo in the absence of defense counsel, prompting her to say she identified #4 at the line up parade when Charles was #2 in the actual line up parade" (Comp. ¶ 79).

Mr. Campo's appearance in the criminal proceedings brought against Charles did not occur until after Charles's indictments in Superior Court (Sup.Docket at p.1, **Tab A1**).  Mr. Campo did not make the presentments to the Grand Jury (Indictments, **Tab B**). There are no allegations in the complaint that

Mr. Campo had any involvement in Charles's case prior to Charles being bound over to Superior Court and subsequently indicted.

The alleged impermissibly suggestive line up procedure, alleged false testimony and in court identification upon which Charles bases his claims against Mr. Campo under paragraphs 78C and 79 of Count I were conducted post indictment. The line up procedure was conducted pursuant to a post indictment motion for a line up (Sup. Docket at p.4, **Tab A1**). The testimony and in court identification occurred at trial (Comp. ¶ 40). It is beyond question that these activities are associated with the judicial phase of the criminal process.

Judge Tauro recently dismissed a similar claim made against an assistant district attorney under § 1983 for employing allegedly suggestive identification procedures on the basis that the district attorney possessed absolute immunity. *Miller,* 297 F. Supp.2d at 370-371. Indeed, in *Miller* Judge Tauro held absolute immunity applied where the allegedly impermissible line up occurred during the probable cause hearing. *Miller,* 297 F. Supp.2d at 370. As noted in *Miller,* "it is also beyond question that appearing at a probable cause hearing 'is … connected with the initiation and conduct of a prosecution, particularly where the hearing occurs after the arrest …'". *Miller,* 297 F. Supp.2d at 370, quoting *Burns v. Reed,* 500 U.S. 478, 492, 111 S.Ct. 1934 (1991).

In the instant case, the criminal proceedings against Charles had already moved well beyond the arrest and probable cause stages. Charles's assertion that Mr. Campo "was acting in his investigative capacity" (Comp. ¶ 79) is without

legal merit and contrary to long established principles that such activities are prosecutorial in nature, and therefore, incapable of supporting a claim under § 1983. Accordingly, with respect to the allegations made against Mr. Campo in Count I, Charles's claims are barred by the doctrine of absolute immunity and fail to state a claim upon which relief can be granted.

Mr. Campo also possesses absolute immunity from suit to the extent that Count I alleges a claim under state law. The Supreme Judicial Court has held that the scope of prosecutorial immunity under State common law and the Massachusetts Civil Rights Act "is at least as broad as under § 1983". *Chicopee Lions Club v. District Attorney for the Hampden District,* 396 Mass. 244, 251, 485 N.E.2d 673, 677 (1985). Indeed, Massachusetts extends absolute immunity to district attorneys and assistant attorney generals in matters involving the conduct of civil litigation. *Dinsdale v. Commonwealth,* 424 Mass. 176, 182, 675 N.E.2d 374, 378 (1997). Accordingly, to the extent that Count I alleges a claim under state law, it is barred by absolute immunity and must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

### 2. Count II – Failing to disclose evidence and fabricating evidence

The allegations contained in Count II against Mr. Campo are that he failed to disclose five categories of allegedly exculpatory evidence (Comp. ¶ 85) as required by *Brady*. Allegations of this type also fail to state a claim upon which relief can be granted. It has long been established that prosecutors, such as Mr. Campo, enjoy absolute immunity from claims of this type made under § 1983.

See, e.g, *Reid,* 56 F.3d at 336; *Robinson v. Volkswagenwerk AG,* 940 F.2d 1369,

1372-1373 (10th Cir. 1991), *cert. denied,* 502 U.S. 1091, 112 S.Ct. 1160 (1992);

*Myers v. Morris,* 810 F.2d 1437, 1446 (8th Cir.), *cert. denied,* 484 U.S. 828 (1987).

As explained by the Supreme Court in *Burns*, when the *Imbler* court held that

absolute immunity for prosecuting attorneys was applicable to claims asserted

under § 1983, "[e]ach of the charges against the prosecutor in *Imbler* involved

conduct having that association [initiating a prosecution and in presenting the

State's case], including the alleged knowing use of false testimony at trial and the

alleged deliberate suppression of exculpatory evidence".  *Burns,* 500 U.S. at 486,

111 S.Ct. at 1939.  Whether the claim involves withholding evidence, failing to

correct a misconception or instructing a witness to testify evasively, a prosecutor

possesses absolute immunity from civil damages.  *Robinson,* 940 F.2d at 1373 n.4.

Accordingly, Count II fails to state a claim upon which relief can be granted.  Mr.

Campo possesses absolute immunity from liability for any alleged failure to

disclose exculpatory evidence to Charles, or for any alleged use of false testimony

or fabricated evidence at trial.

### 3.    **Count III – Section 1983 Conspiracy**

Charles's attempt to fashion a § 1983 claim under a conspiracy theory also

lacks merit and must fail as a matter of law.  "When the underlying activity at

issue is covered by absolute immunity, the plaintiff derives no benefit from

alleging a conspiracy".  *Hill v. City of New York,* 45 F.3d 653, 659 n. 2 (2d Cir.

1995); accord *Cignetti v. Healy,* 89 F. Supp.2d 106, 117 (D. Mass. 2000)(Lasker,

J.); see *Campbell v. State of Maine,* 787 F.2d 776, 778 (1ˢᵗ Cir. 1986)(affirming district court's dismissal of plaintiff's conspiracy claims asserted under § 1983 under doctrine of absolute immunity noting that alleging a conspiracy did not alter the result "when each claim in the complaint is legally infirm").  Prosecutors are absolutely immune from claims alleging conspiracy to present false testimony. *Dory v. Ryan,* 25 F.3d 81, 83-84 (2d Cir. 1994).   All of Charles's claims are barred by absolute immunity.  The allegation that those same acts provide support for a § 1983 claim based upon conspiracy also fails as a matter of law.

### 4. Count IV and Count VII – Section 1983 claim for malicious prosecution and state law claim for malicious prosecution.

These claims also are barred by absolute immunity.  As previously noted, under *Imbler,* a prosecutor is immune from § 1983 liability for malicious prosecution for those acts performed as an advocate in judicial proceedings. *Imbler,* 424 U.S. at 428-431; 96 S.Ct. at 994-996.  See, e.g., *Day v. Morgenthau,* 909 F.2d 75, 77 (2d Cir. 1990)(allegation that prosecutor engaged in malicious prosecution on the charges against plaintiff clearly is within the "judicial phase of the criminal process").  As with Charles's conspiracy claim under Count III, his claim for malicious prosecution must fail because all of the acts allegedly committed by Mr. Campo, upon which this claim is based, occurred within the judicial phase of the criminal process and well after Charles had been arrested and indicted.  Mr. Campo was acting in his capacity as an advocate for the Commonwealth in prosecuting the charges against Charles and possesses absolute

immunity against those claims.    Accordingly, Charles's claim for malicious prosecution under § 1983 also fails.

Similarly, Charles's state law claim for malicious prosecution must be dismissed as Massachusetts affords its prosecuting attorneys absolute immunity from such claims to "at least" the same limits as provided under federal law. *Chicopee Lions Club,* 396 Mass. at 251, 485 N.E.2d at 677.

### B.    Counts IV and VII fail to state claims for malicious prosecution.

Under both federal and state law, a claim for malicious prosecution must allege and prove that the prior criminal court proceedings were resolved in the plaintiff's favor.  *Heck v. Humphrey,* 512 U.S. 477, 484, 114 S.Ct. 2364, (1994); *Wynne v. Rosen,* 391 Mass. 797, 464 N.E.2d 1348, 1350 (1984).  Contrary to the allegations made in the complaint, the granting of the *Nolle Prosequi* does not automatically establish that the prior criminal proceedings were resolved in the plaintiff's favor.  "A *nol pros* signifies termination of charges in favor of the accused "*only when their final disposition is such as to indicate the innocence of the accused*".  *Donahue v. Gavin,* 280 F.3d 371, 383 (3rd Cir. 2002)(emphasis in original).    The result is the same under Massachusetts law.  See *Wynne,* 391 Mass. at 799-800, 464 N.E.2d at 1351 (in a malicious prosecution action a criminal proceeding is terminated in favor of the plaintiff when the district attorney formally abandons criminal proceedings by a *Nolle Prosequi*, "[h]owever,

the reasons stated for the nolle prosequi or dismissal must be consistent with the innocence of the accused").

In *Donahue*, the Third Circuit examined the wording of the *Nolle Prosequi* and found as a matter of law that it did not suggest that the plaintiff was innocent of the criminal charges. *Donahue,* 280 F.3d at 384. In that case the court noted the *Nolle Prosequi* included the following language which led to its conclusion that the criminal proceedings were not terminated in the plaintiff's favor:

> In addition the defendant has already served approximately 2 years, 7 months and 23 days, and if convicted, the defendant most likely would not receive any additional jail time. Therefore, in the interest of judicial economy and to preserve Judicial resources, the Commonwealth of Pennsylvania in exercising its prosecutorial discretion, requests entry of a Nolle Prosequi Order.

Similarly, federal judges have dismissed malicious prosecution claims as a matter of law when, after examining the language of the *Nolle Prosequi* order, found the proceedings were not terminated in favor of the plaintiff. See e.g., *Basu v. Brogan,* 2002 WL 745838 at p. 3 (D. Mass.)(Zobel, J.)(granting summary judgment where *Nolle Prosequi* reason only stated "in the interest of justice" as being too ambiguous to <u>compel</u> an inference that there existed a lack of reasonable grounds to pursue prosecution, citing *Wynne*)(a copy of which is attached at **Tab F**); *Molina v. City of Lancaster,* 2002 WL 485595 at p. 3 (E.D. Pa)(granting summary judgment on the grounds that the *Nolle Prosequi* was devoid of any evidence to support plaintiff's allegation that the charges were dismissed against him for lack of evidence)(a copy of which is attached at **Tab G**). In contrast, in

*Wynne*, the Court noted the *Nolle Prosequi* met the requirements because the reasons given by the assistant district attorney indicated a lack of reasonable grounds to prosecute.  *Wynne,* 391 Mass. at 801, 464 N.E.2d at 1351.

Charles clearly cannot meet the above standard under either his § 1983 or state law malicious prosecution claim.   The *Nolle Prosequi* (**Tab D**) contains the following statements, all of which are diametrically opposed to any inference that Charles is innocent of the charges.

> Although the DNA test results may be exculpatory, they do not exonerate the defendant.  Whether he committed these crimes, as the first jury determined beyond a reasonable doubt, will never be known with certainty.  The absence of Charles' DNA does not mean he was not the rapist – as the facts presented at trial are otherwise convincing of his guilt.

> The fact that the defendant's DNA was not on the cloth was not an unexpected result, as defendant's blood type and that of the stains on the cloth were not the same, as the jury was told at the time of trial in 1984.  At trial an independent expert as well as a technician from the Boston Police Crime Lab, did not detect any sperm on the cloth and the jury was advised of this fact, and information that the rapist had not ejaculated.  The judge who decided the motion for new trial, however, felt that the information that sperm was present at the scene of the crime, and that it was multiple sources, but not the defendant, should be presented to a jury at a new trial.

> The trial exhibits no longer exist.

> Despite the impact which these crimes, and the overturning of the verdicts, had on the victims, two of the victims are willing to testify in a new trial, including the victim who identified defendant as her rapist by photograph, at a line up, and in court.

> In light of the difficulties inherent in retrying a case 17 years after the first verdict of guilt, and 20 years after the rapes, exacerbated by the lack of trial exhibits and the current unavailability of at least one

witness, it is not in the interests of justice for the Commonwealth to further prosecute this case.

The reasons set forth in the *Nolle Prosequi* do not remotely suggest that Charles was exonerated of the charges.   Accordingly, as Charles can not establish an essential element of the tort of malicious prosecution, Counts IV and VII fail to state claims upon which relief can be granted.

### C.    Counts I, II and III are barred by the Statute of Limitations[14]

Section 1983 does not contain a built in statute of limitation, therefore, a federal court ordinarily must borrow from the forum state's limitation period governing personal injury causes of action. *Nieves v. McSweeney,* 241 F.3d 46, 51 (1st Cir. 2001).   Massachusetts prescribes a three year statute of limitation for personal injury actions.  G.L. c. 260, § 2A.   The First Circuit borrows this statute for § 1983 actions arising in Massachusetts.  *Nieves*, 241 F.3d at 51.  A cause of action accrues under federal law when the plaintiff knows or has reason to know of the injury which is the basis of the action. *Torres v. Superintendent of Police of Puerto Rico,* 893 F.2d 404, 407 (1st Cir. 1990).

Under *Heck v. Humphrey*, supra, a claim based upon an allegedly unconstitutional conviction or imprisonment can not be brought under § 1983 unless the underlying conviction has been declared invalid by a state tribunal authorized to make such determinations, or called into question by a federal

---

[14]   Mr. Campo does not argue that Count IV (§ 1983 claim for malicious prosecution) and the second Count labeled VII (state law claim for malicious prosecution) are barred by the statute of limitations. However, as stated in Sections A and B above, these claims are barred by the doctrine of absolute immunity and for failure to establish that the underlying convictions were resolved in Charles's favor.

court's issuance of a writ of *habeas corpus*. *Heck,* 512 U.S. at 486-487, 114 S.Ct. at 2372. *Heck* declined to directly address application of its holding with respect to determining commencement of the statute of limitations in § 1983 actions. *Heck* 512 U.S. at 489-490; 114 S.Ct. at 2373-2374. The Tenth Circuit, however, has addressed this issue and held that the statute of limitations starts on the date that the plaintiff's criminal convictions were invalidated.

In *Smith v. Gonzales*, 222 F.3d 1220 (10th Cir. 2000), the plaintiff's convictions in state court on two counts of murder were reversed in *habeas corpus* proceedings in federal court on March 7, 1995. *Smith,* 222 F.3d at 1222. In subsequent state court proceedings on the criminal charges, the jury was unable to reach a verdict and on April 21, 1996 the state filed a *Nolle Prosequi* that it would not prosecute the plaintiff further and released him from custody the same day. *Id*. at 1221. The plaintiff filed his § 1983 action on February 19, 1999. *Id.*

Applying the principles set forth in *Heck,* the Tenth Circuit rejected the plaintiff's contention that the statute of limitations did not commence until three years after the filing of the *Nolle Prosequi*, holding instead that the statute of limitations accrued on March 7, 1995, when the order granting him *habeas corpus* relief and a new trial was filed. *Smith,* 222 F.3d at 1222. As explained by the court, a favorable judgment in the § 1983 action would not render invalid any outstanding criminal judgment against the plaintiff because those convictions had been reversed in the *habeas corpus* proceedings. *Id.* The Tenth Circuit held the

statute of limitations commenced on March 7, 1995 and the plaintiff's complaint filed on April 19, 1999 was time barred. *Id.*

In his complaint, Charles alleges the date his new trial was granted was on May 14, 2001 (Comp. ¶ 66). This is incorrect. The docket attached at **Tab A1** states that entry of the Superior Court's decision and order granting Charles's motion for a new trial was entered on **May 11, 2001** (Sup. Docket at p. 18, **Tab A1**). This docket entry also states "(Attorney Hrones notified in hand, copies faxed to ADA Zanini and Attorney J. Boyden)" (Sup. Docket at p. 18, **Tab A1**). The Superior Court's order was filed on May 11, 2001 and Charles's attorneys were notified of the court's order that same day, May 11, 2001. For purposes of determining the statute of limitations, Charles is chargeable with the knowledge of his attorneys that the order was entered on May 11, 2001. See *Jones v. City of Boston*, supra at pp. 2-3, **Tab E**, (a plaintiff in a § 1983 action is held to have constructive knowledge of information provided to his attorney as his agent for purposes of determining the statute of limitations).

Charles's criminal convictions were invalidated on May 11, 2001 when the Massachusetts Superior Court issued its decision and order granting him a new trial (Sup. Docket at p.18, **Tab A1**). Under *Heck* and *Poy v. Boutselis*, 352 F.3d 479 (1st Cir. 2003) Charles had to file his action on or before May 11, 2004. In *Poy* the First Circuit held that in determining the accrual and limitations period of a § 1983 claim arising in Massachusetts, the First Circuit borrows both G.L. c. 260, § 2A as well as Mass. R. Civ. P. 6(a). *Poy,* 352 F.3d at 483-484. Under

Massachusetts law, the date the cause of action accrues is excluded from the calculation of the limitations period. Massachusetts begins counting on the day following the day of accrual, with the last day for filing suit being the anniversary of the event. *Id.* Accordingly, for calculating the statute of limitations in this action, the May 11, 2001 date is excluded, the three year statute started to run on May 12, 2001 and the statute ran out on May 11, 2004. Charles did not file this action until May 17, 2004. Accordingly, Charles's complaint was not filed within the three year statute of limitations with respect to Counts I, II and III.[15]

Under the principles set forth in *Heck* as interpreted by the Tenth Circuit in *Smith* and by the First Circuit in *Nieves*, Counts I, II and III are time barred. Accordingly, the Court should dismiss those counts pursuant to Fed. R. Civ. P. 12(b)(6) on the grounds that Charles failed to file his complaint within the applicable statute of limitations.

## *CONCLUSION*

As set forth above, Mr. Campo is absolutely immune from liability based upon any and all of the allegations set forth in the complaint. Also, despite having more than adequate time to do so, Charles failed to timely file his action with

---

[15] Alternatively, Charles' conspiracy claim made in Count III also is barred by the statute of limitations under *Nieves v. McSweeney*. In that case the First Circuit held that the statute of limitations on a § 1983 claim for conspiracy runs from the date of the last overt act that causes damage to the plaintiff. *Nieves* 241 F.3d at 51. The court specifically rejected the argument that under *Heck*, the conspiracy claim did not accrue until the criminal proceedings were resolved in his favor. *Id.* at 52. Accordingly, under *Nieves* the statute of limitations on Charles's conspiracy claim contained in Count III may have expired as long as 20 years ago. Accordingly, even if the May 12, 2001 date were used as the starting point for Charles's § 1983 conspiracy claim, he filed his action too late.

respect to Counts I, II and III and failed to establish an essential element of Count IV and the second numbered count VII.

Mr. Campo should not be forced to defend himself in an action, which is utterly bereft of merit, legally unsound and untimely. Accordingly, the Defendant Charles Campo respectfully requests this Honorable Court to dismiss all Counts of the complaint against him.[16]

CHARLES CAMPO,
By his attorneys,


____/s/ Richard M. Egbert
Richard M. Egbert (BBO #151800)
99 Summer Street
Boston, MA 02110
617-737-8222


## CERTIFICATE OF SERVICE

I, Richard M. Egbert, hereby certify that a true copy of the above document was served on all parties of record by first class mail, postage prepaid, this 15th day of October, 2004

____/s/ Richard M. Egbert
Richard M. Egbert

---

[16] No claims are made against Mr. Campo in Counts V, VI and the first numbered count VII which consists of paragraphs 107 and 108 (the complaint contains two counts numbered "VII"). However, the complaint makes a blanket call for judgment against all defendants on all counts. Accordingly, Mr. Campo requests that each of these counts be dismissed against him as well.