UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ULYSSES RODRIGUEZ CHARLES,<br>            Plaintiff,<br>v.<br>CITY OF BOSTON;<br>JOHN MULLIGAN, in his individual capacity;<br>WILLIAM KEOUGH, in his individual capacity;<br>PAUL RUFO, in his individual capacity;<br>KATHLEEN HANLEY JOHNSON, in her individual capacity;<br>STANLEY BOGDAN, in his individual capacity;<br>JOHN DOE and JANE DOE, supervisors in the Boston Police Department, in their individual capacity;<br>CHARLES CAMPO, in his individual capacity;<br>JOHN ZANINI, in his individual capacity;<br>SUFFOLK COUNTY; and SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE,<br>            Defendants. | C.A. No. 04-10986-NG |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO THE MOTION TO DISMISS OF STANLEY BOGDAN**

Plaintiff Ulysses Rodriguez Charles ("Charles") herewith submits this memorandum in opposition to the motion to dismiss of Defendant Stanley Bogdan ("Bogdan").[1]

**INTRODUCTION**

Charles has brought this action to recover damages for injuries done to him as a result of a conspiracy to violate his constitutional rights. In the early 1980s, Charles, a black man, was singled out by members of the Boston Police Department who, with the agreement and active cooperation of others, including Bogdan, framed him for the 1980

---

[1] Charles opposes Bogdan's motion solely with respect to Counts II (due process violation; failure to disclose *Brady* material) and III (Section 1983 conspiracy).

rape of three white women.[2]  Found guilty in 1984 in a trial fraught with constitutional violations, including Bogdan's knowingly false testimony, Charles was sentenced to eighty years of imprisonment.  In 1999, DNA tests were performed on semen that had been collected at the crime scene, but which had been concealed from Charles during his trial.  On the basis of negative test results showing that Charles could not have been the source of the semen, Charles was granted a new trial by the state trial court.  Because the District Attorney filed a *nolle prosequi*, Charles was not retried.

As set forth more fully below, Bogdan's motion to dismiss should be denied as to Counts II and III, for the following reasons:

i. The Complaint states a claim against Bogdan for Count II (due process and *Brady* violation) because it alleges the requisite wrongdoing against Bogdan;

ii. Conspiracy under Count III is sufficiently pled to withstand a motion to dismiss;

iii. Suit against Bogdan in his individual capacity does not negate the law of conspiracy; and

iv. Bogdan is not protected by absolute immunity.

For these reasons and for the additional reasons set forth below, the Court should deny the motion and permit Charles to have the opportunity to obtain the vindication of his rights that he has long sought.

---

[2] Revelations of such misdeeds perpetrated by City of Boston law enforcement officials against black men have become familiar in the courts.  *See Mitchell v. City of Boston*, 130 F. Supp. 201 (D. Mass. 2001); *Miller v. City of Boston*, 297 F. Supp. 2d 361 (D. Mass. 2003).

## FACTUAL BACKGROUND[3]

**Prior Racially Motivated Official Misconduct**

Beginning in the mid-1970s, police of the Defendant City of Boston's Police Department ("BPD") began harassing Charles, a black man. Charles was targeted by John Mulligan ("Mulligan") and other members of the BPD because he is a black of West Indian origin. The harassment took the form, among other things, of unjustified stops and searches, threats, and false accusations of criminal wrongdoing. Complaint ¶25-32.

The harassment was a consequence of the policies, customs, and practices of the BPD, which tolerated, encouraged, and failed to rectify such racial harassment and other racially motivated misconduct, including the use of faulty, biased and inadequate investigative methods. Complaint ¶¶67-74, 101-102.

**The Crime And The Investigation**

On December 8, 1980, three white women were violently assaulted, raped and robbed in their Brighton apartment by a black man. Complaint ¶¶20-24.

In their initial description, given to Defendant Hanley Johnson, the women described their assailant as a black man of medium complexion, 5 feet 10 inches in height, with a thin build and a straggly beard. In the description of the rapist, the women made no mention of dread locks, a Caribbean accent, and gold front teeth, which were all notable and identifying traits of Charles at the time. Complaint ¶¶33-34, 41.

---

[3] The following summary is drawn from the Complaint. *See Hathaway v. Stone,* 687 F. Supp. 708, 710 (D.Mass.1988) (for Rule 12(b)(6) purposes, court must "view the facts presented in the pleadings and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party"). *See also Haines v. Kerner,* 404 U.S. 519, 520 (*pro se* complaint held to less stringent standard).

The women were taken to a hospital and examined, and vaginal swabs from two of the women revealed the presence of sperm. At the hospital, one of the women told a doctor that the rapist had an American accent. Complaint ¶¶35, 44.

Defendants William Keough ("Keough") and Paul Rufo ("Rufo") of the BPD were assigned to the case. (Significantly, only days before the crime, Keough, like Mulligan, was targeting Charles for harassment.). On December 9, 1980, they interviewed the women for two hours concerning the crime. The interview was tape recorded. Complaint ¶¶31, 37-38.

It would later be claimed by the BPD that Keough subsequently showed the women a photo array of possible suspects at the police station and that two of the women identified Charles from the array. Significantly, however, one of the women would later testify that she identified Charles from the photos on the basis of his having dread locks ("The pictures I picked out—he had dreads."). In fact, none of the photos the victims could have been shown at the time of the supposed array depicted Charles with dread locks. The only photographs the women were shown were those of Charles that Keough was known to have been carrying with him in the days prior to the rapes. Moreover, dread locks was not part of the description initially given to the police by the women. Complaint ¶¶36, 39-41, 86.

On or about December 12, 1980, Keough collected the rape kit from the hospital. Despite having been warned in writing by the hospital that it would destroy the swabs in seven days if they were not collected by the BPD, Keough failed to secure from the hospital these crucial items of evidence as part of his criminal investigation. Complaint ¶¶45.

Also on December 12, 1980, Keough and Defendant Stanley Bogdan, a senior criminalist of the BPD, collected as evidence a bed sheet on which two of the rapes had occurred and a robe worn by one of the victims during her rape. Bogdan determined that stains found on these items were seminal in origin and derived from a type O secretor. Bogdan determined that Charles, by contrast, is a type B secretor. Bogdan also tested and eliminated a boyfriend of one of the victims as the source of the seminal evidence. Complaint ¶52-54.

On the basis of the alleged identification from the photo array, Charles was arrested on June 1, 1981. A probable cause hearing was set for June 9, 1981. In the corridor, before the hearing, Keough was seen showing one of the women Charles's arrest photo. The hearing judge, on being informed of this conduct, refused to permit an identification of Charles to be made at the hearing. Complaint ¶¶39, 42.

On November 3, 1983, Keough and Defendant Charles Campo ("Campo"), who was an assistant district attorney at the time, arranged a line-up at BPD headquarters. However, none of the three victims was able to make an identification of their assailant from the line-up. Complaint ¶47.

After the line-up had been dismissed, Campo reassembled the line-up and photographed it. In the second line-up, Charles was standing in the fourth position, unlike in the first line-up where he had been second. After taking the photograph, Campo met in a separate room with one of the victims and, in essence, reheld the line-up, showing her the photograph and inducing her to identify Charles as the rapist from it. Complaint ¶¶48-50, 78C-79.

**Misconduct At Trial**

Neither before trial nor during it was it revealed to Charles that Bogdan had excluded the boyfriend as the source of the stains found on the bed sheet and robe. Campo also elicited false testimony from Bogdan that the stains were *not* seminal in origin. Campo failed to disclose that sperm had been found on the vaginal swabs, although he knew this to be the case from his review of the medical records (which he failed to make available to the defense). Contrary to all this evidence, Campo argued to the jury that the rapist had not ejaculated. Campo also entered into a stipulation at trial that what one of the victims had told the doctor was that the rapist had a *non*-American accent, although Campo knew from the medical records that this was false. Complaint ¶¶54-55, 57, 59.

Also, it was offered at trial that Charles had been identified from the "photo array," rather than from the photos Keough had been carrying around for days prior to the rapes. Indeed, one of the women testified that in the photo array she had recognized Charles as the rapist from his dread locks, a trait that only appeared on Charles' later, June 1, 1981 arrest photograph. Campo elicited false testimony from the same witness that she had identified Charles, standing number *four* in the line-up, as the rapist, although in the actual line-up Charles had stood second and was fourth only in the photograph Campo had used to induce the witness to make a false identification. Complaint ¶¶40, 50-51, 57, 78C-79.

At trial, Keough testified that he had given the tape of the December 9, 1980 interview with the victims to Rufo. Keough then testified falsely that Rufo had died in

May of 1981 (Rufo had in fact died in 1983) and the tape had consequently gone "missing." Complaint ¶¶43-46.

On the basis of such constitutionally improper evidence, Charles was convicted in 1984 and sentenced to eighty years. Complaint ¶1. He sought appellate relief, but was unsuccessful in obtaining vindication at that time. Complaint ¶58.

**Post-Trial Exoneration**

After many years of imprisonment, Charles succeeded in obtaining copies of the medical records that the defendants had concealed from him. Discovering in them that there had been definite evidence of sperm on the swabs and that the police had permitted it to be destroyed, in 1995 Charles sought to subject the stains on the bed sheet and robe to DNA testing. John Zanini ("Zanini"), an assistant district attorney, persuaded the state court to deny Charles' request. Complaint ¶¶59-61.

Only after another four years had elapsed was Charles permitted to have the DNA testing done. The results revealed that there were traces of semen from two different men and that Charles could be excluded as a source. Nonetheless, Zanini and the District Attorney's Office refused to acknowledge the exculpatory nature of the results, rationalizing away their significance and even conducting their own tests, which only confirmed the earlier results. Complaint ¶¶62-66.

Over Zanini's objections, the state trial court (Rouse, J.) vacated the convictions and granted Charles' motion for a new trial, and the prosecution decided not to retry him. Complaint ¶66.

**ARGUMENT**

I.     **Standard For Rule 12(b) (6) Motion**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that dismissal is appropriate where a party "fail[s] to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) motion to dismiss, "a court should not decide questions of fact." *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 25 (1st Cir. 1987). Rather, it "must view the facts presented in the pleadings and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Hathaway v. Stone,* 687 F. Supp. 708, 710 (D. Mass. 1988).

The Complaint in this action was drafted and filed *pro se* by Charles. *See* Complaint. When the Court is presented with a motion to dismiss a *pro se* complaint, the Supreme Court unanimously held in *Haines v. Kerner,* 404 U.S. 519, 520-521 (1972), that the *pro se* complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears "*beyond doubt* that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 520-521 (emphasis added), *quoting Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

II.    **The Complaint States A Claim Against Bogdan Under Count II**

The Court should find that this *pro se* Complaint states a claim against Bogdan under Count II for failing to disclose material exculpating evidence.

Under *Brady v. Maryland*, 373 U.S. 83 (1963), prosecutors have a duty to disclose material exculpatory evidence to a defendant. Criminal investigators also have a *Brady* duty under which they must disclose such evidence to the prosecutor. This duty of disclosure to the prosecutor was clearly established at the time the crime for which

Charles was convicted was being investigated by Bogdan and the other defendants. *See Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) (clearly established in 1979 and 1980 that police could not withhold *Brady* evidence from prosecutor); *Hauptmann v. Wilentz*, 570 F. Supp. 351, 389 (D.N.J. 1983) (police duty to disclose to prosecutor); *Carter v. Harrison*, 612 F. Supp. 749, 757 n.5 (D.C.N.Y. 1985) (little doubt police officers have *Brady* obligation to disclose exculpatory information to prosecutors), *citing Freeman v. Georgia,* 599 F.2d 65, 68-69 (5th Cir. 1979), *United States v. Butler,* 567 F.2d 885, 890 (9th Cir. 1978), *United States v. Bryant,* 439 F.2d 642, 647-48 (D.C. Cir. 1971), and *Barbee v. Warden,* 331 F.2d 842, 845 (4th Cir. 1964).

In the present case, the Complaint alleges that a boyfriend of one of the victims was serologically tested by Bogdan and excluded as a source of the stains found on the bed sheet and robe. Complaint ¶54. This finding was material exculpatory evidence because the test result made it more likely that the stains were produced by the rapist and that the rapist could not have been Charles since he had already been excluded as a source of the stains.

In the Complaint, Charles has alleged both that Campo withheld this evidence from Charles and that Bogdan withheld it. Complaint ¶¶54 (Campo), 86 (Bogdan). While Bogdan argues in his motion that he had no *Brady* duty to disclose such evidence directly to Charles, the allegations of a *pro se* plaintiff are not to be construed in so literal and narrow a manner. Under the standard articulated by the Supreme Court in *Haines*, *see supra* at 8, a *pro se* complaint such as this one should be construed less stringently than a lawyer-drafted one. *See also* Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). For these reasons, the Court should understand

Charles to be alleging simply that Bodgan failed to disclose the information to the *prosecutor* (*i.e.*, failed to do his *Brady* duty) and in that way made the information unavailable for disclosure by the prosecutor to Charles.[4] This commonsense interpretation of the *pro se* allegations accords with what *Haines* teaches, and satisfies the goal of notice pleading, which is to give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *See Swierkiewicz v. Sorema*, 534 U.S. 506, 512 (2002), *citing Coley v. Gibson*, 355 U.S. 41, 47 (1957).

When *Brady* evidence is withheld from the prosecutor out of a bad faith motive or with the intent to violate the Section 1983 plaintiff's constitutional rights, as is alleged here of Bogdan, a Section 1983 claim will lie against the withholding official. *See Reid v. Simmons*, 163 F. Supp. 2d 81, 90 (D.N.H. 2001); *Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004); *Newsome*, 256 F.3d at 752; *McMillian v. Johnston*, 88 F.3d 1554, 1569 (11th Cir. 1996). For this reason, Charles states a claim under Count II against Bogdan, and the motion to dismiss should be denied as to this Count.

In arguing for dismissal, Bogdan addresses only the issue of his having a possible *Brady* duty of disclose *directly* to Charles, and he fails to consider the alternative that he breached his *Brady* obligations by withholding the evidence from the *prosecutor*. His qualified immunity argument turns on the absence of a clearly established duty for him to disclose directly to a *defendant*. However, he cannot raise this argument as to his failure to disclose to the *prosecutor*, since that obligation was extant at the time of his investigation into the rapes. *See supra* at 8-9.

---

[4] Should the Court find any deficiency in the pleading in this regard, Charles would respectfully request that if the Court decides to dismiss the count against Bogdan, it do so without prejudice to Charles' right to file an amended Complaint prepared by legal counsel, in order to remedy the *pro se* Complaint presently before the Court.

Since the Complaint pleads that Bogdan's actions, along with those of the other defendants, were done as part of a bad faith conspiracy to wrongfully convict him, Complaint ¶¶1-2, in part by withholding *Brady* evidence, the Court should find that the Complaint does in fact state claim against Bogdan under Count II. The Court should therefore deny the motion on Count II.

### III.     Conspiracy Is Sufficiently Pled To Withstand A Motion To Dismiss

Contrary to Bogdan's argument, the conspiracy count is sufficiently alleged against him and the other defendants, and it should not be dismissed as to Bogdan on a Rule 12 motion.

After *Swierkiewicz v. Sorema*, 534 U.S. 506 (2002) (no heightened pleading requirement for civil rights actions; re-emphasis on basics of notice pleading) and *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993) (no heightened pleading requirement for Section 1983 claims), a pleading should at least set forth "minimal facts as to who did what to whom, when, where, and why—although why, when why means the actor's state of mind, can be averred generally, *see Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61, 68 (1st Cir. 2004). Charles has easily met these pleading standards for Count III.

The present Complaint pleads a conspiracy between Bogdan and the other defendants to frame Charles, and it details a series of mutually reinforcing actions undertaken by law enforcement officials, beginning before Charles' arrest and culminating in his wrongful conviction. *See* Complaint ¶¶2-3, 90. Throughout the *pro se* Complaint Charles drafted, there is set forth an abundance of facts about the overt actions taken against him (*e.g.,* ¶¶46, 50-51, 91), the defendants' respective roles in framing him

11

(*e.g.,* ¶¶37, 79), the dates of the acts (*e.g.,* ¶¶45, 52), and the common goal of the defendants (*e.g.,* ¶¶2, 78).

Agreement—which is the *sine qua non* of conspiracy—*United States v. Tormos-Vega*, 959 F.2d 1103, 1117 (1st Cir. 1992), usually must be inferred from all the circumstances, s*ee Earle v. Benoit*, 850 F.2d 836, 843 (1st Cir.).  It is not necessary to show an express agreement in order to state a claim for conspiracy. *Id.* at 845.  Judged by these standards and read in the light most favorable to Charles as the non-moving party, the *pro se* Complaint alleges sufficient circumstantial detail, at least at the motion to dismiss stage, from which to infer an unlawful agreement among Bogdan and the other law enforcement officials.  *See Haines v. Kerner,* 404 U.S. 519, 520 (1972) (*pro se* complaint to be dismissed for failure to state a claim only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"); *Limone v. Condon*, 372 F.3d 39, 49 (2004) (finding, for Rule 12 purposes, allegations not conclusory as to defendant's knowledge of conspiracy and wrongdoing in light of factual allegations pertaining to defendant and plausible inferences to be drawn in plaintiff's favor).

IV.     **Suit Against Bogdan In His Individual Capacity Does Not Negate The Joint Liability Of Conspirators**

Bogdan also argues that because he is sued in his individual capacity under Section 1983 he is exempt from liability for the overt actions taken by his fellow conspirators in furtherance of the agreement to frame Charles, *i.e.,* that the Court should look narrowly only to his actions in evaluating Count III.  Bogdan's position is not supported by his legal authorities and should be rejected.

It is well-established that co-conspirators are *jointly* liable for any overt actions taken in furtherance of their conspiracy, *regardless* of who actually performed the actions. *See Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir. 1980) (Section 1983 action; conspiracy mechanism to impose liability on one defendant for acts of others performed in pursuance of conspiracy); *Nieves v. McSweeney*, 73 F.3d 98, 104 (1st Cir. 1999) (same).

The cases cited by Bogdan offer no support for his attempt to shirk joint liability. *Rogan v. Menino* stands only for the legal truism that a Section 1983 plaintiff need not prove that the actions of a defendant who is sued in his individual capacity were taken pursuant to a custom or policy of a government entity. 175 F.3d 75, 77 (1st Cir. 1999). In that sense only, a defendant's liability is gauged in terms of his own actions, *i.e.,* not on the basis of any governmental policy that may have determined his conduct. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) (plaintiff does not need to show policy or custom to maintain Section 1983 action against official who is sued in his individual capacity).

In another case cited by Bogdan, the Seventh Circuit found only that where a defendant did not himself participate in a wrongful act which was undertaken in furtherance of a conspiracy and where the defendant's connection with the conspiracy remained unknown, there was no reason to hold the defendant liable for the act. *Ryan v. Mary Immaculate Queen Center*, 188 F.3d 857, 859-860 (7th Cir. 1999). In so holding, the Seventh Circuit clearly indicated that it was prepared to hold the defendant liable for the act even if he did not commit it, provided the allegations of conspiracy had tied him to the act sufficiently. *See id*.

Thus, case law does not support Bogdan's argument that the Complaint is deficient simply because it supposedly does not allege that Bogdan himself committed an overt act as part of the conspiracy. If the conspiracy is adequately pled so as to include him, *see id.*, then the conspiracy connects him with the wrongful acts of his fellow conspirators, *see Landrigan* and *Nieves, supra* at 12-13. The Complaint here does in fact connect Bogdan to a conspiracy and amply recounts the numerous overt acts by Bogdan's co-conspirators against Charles, *see supra* at 3-6, 11-12.

Moreover, it is not true that the Complaint does not allege an overt act by Bogdan in furtherance of the conspiracy. As argued above at 8-11, Charles pleads in the alternative that Bogdan violated *Brady* by failing, in bad faith, to disclose exculpatory evidence to the prosecutor.

For all of these reasons, Bogdan's argument for dismissal of Count III should be rejected.

**V.     Bogdan Is Not Protected From Conspiracy Liability By Absolute Immunity**

Bogdan also argues that the conspiracy claim is an impermissible attempt to short-circuit the absolute liability he enjoys in his role as a testifying witness at the trial of Charles. *See Mitchell v. City of Boston*, 130 F. Supp. 2d 201, 211-212 (D. Mass. 2001). In *Mitchell*, however, Judge Saris noted that where the wrongdoing extends beyond perjury, *i.e.,* includes "extra-judicial" acts, the defendant cannot use absolute immunity as a shield to protect an entire course of conduct merely because, at some point, he testified. *Id*. at 212.

For the reasons given above, the Court should find that an extra-judicial course of wrongdoing has been sufficiently pled in Charles' Complaint against Bogdan and the other defendants extending back to before Charles was even arrested. *See supra* at 11-12.

14

This conclusion is bolstered by the standard applicable in deciding Rule 12(b)(6) motions. Under this standard, the pleadings are construed in favor of Charles, as the non-moving party, and he is entitled to the benefit of all reasonable inferences. *Hathaway*, 687 F. Supp. at 710. (It should be noted that *Mitchell* was decided on summary judgment and required a much higher showing by the Section 1983 plaintiff in order for his claims to survive.)

Moreover, Bogdan's own individual role in the extra-judicial conspiracy is adequately pled in the Complaint. *See supra* at 9-10. Bogdan collected physical evidence at the crime scene with Keough, a police official who, together with other members of the BPD, was clearly targeting Charles and who was involved in the disappearance of crucial evidence (the tape recording and the swabs). Indeed, it is highly significant that Bogdan and Keough were working together and were *both* involved with physical evidence relating to the question of whether the rapist left semen at the scene of the rape. In each case, the handling of the evidence prejudiced Charles' defense. Under the circumstances, it is a reasonable inference that Bogdan was engaged with Keough and others in wrongfully withholding and destroying *physical* evidence for the purpose of convicting Charles. *See supra* at 9-12. Thus, Bogdan's wrongdoing involved more than testimonial evidence, and so he cannot claim a right to dismissal of Count III on the grounds of his absolute immunity as a trial witness.

## CONCLUSION

For all of the foregoing reasons, Plaintiff Ulysses Rodriguez Charles requests that the Court deny the motion to dismiss of Defendant Stanley Bogdan as to Counts II and III of the Complaint.

Dated: December 20, 2004                    Respectfully Submitted,

                                            /s/ Mayeti Gametchu
                                            Kevin J. O'Connor (BBO# 555250)
                                            oconnor@paragonlaw.com
                                            Mayeti Gametchu (BBO# 647787)
                                            gametchu@paragonlaw.com
                                            PARAGON LAW GROUP, LLP
                                            184 High Street
                                            Boston, MA 02110
                                            (617) 399-7950

                                            Attorneys for Plaintiff
                                            ULYSSES RODRIGUEZ
                                            CHARLES

**CERTIFICATE OF SERVICE**

I, Mayeti Gametchu, hereby certify that, on December 20, 2004, I caused a true and correct copy of the foregoing document to be served by first class mail upon the persons listed below.

                                            /s/ Mayeti Gametchu
                                            Mayeti Gametchu

Richard M. Egbert, Esq.                     Amy E. Ambraik, Esq.
Law Offices of Richard M. Egbert            Thomas R. Donohue, Esq.
99 Summer Street                            Assistant Corporation Counsel
Suite 1800                                  City of Boston Law Department
Boston, MA 02110                            City Hall, Room 615
                                            Boston, MA  02201
Attorney for Defendant
CHARLES CAMPO                               Attorneys for Defendant
                                            STANLEY BOGDAN

Daniel I. Smulow, Esq.
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, MA  02108

Attorney for Defendants
JOHN ZANINI and the
OFFICE OF THE DISTRICT ATTORNEY
FOR THE SUFFOLK DISTRICT

0038-002-101215.doc