```
               UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
```

| | |
|---|---|
| **ULYSSES RODRIGUEZ CHARLES,**    )<br>     **Plaintiff,**              )<br>                                 )<br>     v.                          )<br>                                 )<br> **CITY OF BOSTON, et al.,**         )<br>     **Defendants.**             ) | C.A. No. 04-10986-NG |

GERTNER, D.J.:

**MEMORANDUM AND ORDER RE:**
**DEFENDANT STANLEY BOGDAN'S MOTION TO DISMISS**
**March 29, 2005**

I.   **INTRODUCTION**

Plaintiff Ulysses Rodriguez Charles ("Charles") tells a far too familiar and tragic story. He was released from prison on May 17, 2001, after serving nineteen years of an eighty year sentence for unlawful confinement, rape and robbery. He was released after DNA testing on the physical evidence used against him exonerated him of the crimes for which he was convicted.

Charles brought this civil rights action under 28 U.S.C. § 1983 to recover damages for violations of his constitutional rights resulting in his wrongful conviction, including failure to disclose evidence, conspiracy to commit wrongful imprisonment, and malicious prosecution under both federal and state law.

Defendant Stanley Bogdan ("Bogdan"), a senior Boston Police Department ("BPD") forensic criminalist who worked with other law enforcement officials investigating the crimes for which Charles was convicted, moves to dismiss the claims against him pursuant to Federal Rule of Civil Procedure 12(b)(6). This Court held a

hearing on defendant Bogdan's motion to dismiss on January 20, 2005.

For the reasons set forth below, defendant Bogdan's motion to dismiss [document #13] as to Counts II and III of the Complaint – for failure to disclose evidence and conspiracy – is hereby **DENIED**.  Counts IV and VI of the Complaint - for malicious prosecution under federal and state law - are hereby **DISMISSED**, as Charles did not object to defendant Bogdan's motion to dismiss these counts.

In addition to the motions that are the subject of the instant opinion, motions related to defendant Bogdan's motion to dismiss are disposed of as follows:  Plaintiff Charles' motion to vacate [document #24] his first motion for entry of default [document #23] is **GRANTED**, and his second motion for entry of default [document #25] is **DENIED**.  Defendant Bogdan's motion to stay the case pending the issuance of this written opinion [document #26] is **DENIED** as moot.

   A.   **Factual Background**

In 1984, Charles, an African-American man of West Indian decent, was found guilty of committing a 1980 rape against three white women and sentenced to eighty years in prison.  In 1999, fifteen years later, DNA tests were performed on semen that had been collected at the crime scene and withheld from Charles during his trial.  The DNA tests showed that Charles could not

have been the source of the semen.  The state court granted Charles a new trial, but the Suffolk County district attorney declined to retry him; the charges were dismissed.

To understand the nature of the § 1983 claims lodged against the several named defendants, it is important to review the facts surrounding Charles' arrest and conviction.

### 1. Prior Racially Motivated Official Conduct

According to Charles, BPD officers began harassing him in the mid-1970's, harassment which took the form of unjustified stops, searches, threats and false accusations of criminal wrongdoing.  For example, in 1975, Boston police officers arrested and charged Charles for serious crimes,[1] and he was ultimately convicted.  However, the Massachusetts state court did not sentence him to prison because, according to the Complaint, the court did not believe the police testimony garnered at trial.

Following that decision, Charles claims that former BPD Officer John Mulligan went after him, targeting him and his family and friends for stops, searches, harassment and threats. Significantly, Charles alleges that defendant William Keogh, also a BPD officer at the time, harassed Charles only days before the 1980 crime occurred.

### 2. The 1980 Crime and Ensuing Investigation

---

[1] Charles does not provide details about these "additional serious crimes he did not commit" in either the Complaint or in his subsequent pleadings. Compl. ¶ 25.

-3-

On December 8, 1980, three white women were violently assaulted, raped and robbed in their Brighton apartment by an African-American man. In their initial description, the women described their assailant as an African-American man of medium complexion, five feet, ten inches in height, with a thin build and straggly beard. At the hospital, one of the victims told the doctor that her rapist had an American accent. The women made no mention of Charles' hair style, dread locks, his Caribbean accent, or the fact that his front teeth were gold, all distinctive physical traits.

Defendants Keough and Paul Rufo of BPD were assigned to the case and interviewed the victims on December 9, 1980. That interview was tape recorded.

Vaginal swabs from two of the victims revealed the presence of sperm. On or about December 12, 1980, defendant Keough collected the rape kit from the hospital, but he did not collect the vaginal swabs, despite written warnings by the hospital that such evidence would be destroyed after seven days if BPD failed to retrieve it before then.

On the same day, defendant Keough and defendant Bogdan, a senior BPD criminalist and the movant in this motion to dismiss, went to the crime scene and collected a bed sheet on which two of the rapes had occurred as well as the robe worn by one of the victims during her rape. Bogdan determined that stains on these

items were seminal in origin and derived from an O-type secretor. At the same time, he concluded that Charles is a B-type secretor, and that neither Charles nor a boyfriend of one of the victims were the source of the semen stains. Charles never learned about these exculpatory findings until long after his conviction and imprisonment.

Following the December 9 interview of the victims, defendant Keough took the women to BPD Headquarters where they viewed about two hundred photographs, including two photographs of Charles. Defendant Keough would later testify that they arrested Charles on June 1, 1981, based on photograph identifications by two of the victims.[2] At trial, one of the victims testified that she picked out Charles' photograph because "he had dreads." The BPD, however, did not have a picture of Charles with dread locks at the time of the December interview. Indeed, it was not until the photograph taken at the time of his arrest in June 1981 that BPD obtained a photograph of Charles with dread locks.

Charles also alleges that, before his June 9, 1981, probable cause hearing, defendant Keough was seen actually showing one of the victims Charles' arrest photograph. As a result, the hearing judge refused to allow an in-court identification of Charles. In fact, Charles alleges that several other suggestive

---

[2] Neither Charles nor defendant Bogdan account for the six-month lag between the crime and Charles' arrest.

identification techniques were used by BPD and the district attorney throughout their investigation and Charles' prosecution.

### 3. Misconduct at Trial

At no time before or during Charles' trial did the BPD or the Suffolk County District Attorney's Office reveal to Charles Bogdan's central finding – that he had excluded Charles as well as a boyfriend of one of the victims as the source of the semen stains found on the bed sheet and robe. In fact, Charles Campo, a Suffolk County assistant district attorney at the time, elicited false testimony from defendant Bogdan that the stains were *not* seminal in origin. In addition, Campo never disclosed that sperm had been retrieved on vaginal swabs immediately after the crime, or that the BPD did not preserve that evidence. According to Charles, Campo knew that the swabs existed from his review of the victims' medical records, but he failed to make the records available to the defense. Contrary to all of the evidence known to Campo at the time, he testified at trial that the rapist had not ejaculated, thereby explaining the lack of semen matching Charles, the alleged rapist. Indeed, Campo entered into a stipulation at trial that what one of the victims had told the doctor shortly after the rapes was that the rapist had a *non*-American accent, although Campo knew from the accounts in the medical records that this was untrue.

Charles was convicted in 1984 and sentenced to eighty years in state prison. All of his appeals failed.

### 4. <u>Post-Trial Exoneration</u>

After many years of incarceration, Charles finally obtained copies of the victims' medical records that BPD officers and Suffolk County district attorneys withheld from him during his trial.[3] From the records, Charles learned that sperm had been found on the vaginal swabs taken from the victims, and that the BPD had ignored the hospital's requests that they retrieve them, permitting them to be destroyed. In 1995, Charles sought to have the bed sheet and robe stains tested with what was then new DNA technology. John Zanini, a Suffolk County assistant district attorney at that time, persuaded the state court to deny Charles' request.

It was not until 1999 that Charles was finally allowed to perform the DNA testing. The results revealed that there were traces of semen from two different men on the bed sheet and robe, and that Charles could be excluded as a source of either one. Despite this apparent exoneration, Zanini and the Suffolk County District Attorney's Office persisted in denying the exculpatory value of the results. Over their objections, the state court vacated Charles' conviction and granted his motion for a new

---

[3] In his initial pleadings, Charles does not disclose how he was able to discover records that had been withheld from him at the time of trial.

trial.  The Suffolk County District Attorney's Office declined to retry him.

### B. Procedural Background

Charles filed his suit in federal court on May 17, 2004, pursuant to 28 U.S.C. § 1983, alleging that his wrongful conviction was a direct result of the tortious and unconstitutional acts of the named defendants – the City of Boston, BPD Officer John Mulligan, BPD Officer William Keough, BPD Officer Paul Rufo, BPD Officer Kathleen Johnson, BPD criminalist Stanley Bogdan, unnamed BPD supervisors, Suffolk County Assistant District Attorney Charles Campo, the Suffolk County District Attorney's Office, and Suffolk County Assistant District Attorney John Zanini.[4]  Initially pro se at the time he filed his complaint, Charles has since obtained counsel.

## II. ANALYSIS

Defendant Stanley Bogdan has moved to dismiss all of Charles' allegations against him, pursuant to Federal Rule of Civil Procedure 12(b)(6).  In short, Bogdan contends that he is entitled to dismissal because, as a BPD criminalist, he has immunity, and because the claims against him are insufficiently plead.

### A. Charles' Factual Allegations Against Defendant Bogdan

---

[4] By stipulation on December 21, 2004, defendants Charles Campo, John Zanini, and the Suffolk County District Attorney's Office were dismissed from the suit.  Defendant Bogdan reports that defendant BPD officers John Mulligan, William Keough, and Paul Rufo are deceased.

Charles makes the following factual allegations in support of his Brady and conspiracy claims against Bogdan:

1. On December 12, 1980, Bogdan collected a stained bed sheet and robe from the crime scene. Upon performing tests on these items, Bogdan determined that the stains were seminal in origin and from an O-type secretor.

2. Bogdan then collected and compared Charles' blood type and the blood type of a boyfriend of one of the victims with that of the bed sheet and robe. Bogdan determined that neither Charles nor the boyfriend were sources of the semen.

3. At trial, Bogdan testified falsely that the stains on the bed sheet were not seminal in origin, and thus the rapist did not ejaculate.

4. Before and during trial, Bogdan failed to disclose to Charles' defense counsel material information that was favorable to Charles, including serological evidence that would have excluded Charles as the rapist.

**B.   Motion to Dismiss Standard**

Dismissal pursuant to Rule 12(b)(6) is appropriate where a party "fail[s] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Even in a civil rights case, a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Educadores Puertorriquenos En Accion v. Hernandez, 367 F.3d 61, 66 (1st Cir. 2004) (internal citations omitted).

In considering motions to dismiss, "a court should not decide questions of fact." Roeder v. Alpha Industries, 814 F.2d 22, 25 (1st Cir. 1987). Rather, a court must accept the

plaintiff's sufficiently plead facts as true and grant all reasonable inferences in the plaintiff's favor. <u>Cooperman v. Individual</u>, 171 F.3d 43, 46 (1st Cir. 1999). A motion to dismiss is only allowed where it is clear that the plaintiff can prove no set of facts to support his or her cognizable claim. <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957). Where state of mind is relevant to the claim, knowledge, motive and intent may be averred generally. <u>Educadores Puertorriquenos</u>, 367 F.3d at 66.

A pro se complaint "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers." <u>Haines v. Kerner</u>, 404 U.S. 519, 520-521 (1972). It can only be dismissed per Rule 12(b)(6) if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Id.</u> Charles' Complaint is somewhat anomalous. On the one hand, it was initially prepared by a pro se plaintiff, but on the other hand, Charles' newly retained counsel has chosen not to amend the pro se Complaint. Thus, the Complaint can no longer be deemed pro se for the purposes of determining whether it survives a Rule 12(b)(6) dismissal. Nevertheless, the issue is moot because, as I describe below, the Complaint – pro se or not – more than suffices to meet the standards of Rule 12(b)(6) and the applicable law.

    C.    **<u>Count II: Charles' Brady Claim Against Defendant Bogdan</u>**

In Count II of his Complaint and in his opposition to Bogdan's motion to dismiss, Charles claims that defendant Bogdan violated the Fourteenth Amendment's due process requirement that law enforcement officers disclose material exculpatory information to the defense by turning such information over to the prosecutors. Specifically, Charles alleges that Bogdan failed to disclose to ADA Campo material information that was favorable to Charles, including the serological evidence. There is no question that the serological evidence and testing were exculpatory even before DNA testing was available: The test results confirmed the presence of semen. The semen stains were likely produced by the rapist, who was an O-type secretor, while Charles was a B-type. The failure to disclose these results, argues Charles, was a direct violation of the strictures of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.

At the time of Charles' arrest and prosecution, there was no question that criminal investigators had a Brady obligation to disclose material exculpatory evidence to the prosecutor, who in turn was obliged to disclose it to the defense. See, e.g., Newsome v. McCabe, 256 F.3d 747, 752 (7th Cir. 2001) (it was clearly established in 1979 and 1980 that police could not withhold Brady evidence from the prosecutor); Hauptmann v. Wilentz, 570 F.Supp. 351, 389 (D.N.J. 1983) (police duty to disclose to prosecutor).

Bogdan does not dispute that he had Brady obligations.  He seeks to evade them by urging the Court to read Charles' Complaint literally and strictly, precisely the opposite of what Rule 12 (b)(6) directs a court to do.  Bogdan claims that, since the Complaint accuses him of violating Brady only insofar as he did not turn over the material evidence *directly* to Charles or his counsel, he could not be liable.  As a crime lab technician, he argues, he does not have a Brady duty to disclose evidence *directly* to a criminal defendant.  For support, Bogdan notes that the four circuits that have considered the issue have declined to extend that type of Brady duty to lab technicians.  See Villasana v. Wilhoit, 368 F.3d 976 (8th Cir. 2004); Mowbray v. Cameron County, 274 F.3d 269 (5th Cir. 2001); Newsome v. McCabe, 256 F.3d 747 (7th Cir. 2001); McMillan v. Johnson, 88 F.3d 1154 (11th Cir. 1996).  Thus, argues Bogdan, his duties under Brady were fulfilled once he turned over the lab results to Charles' prosecutors.

But the Complaint, read liberally as this Court is required to do under the Rule, alleges simply that Bogdan's results were never turned over to the defense.  This can be the result of Bogdan's failure to turn over the results, or because Campo failed to do so despite having received the results from Bogdan.  At this point, Charles is free to argue in the alternative.

It is true that some criminalists who have minor law enforcement roles (e.g., lab technicians who merely test numbered vials) may not have independent Brady obligations. But from the face of the Complaint, defendant Bogdan's role in Charles' prosecution was hardly insignificant. He accompanied BPD officers to the crime scene to collect evidence, tested that evidence, tested Charles, tested a boyfriend of one of the victims, and then lied on the stand about the inculpatory nature of his findings.

Bogdan's related qualified immunity argument must also fail because it turns on the absence of a clearly established duty for him to disclose *directly to a defendant*, which is not the constitutional breach that Charles is alleging. Bogdan's duty to disclose Brady information *to the prosecutor* was clearly established at the time of his investigation into the 1980 rapes (not to mention his duty – unquestionably well-established – to testify truthfully on the stand).

Thus, if the qualified immunity question is "whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of the allegedly unlawful conduct," Lowinger v. Broderick, 50 F.3d 61, 65 (1st Cir. 1995) (internal citations omitted), the answer is an unequivocal "no." Bogdan, an experienced crime lab technician, must have known of

his legal obligation to disclose exculpatory evidence to the prosecutors, their obligation to pass it along to the defense, and his obligation not to cover up a Brady violation by perjuring himself.  That there is no statutory or common law rule explicitly proscribing such conduct  – no case that says "a crime lab technician whose tests go a long way to exculpating the defendant must disclose that to the prosecutor and cannot lie about them on the stand" – does not mean that Bogdan's behavior is immunized.  Some acts are unlawful on their face.  See Limone v. United States, 271 F.Supp.2d 345, 365-366 (D.Mass. 2003).

### D.   Count III: Charles' Conspiracy Claim Against Defendant Bogdan

In Count III of the Complaint, Charles alleges that all of the named defendants conspired, reached a mutual understanding and acted in concert to violate his civil rights.  Bogdan is implicated in this conspiracy through the withholding of exculpatory physical evidence, which culminated in his false testimony at trial.

While it is true that Charles accuses *both* ADA Campo and Bogdan of violating their Brady obligations, even though the failure to disclose could have belonged to one or the other (i.e. if Bogdan failed to disclose, then Campo might not have known of the Brady material, and if Bogdan disclosed the Brady material, then the failure was Campo's), as described above, Charles does not have to wed himself to one version of the facts at this

preliminary stage. Charles can lodge claims against both Bogdan and Campo and decide later, after discovery and further pleadings, which of the two, if either, is guilty of withholding critical Brady evidence. At that point, Bogdan can file a dispositive motion on his behalf.

Bogdan also argues that the conspiracy charges contained in Count III of Charles' complaint are insufficiently plead, as they posit "a conclusory assertion, unsupported by any alleged facts." But Charles' complaint – even as drafted by a layman – sets forth over seventy paragraphs of factual allegations, several of which specifically describe actions by Bogdan, detailing a series of mutually reinforcing actions undertaken by law enforcement before, during and after Charles' prosecution.

Moreover, agreement between the conspirators – the glue of conspiracy – can be inferred from all of the factual circumstances alleged. United States v. Tormos-Vega, 959 F.2d 1103, 1117 (1st Cir. 1992); Earle v. Benoit, 850 F.2d 836, 843 (1st Cir. 1988). Plaintiff need not show an express agreement in order to state a claim for conspiracy. Earle, 850 F.2d at 845; see also Limone v. Condon, 372 F.3d 39, 49 (1st Cir. 2004) (for Rule 12(b)(6) purposes, the facts alleged in the complaint need only "support a plausible inference that" the alleged co-conspirators acted in concert).

Accordingly, Bogdan is not entitled to a dismissal of the conspiracy charges against him. Bogdan is free to reassert his defense against these charges, namely that he did not act in concert with any of the alleged co-conspirators, "on a more fully developed record, either at summary judgment or at trial." Limone, 372 F.3d at 50.

### E. Count III: Is Defendant Bogdan Protected From Conspiracy Liability By The Absolute Immunity Enjoyed By Testifying Witnesses?

Defendant Bogdan argues that, under Briscoe v. LaHue, 460 U.S. 325 (1983), his testimony at Charles' trial is absolutely immune from civil liability. In short, he argues that "[a] plaintiff cannot use a conspiracy claim to short-circuit Briscoe's grant of absolute immunity to testifying witnesses." Mitchell v. City of Boston, 130 F.Supp.2d 201, 211-12 (D.Mass. 2001).

In response, Charles recites the next step in the court's reasoning in Mitchell, in which she finds that, where the wrongdoing extends beyond perjury, including extra-judicial acts, the conspiracy defendant cannot use Briscoe immunity as a shield to protect an entire course of unlawful conduct merely because at one point the defendant took the stand. Id. at 212. "[T]he fact that a certain subset of conduct, viewed in isolation, is not actionable in tort does not somehow immunize the tortious end to which that conduct is directed." Limone v. United States, 271

F.Supp.2d 345 (D.Mass. 2003), aff'd, 372 F.3d 39 (1st Cir. 2004).

Construed in favor of Charles, the Complaint adequately pleads several extra-judicial instances of Bogdan's participation in the alleged conspiracy – Bogdan collected physical evidence at the crime scene with Officer Keough, he tested that evidence, he prepared reports on the inculpatory conclusions that could be drawn from the evidence, and he lied on the stand to cover up his defalcations or that of the prosecutor. His conduct did not begin and end with his testimony. It predated his testimony, and may well have continued afterwards. He can find no refuge in the Briscoe decision.

### III. CONCLUSION

For the reasons discussed above, defendant Bogdan's motion to dismiss the Complaint is **DENIED** as to as to Counts II and III alleging failure to disclose evidence and conspiracy. Charles' pro se complaint, coupled with his opposition to Bogdan's motion to dismiss, which was prepared by counsel, alleges sufficient facts to survive a Rule 12(b)(6) dismissal as to these claims against Bogdan.

Bogdan's motion to dismiss the Complaint is **GRANTED** as to Counts IV and VI alleging malicious prosecution under federal and state law. Charles did not object to defendant Bogdan's motion to dismiss these counts in his pleadings or during oral argument on January 20, 2005.

Plaintiff Charles' motion to vacate [document #24] his first motion for entry of default [document #23] is **GRANTED**, and his second motion for entry of default [document #25] is **DENIED**. Defendant Bogdan's motion to stay the case pending the issuance of this written opinion [document #26] is **DENIED** as moot.

Defendant Bogdan is hereby instructed to file an answer to the Complaint on or before ten (10) days from the issuance of this opinion – April 8, 2005.  The parties are further instructed to submit an amended joint scheduling statement on or before ten (10) days from the issuance of this opinion – April 8, 2005.

**SO ORDERED.**

**Dated: March 29, 2005**                    **s/ NANCY GERTNER U.S.D.J.**