# UNITED STATES DISTRICT COURT
## DISTRICT OF MASACHUSETTS

ULYSSES RODRIGUEZ CHARLES

      Plaintiff,

     V.

CITY OF BOSTON;  JOHN MULLIGAN, in
his individual capacity;  WILLIAM KEOUGH,
in his individual capacity;  PAUL RUFO, in his
individual capacity;  KATHLEEN HANLEY
JOHNSON,  in her individual capacity;  STANLEY
BOGDAN, in his individual capacity;  JOHN DOE
and JANE DOE, supervisors in the Boston Police
Department, in their individual capacities;
CHARLES CAMPO, in his individual capacity;
JOHN ZANINI,  in his individual capacity;
SUFFOLK COUNTY;  and SUFFOLK COUNTY
DISTRICT ATTORNEY'S OFFICE,

      Defendants.

CIVIL ACTION NO:

## COMPLAINT AND JURY DEMAND

## INTRODUCTION

1.    Plaintiff Ulysses Rodriguez Charles (Mr. Charles) was imprisoned for nineteen

years of an eighty (80) year prison sentence for unlawful confinement, rape and

robbery, all crimes he did not commit.  DNA testing of semen on a bed sheet

where two rapes took place, and  bath robe worn by a complainant when raped,

1



produced indisputable evidence that exonerated Mr. Charles of the crimes. The convictions were vacated and charges dismissed on May 17, 2001.

Mr. Charles' wrongful conviction was not accidental but resulted directly from unconstitutional and tortious efforts by the defendants police officers, police criminalist, and their respective supervisors; and municipal policies, customs and practices deliberately indifferent to civil rights. Despite Mr. Charles' innocence and the utter lack of evidence against him, at each step of the criminal process the defendants employed unconstitutional investigative methods that caused the arrest, unfair trial, conviction, and lengthy imprisonment

3. Acting under the color of law, the defendants applied irreparable suggestive identification procedures that led the rape complainants to misidentify Mr. Charles; they knowingly withheld or destroyed presumptively exculpatory evidence – vaginal swabs collected by a Dr. Batzofin and the complainants detail statements describing their assailant—and manufactured false inculpatory identification evidence that flatly contradict actual exculpatory evidence in their possession;

4. Beyond compensating Mr. Charles for the years stolen from him and his family, and for his continuing injuries, this action seeks to redress the unlawful municipal policies and practices pursuant to which the defendants, acting under color of law, violated his clearly established rights as guaranteed by the First, Fourth, Fifth, Sixth, Eight, Ninth and Fourteenth Amendments to the United States Constitution.

**JURISDICTION AND VENUE**

5.    Title 28 U.S.C. sec. 1331 provides federal question jurisdiction , and 28 U.S.C. sec. 1367 provides supplemental jurisdiction over the state law claims.

6.    Pursuant to 28 U.S.C.  sec.1391(b), venue is proper in the District Court of Massachusetts, the judicial district in which the claim arose and in which, upon information and belief, all defendants resided and/or conducted business at the time of the events in question.

**PARTIES**

7.    Plaintiff ULYSSES RODRIGUEZ CHARLES is, at all times relevant herein was, an individual residing in Boston, Massachusetts.

8.    Defendant CITY OF BOSTON is a duly organized municipal corporation under the laws of the Commonwealth of Massachusetts. At all times relevant to this complaint, THE BOSTON POLICE DEPARTMENT, including its crime laboratory, was a department within the City of Boston.

9.    Defendant JOHN MULLIGAN, at all times relevant to this complaint, was a member of the Boston Police Department. His actions alleged in this complaint were taken under color of laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

10.    Defendant WILLIAM KEOUGH , at all times relevant to this complaint, was a member of the Boston Police Department. His actions alleged in this complaint were taken under  color of the laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

3

11. Defendant PAUL RUFO, at all times relevant to this complaint, was a member of the Boston Police Department. His actions alleged in this complaint were taken under the color of laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

12. Defendant KATHLEEN HANLEY JOHNSON, at all times relevant to this complaint, was a member of the Boston Police Department. Her actions alleged in this complaint were taken under color of laws of the Commonwealth of Massachusetts and the City of Boston. She is sued in her individual capacity.

13. Defendant STANLEY BOGDAN, at all times relevant to this complaint, was a senior criminalist working for the Boston Police Department's crime laboratory. His actions alleged in this complaint were taken under color of laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

14. Defendants JOHN DOE and JANE DOE, whose identities are currently unknown, represents those employees of the Boston Police Department with supervisory authority over defendants JOHN MULLIGAN, WILLIAM KEOUGH, PAUL RUFO, KATHLEEN HANLEY JOHNSON and STANLEY BOGDAN. Their actions alleged in this complaint were taken under color of laws of the Commonwealth of Massachusetts and the City of Boston. They are sued in their individual capacities.

15. Defendant CHARLES CAMPO was, at all times relevant to this complaint, an assistant district attorney with the Suffolk County District Attorney's Office. His

4

actions alleged in this complaint were taken under color of laws of the
Commonwealth of Massachusetts and Suffolk County.

16.    Defendant JOHN ZANINI was, at all times relevant to this complaint, an assistant
district attorney with the Suffolk District Attorney's Office. His actions alleged in
this complaint were taken under the color of laws of the Commonwealth of
Massachusetts and Suffolk County.

17.    Defendant SUFFOLK COUNTY is a duly designated county in the
Commonwealth of Massachusetts under the laws of the Commonwealth of
Massachusetts.

18.    Defendant SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE is a duly
designated local government entity in the Commonwealth of Massachusetts.

**JURY TRIAL DEMAND**

19.    Mr. Charles hereby demands a trial by jury on all issues so triable.

**FACTS**

**The Crime**

20.    On the evening of December 8, 1980, Karen Kramke, Valerie Hays and Shannon
Streeter, all white, were raped and robbed in their Brighton apartment by a black
man whom they did not know. All three women shared the apartment.

21.    The assailant threatened Ms. Kramke with a screw driver and pushed his way into
the apartment screaming "Where is the money", "Where is the jewelry".

22.    Ms. Hayes was sitting in the apartment and screamed when she saw the man.  The
man  told Ms. Kramke and Ms. Hays sit on a couch and do not yell or he will
"hurt them" then placed a coat over their head but they could hear him walking

around the living room dumpting things and rummaging through draws for valuables to steal.

23. The assailant awakened Ms. Streeter who was asleep in her bedroom, bound and threatened her. He then returned to the living room and questioned Kramke and Streeter "why didn't you tell me she was here?

24. The assailant took jewelry from two complainants, raped two vaginally, one anally and one orally. He remained in the apartment for about two hours, played a guitar, rummaged through draws and pulled the phone out the wall before departing.

**Prior Boston Police Encounters**

25. In 1975 Boston police arrested Mr. Charles for disorderly person and later wrongly identified and charged him for additional serious crimes he did not commit. Following jury guilty verdicts in 1976 the judge (Roy, J.) explained he would not send Mr. Charles to prison because he did not believe the police testimony, and suspended the prison sentences to three years probation.

26. Thereafter, Defendant John Mulligan routinely stopped, searched and threatened Mr. Charles "let me see anything shining coming out your pockets and I'll blow your f...in head off," to the extent that Mr. Charles feared for his life.

27. In 1978 Defendant Mulligan pointed a gun to the head of one Andrew Mead and directed he be taken to Mr. Charles' home. Mr. Charles was at work and his then girl friend, Ms. Robin Howell answered the door. Defendant Mulligan forced his way inside, arrested Ms. Howell, searched the house and confiscated jewelry and

6

other items of value including Charles' uncashed paycheck, and charged both Charles and Howell with receiving stolen property.

28.    A few days later Defendant Mulligan, gun pointed, approached Mr. Charles near his home on Massachusetts Avenue. Defendant Mulligan searched Charles took his wrist watch and threatened him "you f...ing West Indian, come here and making more money than me, you better go back where you came from or I'll give you a case and bury you in Walpole for the rest of your life."

29.    Mr. Charles furnished the Court receipts for his watch, jewelry and items of valuable defendant Mulligan seized on the pretense it was stolen property. The Court dismissed the charges and ordered that Defendant Mulligan return Mr. Charles' personal property.

30.    At least three times Mr. Charles went to Boston Police Headquarters seeking to recover his personal property to no avail. One occasion Defendant Mulligan told Charles he did not have the key for the evidence room. Another occasion Defendant Mulligan hid in a back room and had another police tell Mr. Charles he was not there. The last occasion Defendant Mulligan threatened Mr. Charles "don't come down here again asking for anything, do you hear me."

31.    On December 5, 1980, three days before the rape crimes, Defendant Keough was at Ironworkers Union office in Brighton and inquired of Mr. Robert Haynes as to the whereabouts of Mr. Charles.

32.    Also, Defendant Charles Campo disclosed that Defendant Mulligan knew Mr. Charles prior to the rape crimes and was one of the Boston Police looking for Mr. Charles. And on or around December 8, 1980 Defendant Mulligan did forcefully

enter Ms. Robin Howell's apartment looking for Mr. Charles, and arrested Ms. Howell.

**The False Identification of Mr. Charles**

33.    Kramke, Streeter and Hays went to an adjoining neighbour and called the Boston Police. Defendant Hanley Johnson with other police arrived at the scene and drove the complainants to Beth Israel Hospital. The complainants initial description of the suspect given to Defendant Hanley Johnson was of a 5' 10" black man with thin build, medium complexion (as opposed to dark) and straggly beard.

34.    At the hospital Kramke described the assailant to Dr. Batzofin that the suspect was a black male, 5' 10" tall, 165lbs with husky voice, beard and moustache.

35.    Ms. Streeter told the doctor, who is white South African, the suspect had an American accent.

36.    The complainants initial description of the suspect made no mention of peculiar identification characteristics of Caribbean accent, dread locks hair and two front teeth Mr. Charles possessed, that rule him out as a suspect.

37.    Defendants William Keough and Paul Rufo, detectives of the Boston Police Department Sexual Assault Unit, were assigned to the case. Defendant Keough met the complainants the next day on December 9, 1980, at the Chandler Street Boston South End apartment of Kramke's boyfriend, Jeff Jennings, and separately interviewed each complainant in detail regarding identity of the suspect.

8

38.     Defendant Keough tape recorded the two hour long complainants detailed statements that guided him to compile a special group of about two hundred photographs for their viewing.

39.     Following Defendant Keough interview he took the complainants to BostonPolice Headquarters, then to District 4 identification room where they viewed about two hundred photographs that included two photos of Mr. Charles. Mr. Charles was arrested base on the Boston Police claim that Ms. Kramke and Streeter identified Charles' photo from the selected group of photographs.

40.     Kramke was allowed to identify Mr. Charles as the assailant at the trial. This was expected since Mr. Charles was the only black person sitting in the courtroom. Kramke then testified she initially identified Mr. Charles from the group of photographs Defendant Keough showed her on December 9, 1980, and added: "The pictures I picked out – he had dreads." Her testimony was the product of suggestive identification procedures because it was impossible for her to view Mr. Charles photograph depicting his dread locks on December 9, 1980. Only Mr. Charles photograph taken at time of arrest on June 1, 1981 depicted his dread lock hair.

41.     The suggestive identification procedures were conducted knowing that the complainants description did not claim that the suspect had dread locks, two prominent gold teeth, or Caribbean accent. Defendant Keough had Mr. Charles photographs in his possession three (3) days before the rape when he visited Charles Ironworkers Union office on December 5, 1980 seeking to locate Charles.

9

42. Mr. Charles former counsel, Winston Kendall, Charles' mother, his wife and sister attended the probable cause hearing on June 9, 1981. While waiting in the corridor they observed Defendant Keough showing Ms. Kramke a blown up copy of Charles' June 1, 1981 arrest photograph depicting his dread lock. Immediately thereafter Mr. Kendall related the unduly suggestive identification to the hearing judge who, following an inquiry, immediately prohibited any corporeal identification attempt during the hearing.

43. Defendant Keough explained at trial he "lost" the taped detailed statements the complainants gave him that he relied upon to compile the special group of photographs to identify a suspect. He negligently testified he gave Defendant Rufo the tape and Rufo died on May 13, 1981, hence the reason he was unable to locate the tape. But Rufo was very much alive in 1981.

44. Additionally, during a physical examination after the rape the hospital collected hair samples and vaginal swabs of sperm from Kramke and Streeter for a rape kit.

45. Four (4) days after the rape Defendant Keough went to the hospital to collect the rape it. Although the hospital warned him in writing the evidence would be destroyed after seven (7) days, Defendant Keough neglected to collect the vaginal swabs of sperm taken from Ms. Kramke and Ms. Streeter that doctor Batzofin later concluded "could positively identify the rapist."

46. Upon information and belief Defendant Keough intentionally destroyed the taped detailed statements of the victims that described the suspect, as well as the vaginal swabs of sperm, to facilitate the wrongful identification of Mr. Charles as the rapist.

47.  On November 3, 1983, Defendants Charles Campo and Keough arranged a line up parade: At Boston Police  Headquarters. Mr. Charles stood number two (#2) during the actual line up parade. Ms. Kramke, Streeter and Hays all viewed the actual line up parade and declared they can't make an identification. The parade ended.

48.  About thirty (30) minutes after Mr. Charles was placed in a waiting then defense counsel, James Gilden, came into the room and told Charles the prosecutor, Defendant Campo, wants a photograph of the line up participants to "show that the procedure was fair." Charles remained skeptical since the complainants did not make an identification.

49.  To allay his fear, Mr. Gilden told Charles he did not have to use the same #2 he stood in the actual line up.  He held out the card numbers facing down and told Charles he could take any card. Mr. Charles randomly selected card #4, reassembled with the other participants and Defendant Campo took a photograph.

50.  Weeks after the line up Defendant Campo negligently told then defense counsel he "confronted" Ms. Kramke alone after the line up ended and she said "I think it's number four (#4)."  Defendant Campo negligently offered the photograph of the participants wherein Charles stood #4 as if it represented the actual line up, and falsely testified to the jury of what Ms. Kramke purportedly encounter between himself and Kramke.

51.  Mr. Charles was not #4 in the actual line up. He only stood #4 for the photograph of the participants long after the parade.  This shows that Defendant Campo

negligently showed Kramke the photograph he took of the line up participants without the presence of counsel.

**The Forensic Investigation**

52.  On December 12, 1980 Defendant Keough and Defendant Stanley Bogdan went to the crime scene and collected a bed sheet on which two rapes occurred, and maroon robe Ms. Streeter wore during the rape. Defendant Bogdan, a Boston Police senior criminalist, was assigned the case and conducted tests on the sheet and robe. He determined the stains were seminal in origin and from a Type "O" secretor.

53.  Defendant Charles Campo obtained a court order for Mr. Charles blood sample based on the fact that Defendant found seminal stains on the bed sheet and robe. Pursuant to the court order Defendant Bogdan collected and compared Mr. Charles' blood type with that of crime scene sheet and robe. Mr. Charles was a Group B secretor and therefore excluded as depositor of the seminal stains.

54.  Defendants Campo and Bogdan also tested and excluded Ms. Streeter's boyfriend as the depositor of the seminal stains, prior to the trial. But Defendant Campo withheld that evidence from Mr. Mr. Charles.

55.  Defendant Campo examined the hospital medical records and knew Dr. Batzofin collected vaginal swabs of sperm from Kramke and Streeter. Defendant Bogdan tests also confirmed stains on the bedsheet and robe were seminal in origin. However, because the tests excluded Mr. Charles Defendant Campo knowingly presented false evidence at trial that doctor Batzofin found no sperm upon examination of Kramke and Streeter. He also elicited false testimony from

12

Defendant Bogdan the stains on bed sheet and robe were not seminal in origin, and argued the rapist did not ejaculate with the sole intent to injure Mr. Charles.

56.    Defendant Campo's false representations that doctor Batzofin found no sperm upon examination of Ms. Kramke and Ms. Streeter, and that the rapist did not ejaculate interfered with Mr. Charles' ability to earlier prove his innocence as he was misled to believe no evidence existed that could conclusively establish his innocence.

**Trial, Conviction, Incarceration and Exoneration**

57.    The primary evidence against Mr. Charles was Ms. Kramke's, Ms. Streeter's and Ms. Hays testimony that included the photo identification corroborated by Defendant Keough, the line up identification corroborated by Defendant Campo (the prosecutor), and Ms. Kramke's in-court identification. Defendant Campo also interjected Mr. Charles national origin into the trial when he offered Mr. Charles birth certificate into evidence to corroborate his knowing false stipulation that Streeter told doctor Batzofin the assailant had a "non-American accent", Mr. Charles was born in Trinidad.

58.    his direct appeal was denied Mr. Charles contacted Centurion Ministries in New Jersey who decided to assist establish his innocence after Mr. Charles submitted a requested autobiography from his "earliest childhood to present."

59.    At the urging of Centurion Ministries Mr. Charles discovered for the first time that medical records from the rape existed. Mr. Charles also learned through evidence in the medical records that doctor Batzofin found sperm upon examination of Kramke and Streeter. He also discovered, rather than "non-

**13**

American", Ms. Streeter told Dr. Batzofin who is South African, her assailant had an American accent.

60.    Because the vaginal swabs were destroyed and medical records established the rapist did ejaculate, a determination was made in 1995 to DNA test the stains on the bed sheet and robe.

61.    Defendant John Zanini however, through motions in court objected the release to Mr. Charles samples of biological evidence in possession of Boston Police Crime Laboratory.    And, in November 1995, due to the rape conviction prison authorities transported Mr. Charles to Dallas County Jail where he was imprisoned until returned in 1999.

62.    DNA tests conducted by Cellmark Diagnostic in 1999 established that biological stains on the sheet and robe were in fact sperm, and from two different men.

63.    Further DNA testing excluded Mr. Charles as the source of both sperm sample.

64.    Defendant Zanini and Suffolk County District Attorney's Office continued objections to Mr. Charles' release on the contention Ms. Streeter was having sex with many different men who could have deposited the sperm samples, and therefore the DNA exclusion was meaningless.

65.    In 2000 the Court t ordered Defendant Zanini to locate the boyfriend for DNA testing. The boyfriend who was tested before trial was located, tested and excluded. Still Defendant Zanini insisted on the existence of other boyfriend, and for his office to conduct independent testing on Mr. Charles.

66.    Defendant Zanini produced no other boyfriend, and further tests by the Suffolk County District Attorney's Office again excluded Mr. Charles.    Over the

14

objection of Defendant Zanini, the Court vacated the convictions and sentence on May 14, 2001, and Suffolk County District Attorney's Office dismissed the indictments against Mr. on May 17, 2001 when Mr. Charles was released from its custody.

**The City Of Boston's Acquiescence to Police Misconduct**

67.    At the time of Mr. Charles' arrest, policy makers for the Boston Police Department were on notice of misconduct by Boston Police officers, including officers providing false testimony, withholding exculpatory evidence, destroying evidence that could identify a suspect, employing unduly suggestive identification procedures and inadequately investigating cases. Although this misconduct deprived people of their constitutional rights, the policy makers for the Boston Police Department neither required its officers to comply with the law nor punish them when they failed to comply with lawful procedures.

68.    At the time of Mr. Charles' arrest the Boston Police Department did not have a properly functioning system of internal discipline. The police department was such a disgrace that the infamous officer John Mulligan continued to violate people's constitutional rights for years without any fear of reprimand.

69.    Similarly, systematic failures in the Boston Police Department and improper investigative techniques employed by its members may have contributed to the rape of Ms. Kramke, Ms. Streeter and Ms. Hays. For example, Boston Police Department wrongly identified and arrested a black man, Willie Sanders, on the night over 500 Brighton residents questioned the Boston Police Department's inability to put an end to multiple rapes that plagued that neighborhood in the

15

winter of 1978-79. Two juries acquitted Sanders of two counts of rape and a judge dismissed a third count after finding that detectives of the Boston Police Department had destroyed sperm samples, used unduly suggestive identification procedures at photograph display and lineups, and coached the victims to identify Sanders. The very improper methods the Boston Police Department subsequently employed to arrest and charge Mr. Charles for the Brighton rapes of Kramke, Streeter and Hays. The same serial rapist may have raped Kramke, Streeter and Hays.

70. In 1980 Boston Police Department arrested and charged Michael Woods for rape despite the fact he was locked up at the Deer Island House of Correction at the time of the crime.

71. The Boston Police Department continued its unlawful policy even years after Mr. Charles wrongful arrest and imprisonment. In 1989, Marvin Mitchell was charged with rape even though he did not fit the description of the suspect the victims gave Boston police. Two Boston police officers falsely testified that Mr. Mitchell had admitted to wearing unusual clothing described by the victim. After spending over seven years in prison, Mr. Mitchell was exonerated in 1997 through DNA testing. The Boston police officers were not disciplined.

72. The policy maker for the Boston Police Department was on notice that Boston Police officers felt free to falsify affidavits in support of search warrants and to testify falsely to grand juries and at criminal trials before the incidents leading to the wrongful arrest and conviction of Mr. Charles.

73. Despite knowledge that Boston police officers felt free to circumvent the law to secure convictions, the Boston Police Department:

    A.     Failed to require an adequate standard of investigation by its detectives;

    B.     Failed to properly supervise and review the method and process of criminal investigations; and

    C.     Failed to discipline Boston police officers for giving false testimony.

74. The Boston Police Department failed to hold its officers to an ethical standard. This created an environment in which officers like Defendants Mulligan, Keough, Rufo and Hanley Johnson felt free to conduct suggestive identification and to misrepresent facts in order to obtain a conviction because they knew this conduct would not result in punishment. The Boston Police Department allowed its officers to feel that convicting someone, anyone, for a crime was more important than making sure that the person charged with the crime was the true culprit.

The Suffolk County District Attorney's Failure to Properly Train Staff

75. Defendants Suffolk County and the Suffolk County District Attorney's Office, acting through their policymakers, created and maintained a policy, custom, or practice of failing to train and supervise their employees and agents, including Defendants Campo and Zanini, in conducting constitutionally adequate identification procedures and in ensuring that unreliable, discredited, and improper identification techniques not be used.

Damages

76. As a direct result of the defendants' unconstitutional actions, Mr. Charles sustained the following injuries and damages: personal injuries; pain and suffering; severe

mental anguish; emotional distress; loss of income; infliction of physical illness; inadequate medical care; humiliation indignities, and embarrassment; degradation; injury to reputation; permanent loss of natural psychological development; and restriction on all forms of personal freedom, such as diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

## CLAIMS

**Count I    (42 U.S.C. sec. 1983)**
**Claims against Defendant Keough, Rufo,**
**Hanley, Johnson, Mulligan, Zanini and Campo**
**For unduly suggestive identification procedures**

77.   Plaintiff Charles hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

78.     Defendants Keough, Rufo, Mulligan, Hanley Johnson, Zanini and Campo conducted unduly suggestive identification procedures with Ms. Kramke, Streeter and Hays.  This includes, without limitation, the following acts:

A.   They targeted Mr. Charles before the actual crime occurred and conducted the initial photo array by showing Ms. Kramke, Streeter and Hays  photographs Defendant Keough had in his possession before the crime that looked nothing like Mr. Charles appearance in 1980 when the crimes were committed.

B.     Upon Mr. Charles arrest, Defendant Keough made a blown up copy of the arrest photo and showed it to Ms. Kramke, Streeter and Hays,  in the court house corridor before the probable cause hearing began, thus prompting Ms. Kramke to

18

testify that she initially identified  Mr. Charles unique photo with dread lock hair

although she did not describe her assailant as having dread lock.

C.   Defendant Campo conducted a suggestive line up when he photographed Mr.

Charles after the line up parade and showed the photo to Ms. Kramke encouraging

her to falsely testify she identifed Mr. Charles after the line up parade ended, and

identified Charles, the only black person then in the court room.

79.    Defendant Campo was acting in his investigative capacity when he photographed

Mr. Charles after the line up parade ended and showed Ms. Kramke the photo in

the absence of defense counsel, prompting her to say she identified #4at the line

up parade when Charles was #2 in the actual line up parade.

80.    The defendants committed these unduly acts intentionally and with deliberate

indifference to Mr. Charles clearly established constitutional rights. No

reasonable officer or district attorney would have believed that these procedures

were lawful or would produce a reliable identification.

81.     As a direct and proximate result of the defendants' use of unduly suggestive

identification procedures, Ms. Kramke   misidentified Mr. Charles at trial in

violation of his clearly established Fourteenth Amendment right to a fair trial and

his right not to be deprived of his liberty without due process of law. Mr. Charles

suffered more than nineteen years of wrongful imprisonment, and endured all

other physical, emotional, pecuniary damages set forth above.

**COUNT  II  42 U.S.C. sec. 1983**
**Due Process Claims against Defendants Keough,**
**Bogdan and Campo For Failing to Disclose Evidence;**
**And for Fabricating Evidence; and Due Process**
**Claim Against Defendant Keough  for Failure to Investigate**

19

82.  Plaintiff Charles hereby incorporates fully all of the foregoing as if set forth hereinherein and and further alleges as follows:

**Fourteenth Amendment <u>Brady</u> Claims**

83.  Defendant Keough failed to disclose to defense attorney material information that was favorable to Mr. Charles. This undisclosed information included the fact that he repeatedly employed unduly suggestive conduct that induced Ms. Kramke and Streeter to misidentify Mr. Charles

84.  Defendant Bogdan failed to disclose to defense counsel material information that was favorable to Mr. Charles. This information included serological evidence that would have presumptively excluded Mr. Charles in the rape.

85.  Defendant Campo failed to disclose to defense counsel material information favorable to Mr. Charles. This information included the fact that:

    A.  Kramke did not identify Mr. Charles at the line up in 1983 ;

    B.  That Streeter told doctor Batzofin the assailant had an American accent;

    C.  Dr. Batzofin found sperm upon examination of Kramke and Streeter,

    D.  That the rapist did ejaculate; and,

    E.  That seminal stains was found on the bed sheet and robe .

86.  Defendant Keough failed to disclose that neither Ms. Kramke nor Ms. Streeter identified Mr. Charles but instead were shown single photos of Mr. Charles Keough had in his possession three (3) days before the crime.

87.  Defendant Keough deliberately and recklessly failed to investigate adequately, as any minimal competent officer would have.

88.  Acting with deliberate indifference by withholding these material exculpatory and

impeachment evidence prior to trial, Defendant Keough, Bogdan and Campo violated Mr. Charles clearly established Fourteenth Amendment right to due process of law as interpreted by the United States Court in <u>Brady v. Maryland</u> and its progeny. This directly and proximately caused Mr. Charles to be wrongly convicted and to suffer the injuries and damages described above.

## COUNT III
### 42 U.S.C. sec. 1983 Conspiracy

89.    Plaintiff Charles hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

90.    Upon information and belief, Defendants Keough, Mulligan, Rufo, Hanley Johnson, Campo, Bogdan and Zanini, John and Jane Does, conspired, reached a mutual understanding and acted in concert to violate Mr. Charles' civil rights.

91      In furtherance of the conspiracy, defendants undertook overt acts, including without limitation the following:

A.    Suppressed exculpatory evidence in favor of Mr. Charles and fabricated inculpatory evidence against Mr. Charles.

B.    Deliberately destroyed vaginal swabs of sperm they knew would have identified the rapist and conclusively excluded Mr. Charles.

C.    Destroyed identification statements that would have exculpated Mr. Charles.

92.    Defendants' conspiracy directly caused the constitutional deprivations suffered by Mr. Charles including his false arrest, malicious prosecution, unfair trial, wrongful conviction and unlawful confinement, and all the other grevious permanent damages and injuries set forth herein above.

21

## COUNT IV
### 42 U.S.C. sec. 1983
### Claims against Defendants Keough, Campo,
### Bogdan and Hanley Johnson For Malicious Prosecution

93. Plaintiff Charles hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

94. When Mr. Charles was arrested the only inculpatory evidence was the unreliable identification by Ms. Kramke and Streeter, which was the result of police urging rather than her own memory. Her misidentification did not provide probable cause to arrest him.

95. Defendant Keough, Hanley Johnson, Campo, and Bogdan, all state actors acting under state law, commenced or caused to be commenced a criminal prosecution, instituted with malice and without probable cause, against Mr. Charles. They used improper , unduly suggestive techniques and they wrongly pressured Ms. Kramke and Streeter into falsely identifying Mr. Charles as her rapist. They then failed to disclose material exculpatory evidence including that the identifications were conducted in an unduly suggestive manner and that serological evidence excluded Mr. Charles (contrary to the fabricated evidence the prosecution presented ) .

96. The defendants acted to secure a conviction of Mr. Charles regardless of the evidence. They chose to ignore, failed to disclose, or misrepresented the evidence that indicated Mr. Charles's innocence.

97. The criminal action ultimately terminated in Mr. Charles' favor on May 14, 2001 when his conviction was vacated on the grounds of his actual innocence, due to conclusive comparative DNA exoneration.

22

98.    The defendants' conduct violated Mr. Charles' clearly established rights under the Fourth Amendment and the procedural due process component of the fourteenth Amendment.

99.    As a proximate result of the defendants' conduct, Mr. Charles was arrested, prosecuted, was forced to endure an unfair trial and wrongful conviction, and was imprisoned for more than nineteen years. He suffered the injuries and damages set forth above.

**COUNT V**
**42 U.S.C. sec. 1983**
**Monell Claim against the City of Boston**

100.    Plaintiff Charles hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

101.    By December 1980, the defendant City of Boston had a policy, custom, or practice of failing to properly discipline, supervise, and train Boston police officers including the individuals named in this case. The city failed to ensure that its police officers would conduct constitutionally adequate identification procedures; obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; disclose to prosecutors material information favorable to criminal defendants; follow the duty imposed by Brady v. Maryland; and never fabricate inculpatory evidence.

102.    These policies, customs, and practices led Boston police officers to believe that misconduct would be tolerated and that allegations of abuse of constitutional

rights would not be investigated. They made it foreseeable that officers would violate people constitutional rights.

103.    The policies, customs, and practices of the Boston Police Department described in this complaint were the moving force behind Mr. Charles' arrest, prosecution, and incarceration.

### COUNT VI
### 42 U.S.C. sec. 1983
### Supervisory Liability Claims against John and
### Jane Doe, Supervisors in the Boston Police Department

104.    Plaintiff Charles hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

105.    Unnamed defendant supervisors of the Boston Police Department, collectively referred to here as John Doe and Jane Doe, acting under color of law with deliberate indifference to the rights of criminal suspects, failed to train and supervise adequately defendants Keough, Mulligan, Rufo, Hanley Johnson and Bogdan. In so doing, these defendants acquiesced in, condoned, or encouraged the individual defendants' engaging in unconstitutional misconduct , including the use of unduly suggestive identification procedures, the fabrication of evidence, and the suppression of exculpatory material evidence from the prosecutor.

106.    The failure of these defendants to supervise and train the named defendants amounted to the deliberate indifference, or intentional misconduct, which proximately and directly

### COUNT VII
### 42 U.S.C. sec. 1983
### Monell Claim Against Defendants Suffolk
### County and Suffolk County District Attorney's Office

24

**For Failure to Train and Supervise Prosecutors**

107.    Plaintiff Charles hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

108.    Defendants Suffolk County and Suffolk County District Attorney's Office, by and through their policy makers, created and maintained a policy, custom, or practice of failing to train and supervise their employees and agents, including Defendant Campo and Zanini in conducting constitutionally adequate identification procedures and in ensuring that unreliable, discredited, and improper identification techniques not be used. This failure to train and supervise directly and proximately caused Mr. Charles to suffer constitutional deprivations and thus caused the injuries and damages set forth above.

## COUNT VII
### State Tort Law Claims Against
### Defendant Keough, Mulligan, PlaRufo,
### Rufo, Campo, Hanley Johnson, Bogdan
### Bogdan and Zanini ,For Malicious Prosecution

109.    Plaintiff Charles hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

110.    When Mr. Charles was arrested, the only inculpatory evidence was the unreliable identifications of Ms. Kramke and Ms. Streeter, which was the result of police pressure rather than their own memory.    Ms. Kramke and Streeter's misidentification did not provide probable cause.

111.    Defendants Keough, Mulligan, Rufo, Campo, Hanley Johnson, Bogdan and Zanini, all state actors acting under the color of law, commenced or caused to be

commenced a criminal proceedings instituted with malice and without probable cause against Mr. Charles. They used improper and unduly suggestive techniques and they wrongfully pressured Ms. Kramke and Streeter into falsely identifying Mr. Charles as her rapist. They then failed to disclose material exculpatory evidence, including that the identifications were conducted in an unduly suggestive manner and that serological evidence excluded Mr. Charles (contrary to the fabricated evidence the prosecution presented).

110. The criminal action ultimately terminated in Mr. Charles' favor on May 14, 2001, when his conviction was vacated on the grounds of actual innocence due to conclusive comparative DNA tests .

As aproximate result of the defendants' conduct, Mr. Charles was arrested prosecuted, forced to endure an unfair trial and wrongful conviction, and wrongly imprisoned for more than nineteen years. He suffered injuries and damages as set forth above.

## CLAIMS FOR DAMAGES

111. The defendants' actions deprived  Mr. Charles of his civil rights under the First, Fourth,  Fifth, Sixth,  Eight, Ninth, and Fourteenth Amendments to the United States Constitution and under the laws of the Commonwealth of Massachusetts .

112.    The  defendants'  unlawful,  intentional,  willful,  purposeful,  deliberately indifference, reckless, bad faith, and malicious acts, misdeeds, and omissions caused Mr. Charles to be falsely arrested, maliciously prosecuted, unfairly tried, wrongfully convicted, and wrongfully imprisoned for more than nineteen years, together with all of the other injuries and damages as set forth above.

26

3.   All the alleged acts misdeeds, and omissions committed by the defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, or with bad faith. The proscribe conduct of the individual defendants meet all of the standards for imposition of punitive damages.

HEREFORE, Ulysses Rodriguez Charles prays as follows:

A.   That the court enter judgment in favor of Mr. Charles and against the defenadnts on all Counts of the complaint;

B.   That the court award compensatory damages to Mr. Charles and against the defendants, jointly and severally, un an amount to be determined at trial;

C.   The court award punitive damages to Mr. Charles and against the non-municipal defendants, jointly and severally, in an amount to be determined at trial, in order that such award will deter similar proscribed conduct in the future;

D.   That the court award to Mr. Charles and against the defendants, jointly and severally, pre-judgment interest on all sums awarded him in this action;

E.   That the court award to Mr. Charles and against the defendants, jointly and severally, recovery of his costs concerning this action, including reasonable attorney's fee pursuant to 42 U.S.C. sec. 1988; and,

That the court grant Mr. Charles any such other relief to which he may be entitled.

ESPECTFULLY SUBMITTED

27

Ulysses Rodriguez Charles

47 Larchmont St, ·

Dorchester, MA  02124

May 14, 2004