# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

ULYSSES RODRIGUEZ CHARLES )
)
Plaintiff, )
)
v. )
)
CITY OF BOSTON; JOHN MULLIGAN, in )
his individual capacity; WILLIAM KEOUGH, )
in his individual capacity; PAUL RUFO, in his )        CIVIL ACTION NO.:
individual capacity; KATHLEEN HANLEY )
JOHNSON, in her individual capacity; STANLEY )
BOGDAN, in his individual capacity; JOHN DOE )
and JANE DOE, supervisors in the Boston Police )
Department, in their individual capacities; )
CHARLES CAMPO, in his individual capacity )
JOHN ZANINI, in his individual capacity; )
SUFFOLK COUNTY; and SUFFOLK COUNTY )
DISTRICT ATTORNEY'S OFFICE, )
)
Defendants. )
_____)

## COMPLAINT AND JURY DEMAND

## INTRODUCTION

1.      Plaintiff Ulysses Rodriguez Charles (Mr. Charles) was imprisoned for nineteen years of

an eighty (80) year prison sentence for unlawful confinement, rape and robbery, all

crimes he did not commit. DNA testing of semen on a bed sheet where two rapes took

place, and bathrobe worn by a complainant when raped, produced indisputable evidence

that exonerated Mr. Charles of the crimes. The convictions were vacated and charges

dismissed on May 17, 2001.

2.      Mr. Charles' wrongful conviction was not accidental but resulted directly from

unconstitutional and tortious efforts by the defendants police officers, police criminalist,

and their respect supervisors; and municipal policies, customs and practices deliberately indifferent to civil rights. Despite Mr. Charles' innocence and the utter lack of evidence against him, at each step of the criminal process the defendants employed unconstitutional investigative methods that caused the arrest, unfair trial, conviction, and lengthy imprisonment.

3.    Acting under the color of the law, the defendants applied irreparable suggestive identification procedures that led the rape complainants to misidentify Mr. Charles; they knowingly withheld or destroyed presumptively exculpatory evidence – vaginal swabs collected by a Dr. Batzofin and the complainants detail statements describing their assailant – and manufactured false inculpatory identification evidence that flatly contradicts actual exculpatory evidence in their possession.

4.    Beyond compensating Mr. Charles for the years stolen from him and his family, and for his continuing injuries, this action seeks to redress the unlawful municipal policies and practices pursuant to which the defendants, acting under color of law, violated his clearly established rights as guaranteed by the First, Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

5.    Title 28 U.S.C. sec. 1331 provides federal question jurisdiction, and 28 U.S.C. sec. 1367 provides supplemental jurisdiction over the state law claims.

6.    Pursuant to 28 U.S.C. sec. 1391(b), venue is proper in the District Court of Massachusetts, the judicial district in which the claim arose and in which, upon information and belief, all defendants resided and/or conducted business at the time of the events in question.

**PARTIES**

7.      Plaintiff ULYSSES RODRIGUEZ CHARLES is, at all times relevant herein was, an individual residing in Boston, Massachusetts.

8.      Defendant CITY OF BOSTON is a duly organized municipal corporation under the laws of the Commonwealth of Massachusetts.  At all times relevant to this complaint, THE BOSTON POLICE DEPARTMENT, including its crime laboratory, was a department within the City of Boston.

9.      Defendant JOHN MULLIGAN, at all times relevant to this complaint, was a member of the Boston Police Department.  His actions alleged in this complaint were taken under color of laws of the Commonwealth of Massachusetts and the City of Boston.  He is sued in his individual capacity.

10.     Defendant WILLIAM KEOUGH, at all times relevant to this complaint, was a member of the Boston Police Department.  His actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Boston.  He is sued in his individual capacity.

11.     Defendant PAUL RUFO, at all times relevant to this complaint, was a member of the Boston Police Department.  His actions alleged in this complaint were taken under the color of the laws of the Commonwealth of Massachusetts and the City of Boston.  He is sued in his individual capacity.

12.     Defendant KATHLEEN HANLEY JOHNSON, at all times relevant to this complaint, was a member of the Boston Police Department.  Her actions alleged in this complaint were taken under color of laws of the Commonwealth of Massachusetts and the City of Boston.  She is sued in her individual capacity.

13.    Defendant STANLEY BOGDAN, at all times relevant to this complaint, was a senior criminalist working for the Boston Police Department's crime laboratory. His actions alleged in this complaint were taken under color of laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

14.    Defendants JOHN DOE and JANE DOE, whose identities are currently unknown, represents those employees of the Boston Police Department with supervisory authority over defendants JOHN MULLIGAN, WILLIAM KEOUGH, PAUL RUFO, KATHLEEN HANLEY JOHNSON and STANLEY BOGDAN. Their actions alleged in this complaint were taken under color of laws of the Commonwealth of Massachusetts and the City of Boston. They are sued in their individual capacities.

15.    Defendant CHARLES CAMPO was, at all times relevant to this complaint, an assistant district attorney with the Suffolk County District Attorney's office. His actions alleged in this complaint were taken under color of laws of the Commonwealth of Massachusetts and Suffolk County.

16.    Defendant JOHN ZANINI was, at all times relevant to this complaiknt, an assistant district attorney with the Suffolk District Attorney's Office. His actions alleged in this complaint were taken under the color of laws of the Commonwealth of Massachusetts and Suffolk County.

17.    Defendant SUFFOLK COUNTY is a duly designated county in the Commonwealth of Massachusetts under the laws of the Commonwealth of Massachusetts.

18.    Defendant SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE is a duly designated local government entity in the Commonwealth of Massachusetts.

**JURY TRIAL DEMAND**

19.    Mr. Charles hereby demands a trial by jury on all issues so triable.

**FACTS**

**The Crime**

20.    On the evening of December 8, 1980, Karen [Redacted], Valerie [Redacted] and Shannon

[Redacted], all white, were raped and robbed in their Brighton apartment by a black man

whom they did not know.  All three women shared the apartment.

21.    The assailant threatened Karen with a screw driver and pushed his way into the apartment

screaming "Where is the money," "Where is the jewelry."

22.    Valerie was sitting in the apartment and screamed when she saw the man.  The man told

Karen and Valerie sit on a couch and do not yell or he will "hurt them" then placed a coat

over their head but they could hear him walking around the living room dumping things

and rummaging through drawers for valuables to steal.

23.    The assailant awakened Shannon who was asleep in her bedroom, bound and threatened

her.  He then returned to the living room and questioned Karen and Shannon "why didn't

you tell me she was here?"

24.    The assailant took jewelry from two complainants, raped two vaginally, one anally and

one orally.  He remained in the apartment for about two hours, played a guitar, rummaged

through drawers and pulled the phone out of the wall before departing.

**Prior Boston Police Encounters**

25.    In 1975 Boston police arrested Mr. Charles for disorderly person and later wrongly

identified and charged him for additional serious crimes he did not commit.  Following

jury guilty verdicts in 1976 the judge (Roy, J.) explained he would not send Mr. Charles

to prison because he did not believe the police testimony, and suspended the prison sentences to three years probation.

26.  Thereafter, Defendant John Mulligan routinely stopped, searched and threatened Mr. Charles "let me see anything shining coming out your pockets and I'll blow your f...ing head off," to the extent that Mr. Charles feared for his life.

27.  In 1978 Defendant Mulligan pointed a gun to the head of one Andrew Mead and directed he be taken to Mr. Charles' home. Mr. Charles was at work and his then girlfriend, Ms. Robin Howell, answered the door. Defendant Mulligan forced his way inside, arrested Ms. Howell, searched the house and confiscated jewelry and other items of value including Charles' uncashed paycheck, and charged both Charles and Howell with receiving stolen property.

28.  A few days later Defendant Mulligan, gun pointed, approached Mr. Charles near his home on Massachusetts Avenue. Defendant Mulligan searched Charles, took his wrist watch and threatened him "you f...ing  West Indian, come here and make more money than me, you better go back where you came from or I'll give you a case and bury you in Walpoler for the rest of your life."

29.  Mr. Charles finished the Court receipts for his watch, jewelry and items of value defendant Mulligan seized on the pretense it was stolen property. The Court dismissed the charges and ordered that Defendant Mulligan return Mr. Charles' personal property.

30.  At least three times Mr. Charles went to Boston Police Headquarters seeking to recover his personal property to no avail. One occasion Defendant Mulligan told Charles he did not have the key for the evidence room. Another occasion Defendant Mulligan hid in a back room and had another police officer tell Mr. Charles he was not there. The last

occasion Defendant Mulligan threatened Mr. Charles "don't come down here again asking for anything, do you hear me?"

31. On December 5, 1980, three days before the rape crimes, Defendant Keough was at Ironworkers Union office in Brighton and inquired of Mr. Robert Haynes as to the whereabouts of Mr. Charles.

32. Also, Defendant Charles Camp disclosed that Defendant Mulligan knew Mr. Charles prior to the rape crimes and was one of the Boston Police looking for Mr. Charles. And on or around December 8, 1980 Defendant Mulligan did forcefully enter Ms. Robin Howell's apartment looking for Mr. Charles, and arrested Ms. Howell.

## The False Identification of Mr. Charles

33. Karen, Shannon and Valerie went to an adjoining neighbor and called the Boston Police. Defendant Hanley Johnson and other police arrived at the scene and drove the complainants to Beth Israel Hospital. The complainants' initial description of the suspect given to Defendant Hanley Johnson was of a 5' 10" black man with thin build, medium complexion (as opposed to dark) and straggly beard.

34. At the hospital Karen described the assailant to Dr. Batzofin that the suspect was a black male, 5' 10" tall, 165 lbs. with husky voice, beard and moustache.

35. Shannon told the doctor, who is white South African, the suspect had an American accent.

36. The complainants' initial description of the suspect made no mention of peculiar identification characteristics of Caribbean accent, dread locks hair and two front teeth Mr. Charles possessed, that rule him out as a suspect.

37.    Defendants William Kough and Paul Rufo, detectives of the Boston Police Department
       Sexual Assault Unit, were assigned to the case.  Defendant Keough met the complainants
       the next day on December 9, 1980, at the Chandler Street Boston South End apartment of
       Karen's boyfriend, Jeff Jennings, and separately interviewed each complainant in detail
       regarding identity of the suspect.

38.    Defendant Keough tape recorded the two hour long complainants' detailed statements
       that guided him to compile a special group of about two hundred photographs for their
       viewing.

39.    Following Defendant Keogh's interview he took the complainants to Boston Police
       Headquarters, then to District 4 identification room where they viewed about two
       hundred photographs that included two photos of Mr. Charles.  Mr. Charles was arrested
       based on the Boston Police claim that Karen and Shannon identified Charles's photo
       from the selected group of photographs.

40.    Karen was allowed to identify Mr. Charles as the assailant at the trail.  This was expected
       since Mr. Charles was the only black person sitting in the court room.  Karen then
       testified she initially identified Mr. Charles from the group of photographs Defendant
       Keough showed her on December 9, 1980, and added:  "The pictures I picked out – he
       had dreads."  Her testimony was the product of suggestive identification procedures
       because it was impossible for her to view Mr. Charles's photograph depicting his
       dreadlocks on December 9, 1980.  Only Mr. Charles's photograph taken at the time of
       arrest on June 1, 1981 depicted his dreadlocked hair.

41.    The suggestive identification procedures were conducted knowing that the complainants'
       description did not claim that the suspect had dreadlocks, two prominent gold teeth, or

Caribbean accent. Defendant Keough had Mr. Charles's photographs in his possession three (3) days before the rape when he visited Charles's Ironworkers Union office on December 5, 1980 seeking to locate Charles.

42. Mr. Charles's former counsel, Winston Kendall, Charles's mother, his wife and sister attended the probable cause hearing on June 9, 1981. While waiting in the corridor they observed Defendant Keough showing Karen a blown up copy of Charles's June 1, 1981 arrest photograph depicting his dreadlocks. Immediately thereafter Mr. Kendall related the unduly suggestive identification to the hearing judge who, following an inquiry, immediately prohibited any corporeal identification attempt during the hearing.

43. Defendant Keough explained at trial he "lost" the taped detailed statements the complainants gave him that he relied upon to compile the special group of photographs to identify a suspect. He negligently testified he gave Defendant Rufo the tape and Rufo died on May 13, 1981, hence the reason he was unable to locate the tape. But Rufo was very much alive in 1981.

44. Additionally, during a physical examination after the rape the hospital collected hair samples and vaginal swabs of sperm from Karen and Shannon for a rape kit.

45. Four (4) days after the rape Defendant Keough went to the hospital to collect the rape kit. Although the hospital warned him in writing the would be destroyed after seven (7) days, Defendant Keough neglected to collect the vaginal swabs of sperm taken from Karen and Shannon that Dr. Batzofin later concluded "could positively identify the rapist."

46. Upon information and belief Defendant Keough intentionally destroyed the taped detailed statements of the victims that described the suspect, as well as the vaginal swabs of sperm, to facilitate the wrongful identification of Mr. Charles as the rapist.

47.     On November 3, 1983, Defendants Charles Campo and Keough arranged a line up parade at Boston Police Headquarters. Mr. Charles stood number two (#2) during the actual line up parade. Karen, Shannon and Valerie all viewed the actual line up parade and declared they can't make an identification. The parade ended.

48.     About thirty (30) minutes after Mr. Charles was placed in a waiting then defense counsel, James Gilden, came into the room and told Charles the prosecutor, Defendant Campo, wants a photograph of the line up participants to "show that the procedure was fair." Charles remained skeptical since the complainants did not make an identification.

49.     To allay his fear, Mr. Gilden told Charles he did not have to use the same #2 he stood in the actual line up. He held out the card numbers facing down and told Charles he could taken any card. Mr. Charles randomly selected card #4, reassembled with the other participants and Defendant Campo took a photograph.

50.     Weeks after the line up Defendant Campo negligently told then defense counsel he "confronted" Karen alone after line up ended and she said "I think it's number four (#4)." Defendant Campo negligently offered the photograph of the participants wherein Charles stood #4 as if it represented the actual line up, and falsely testified to the jury of what Karen purportedly encountered between himself and Karen.

51.     Mr. Charles was not #4 in the actual line up. He only stood #4 for the photograph of the participants long after the parade. This shows that Defendant Campo negligently showed Karen the photograph he took of the line up participants without the presence of counsel.

**The Forensic Investigation**

52.     On December 12, 1980 Defendant Keough and Defendant Stanley Bogdan went to the crime scene and collected a bed sheet on which two rapes occurred, and a maroon robe

Shannon wore during the rape.  Defendant Bogdan, a Boston Police senior criminalist, was assigned the case and conducted tests on the sheet and robe.  He determined the stains were seminal in origin and from a Type "O" secretor.

53.    Defendant Charles Campo obtained a court order for Mr. Charles's blood sample based on the fact that Defendant found seminal stains on the bed sheet and robe.  Pursuant to the court order Defendant Bogdan collected and compared Mr. Charles's blood type with that of crime scene sheet and robe.  Mr. Charles was a Group B secretor and therefore excluded as depositor of the seminal stains.

54.    Defendants Campo and Bogdan also tested and excluded Shannon's boyfriend as the depositor of the seminal stains, prior to the trial.  But Defendant Campo withheld that evidence from Mr. Charles.

55.    Defendant Campo examined the hospital medical records and knew Dr. Batzofin collected vaginal swabs of sperm from Karen and Shannon.  Defendant Bodgan's tests also confirmed stains on the bed sheet and robe were seminal in origin.  However, because the tests excluded Mr. Charles Defendant Campo knowingly presented false evidence at trial that Dr. Batzofin found no sperm upon examination of Karen and Shannon.  He also elicited false testimony from Defendant Bogdan the stains on bed sheet and robe were not seminal in origin, and argued the rapist did not ejaculate with the sole intent to injure Mr. Charles.

56.    Defendant Campos's false representations that Dr. Batzofin found no sperm upon examination of Karen and Shannon, and that the rapist did not ejaculate interfered with Mr. Charles's ability to earlier prove his innocence as he was misled to believe no evidence existed that could conclusively establish his innocence.

**Trial, Conviction, Incarceration and Exoneration**

57.    The primary evidence against Mr. Charles was Karen's, Ms. Shannon's, and Valerie's

testimony that included the photo identification corroborated by Defendant Keough, the

line up identification corroborated by Defendant Campo (the prosecutor), and Karen's in-

court identification.  Defendant Campo also interjected Mr. Charles's national origin into

the trial when he offered Mr. Charles's birth certificate into evidence to corroborate his

knowing false stipulation that Shannon told Dr. Batzofin the assailant had a "non-

American accent," Mr. Charles was born in Trinidad.

58.    His direct appeal was denied.  Mr. Charles contacted Centurion Ministries in New Jersey

who decided to assist in establishing his innocence after Mr. Charles submitted a

requested autobiography from his "earliest childhood to present."

59.    At the urging of Centurion Ministries Mr. Charles discovered for the first time that the

medical records from the rape existed.  Mr. Charles also learned through evidence in the

medical records that Dr. Batzofin found sperm upon examination of Karen and Shannon.

He also discovered, rather than "non-American," Shannon told Dr. Batzofin, who is

South African, her assailant had an American accent.

60.    Because the vaginal swabs were destroyed and medical records established the rapist did

ejaculate, a determination was made in 1995 to DNA test the stains on the bed sheet and

robe.

61.    Defendant John Zanini, however, through motions in court objected the release to Mr.

Charles's samples of biological evidence in possession of Boston Police Crime

Laboratory.  And, in November 1995, due to the rape conviction, prison authorities

transported Mr. Charles to Dallas County Jail where he was imprisoned until he returned in 1999.

62.    DNA tests conducted by Cellmark Diagnostic in 1999 established that biological stains on the sheet and robe were in fact sperm, and from two different men.

63.    Further DNA testing excluded Mr. Charles as the source of both sperm samples.

64.    Defendant Zanini and Suffolk County District Attorney's Office continued objections to Mr. Charles's release on the contention Shannon was having sex with many different men who could have deposited the sperm samples, and therefore the DNA exclusion was meaningless.

65.    In 2000 the Court ordered Defendant Zanini to locate the boyfriend for DNA testing. The boyfriend who was tested before trial was located, tested and excluded. Still Defendant Zanini insisted on the existence of other boyfriend, and for his office to conduct independent testing on Mr. Charles.

66.    Defendant Zanini produced no other boyfriend, and further tests by the Suffolk County District Attorney's Office again excluded Mr. Charles. Over the objection of Defendant Zanini, the Court vacated the convictions and sentence on May 14, 2001, and Suffolk County District Attorney's Office dismissed the indictments again Mr. Charles on May 17, 2001, when Mr. Charles was released from its custody.

**The City of Boston's Acquiescence to Police Misconduct**

67.    At the time of Mr. Charles' arrest, policy makers for the Boston Police Department were on notice of misconduct by Boston Police officers, including officers providing false testimony, withholding exculpatory evidence, destroying evidence that could identify a suspect, employing unduly suggestive identification procedures and inadequately

investigating cases.  Although this misconduct deprived people opf their constitutional

rights, the policy makers for the Boston Police Department neither required its officers to

comply with the law nor punish them when they failed to comply with lawful procedures.

68.    At the time of Mr. Charles's arrest the Boston Police Department did not have a properly

functioning system of internal discipline.  The police department was such a disgrace that

the infamous officer John Mulligan continued to violate people's constitutional rights for

years without any fear of reprimand.

69.    Similarly, systematic failures in the Boston Police Department and improper investigative

techniques employed by its members may be contributed to the rape of Karen, Shannon

and Valerie.  For example, Boston Police Department wrongly identified and arrested a

black man, Willie Sanders, on the night over 500 Brighton residents questioned the

Boston Police Department's inability to put an end to multiple rapes that plagued that

neighborhood in the winter of 1978-79.  Two juries acquitted Sanders of two counts of

rape and a judge dismissed a third count after finding that detectives of the Boston Police

Department had destroyed sperm samples, used unduly suggestive identification

procedures at photograph display and lineups, and coached the victims to identify

Sanders.  The very improper methods the Boston Police Department subsequently

employed to arrest and charge Mr. Charles for the Brighton rapes of Karen, Shannon and

Valerie.  The same serial rapist may have raped Karen, Shannon and Valerie.

70.    In 1980 Boston Police Department arrested and charged Michael Woods for rape despite

the fact that he was locked up at the Deer Island House of Correction at the time of the

crime.

71.    The Boston Police Department continued its unlawful policy even years after Mr.

Charles's wrongful arrest and imprisonment.  In 1989, Marvin Mitchell was charged with

rape even though he did not fit the description of the suspect the victims gave Boston

police.  Two Boston police officers falsely testified that Mr. Mitchell had admitted to

wearing unusual clothing described by the victim.  After spending over seven years in

prison, Mr. Mitchell was exonerated in 1997 through DNA testing.  The Boston police

officers were not disciplined.

72.    The policy maker for the Boston Police Department was on notice that Boston police

officers felt free to falsify affidavits in support of search warrants and to testify falsely to

grand juries and at criminal trials before the incidents leading to the wrongful arrest and

conviction of Mr. Charles.

73.    Despite knowledge that Boston police officers felt free to circumvent the law to secure

convictions, the Boston Police Department:

    A.    Failed to require an adequate standard of investigation by its detectives;

    B.    Failed to properly supervise and review the method and process of criminal

        investigations; and

    C.    Failed to discipline Boston police officers for giving false testimony.

74.    The Boston Police Department failed to hold its officers to an ethical standard.  This

created an environment in which officers like Defendants Mulligan, Keough, Rufo and

Hanley Johnson felt free to conduct suggestive identification and to misrepresent facts in

order to obtain a conviction because they knew this conduct would not result in

punishment.  The Boston Police Department allowed its officers to feel that convicting

someone, anyone, for a crime was more important than making sure that the person charged with the crime was the true culprit.

**The Suffolk County District Attorney's failure to properly train staff.**

75.    Defendants Suffolk County and the Suffolk County District Attorney's Office, acting through their policymakers, created and maintained a policy, custom, or practice of failing to train and supervise their employees and agents, including Defendants Campo and Zanini, in conducting constitutionally adequate identification procedures and in ensuring that unreliable, discredited, and improper identification techniques not be used.

**Damages**

76.    As a direct result of the defendants' unconstitutional actions, Mr. Charles sustained the following injuries and damages: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of income; infliction of physical illness; inadequate medical care; humiliation indignities, and embarrassment; degradation; injury to reputation; permanent loss of natural psychological development; and restriction on all forms of personal freedom, such as diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

**CLAIMS**

**Count I (42 U.S.C. sec. 1983)**
**Claims against Defendant Keough, Rufo,**
**Hanley, Johnson, Mulligan, Zanini and Campo**
**For unduly suggestive identification procedures**

77.    Plaintiff Charles hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

78.    Defendants Keough, Rufo, Mulligan, Hanley Johnson, Zanini and Campo conducted

unduly suggestive identification procedures with Karen, Shannon and Valerie.  This

includes, without limitation, the following acts:

   A.    They targeted Mr. Charles before the actual crime occurred and conducted the

initial photo array by showing Karen, Shannon and Valerie photographs

Defendant Keough had in his possession before the crime that looked nothing

like Mr. Charles's appearance in 1980 when the crimes were committed.

   B.    Upon Mr. Charles's arrest, Defendant Keough made a blown up copy of the

arrest photo and showed it to Karen, Shannon and Valerie, in the court house

corridor before the probable cause hearing began, thus prompting Karen to

testify that she initially identified Mr. Charles's unique photo with dreadlock

hair although she did not describe her assailant as having dreadlocks.

   C.    Defendant Campo conducted a suggestive line up when he photographed Mr.

Charles after the line up parade and showed the photo to Karen encouraging

her to falsely testify she identified Mr. Charles after the line up parade ended,

and identified Charleds, the only black person then in the court room.

79.    Defendant Campo was acting in his investigative capacity when he photographed Mr.

Charles after the line up parade ended and showed Karen the photo in the absence of

defense counsel, prompting her to say she identified #4 at the line up parade when

Charles was #2 in the actual line up parade.

80.    The defendants committed these unduly acts intentionally and with deliberate

indifference to Mr. Charles's clearly established constitutional rights.  No reasonable

officer or district attorney would have believed that these procedures were lawful or would produce a reliable identification.

81.     At a direct and proximate result of the defendants' use of unduly suggestive identification procedures, Karen misidentified Mr. Charles at trial in violation of his clearly established Fourteenth Amendment right to a fair trial and his right not to be deprived of his liberty without due process of law.  Mr. Charles suffered more than nineteen years of wrongful imprisonment, and endured all other physical, emotional, pecuniary damages set forth above.

**Count II 42 U.S.C. sec. 1983**
**Due Process Claims against Defendants Keough**
**Bodgan and Campo for Failing to Disclose Evidence;**
**And for Fabricating Evidence; and Due Process**
**Claim Against Defendant Keough for Failure to Investigate**

82.     Plaintiff Charles hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

**Fourteenth Amendment <u>Brady</u> Claims**

83.     Defendant Keough failed to disclose to defense attorney material information that was favorable to Mr. Charles.  This undisclosed information included the fact that he repeatedly employed unduly suggestive conduct that induced Karen and Shannon to misidentify Mr. Charles.

84.     Defendant Bogdan failed to disclose to defense counsel material information that was favorable to Mr. Charles.  This information included serological evidence that would have presumptively excluded Mr. Charles in the rape.

85.     Defendant Campo failed to disclose to defense counsel material information favorable to Mr. Charles.  This information included the fact that:

A.    Karen did not identify Mr. Charles at the line up in 1983;

B.    That Shannon told Dr. Batzofin the assailant had an American accent;

C.    Dr. Batzofin found sperm upon examination of Karen and Shannon;

D.    That the rapist did ejaculate; and

E.    That seminal stains were found on the bed sheet and robe.

86.    Defendant Keough failed to disclose that neither Karen nor Shannon identified Mr.

Charles but instead were shown single photos of Mr. Charles that Keough had in his

possession three (3) days before the crime.

87.    Defendant Keough deliberately and recklessly failed to investigate adequately, as any

minimal competent officer would have.

88.    Acting with deliberate indifference by withholding these material exculpatory and

impeachment evidence prior to trial, Defendant Keough, Bogdan and Campo violated Mr.

Charles's clearly established Fourteenth Amendment right to due process of law as

interpreted by the United States Court in Brady v. Maryland and its progeny.  This

directly and proximately caused Mr. Charles to be wrongly convicted and to suffer the

injuries and damages described below.

**Count III**
**42 U.S.C. sec. 1983 Conspiracy**

89.    Plaintiff Charles hereby incorporates fully all of the foregoing as if set forth herein and

further alleges as follows:

90.    Upon information and belief, Defendants Keough, Mulligan, Rufo, Hanley Johnson,

Campo, Bogdan and Zanini, John and Jane Does, conspired, reached a mutual

understanding and acted in concert to violate Mr. Charles' civil rights.

91.    In furtherance of the conspiracy, defendants undertook overt acts, including without

limitation the following:

A.    Suppressed exculpatory evidence in favor of Mr. Charles and fabricated inculpatory evidence against Mr. Charles.

B.    Deliberately destroyed vaginal swabs of sperm they knew would have identified the rapist and conclusively excluded Mr. Charles.

C.    Destroyed identification statements that would have exculpated Mr. Charles.

92.   Defendants' conspiracy directly caused the constitutional deprivations suffered by Mr. Charles including his false arrest, malicious prosecution, unfair trial, wrongful conviction and unlawful confinement, and all the other grevious permanent damages and injuries set forth herein above.

**Count IV**
**42 U.S.C. sec. 1983**
**Claims against Defendants Keough, Campo**
**Bodgan and Hanley Johnson For Malicious Prosecution**

93.   Plaintiff Charles hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

94.   When Mr. Charles was arrested the only inculpatory evidence was the unreliable identification by Karen and Shannon, which was the result of police urging rather than her own memory. Her misidentification did not provide probable cause to arrest him.

95.   Defendant Keough, Hanley Johnson, Campo, and Bogdan, all state actors acting under state law, commenced or caused to be commenced a criminal prosecution, instituted with malice and without probable cause, against Mr. Charles. They used improper, unduly suggestive techniques and t h e y  wrongly pressured Karen and Shannon into falsely identifying Mr. Charles as their rapist. They then failed to disclose materiel exculpatory evidence including that the identifications were conducted in an unduly suggestive manner and that serological

evidence excluded Mr. Charles (contrary to the fabricated evidence the prosecution presented).

96.  The defendants acted to secure a conviction of Mr. Charles regardless of the evidence. They chose to ignore, failed to disclose, or misrepresented the evidence that indicated Mr. Charles's innocence.

97.  The criminal action ultimately terminated in Mr. Charles's favor on May 14, 2401 when his conviction was vacated on the grounds of his actual innocence, due to conclusive comparative DNA exoneration.

98.  The defendants' conduct violated Mr. Charles' clearly established rights under the Fourth Amendment and the procedural due process component of the fourteenth Amendment

99.  As a proximate result of the defendants' conduct, Mr. Charles was arrested, prosecuted, was forced to endure an unfair trial and wrongful conviction, and was imprisoned for more than nineteen years.  He suffered the injuries and damages set forth above.

**Count V**
**42 U.S.C. sec. 1983**
**Monell Claim against the City of Boston**

100.  Plaintiff Charles hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

101.  By December 1980, the defendant City of Boston had a policy, custom, or practice of failing to properly discipline, supervise, and train Boston police officers including the individuals named in this case. The city failed to ensure that its police officers would conduct constitutionally adequate identification procedures, obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; disclose to prosecutors material information favorable to criminal defendants, follow the duty imposed

by Brady v. Maryland; and never fabricate inculpatory evidence.

102.    These policies, customs, and practices led Boston police officers to believe that misconduct would be tolerated and that allegations of abuse of constitutional rights would not be investigated. They made it foreseeable that officers would violate people's constitutional rights.

103.    The policies, customs, and practices of the Boston Police Department described in this complaint were the moving force behind Mr. Charles's arrest, prosecution, and incarceration.

**Count VI**
**42 U.S.C. sec. 1983**
**Supervisory Liability Claims against John and**
**Jane Doe, Supervisors in the Boston Police Department**

104.    Plaintiff Charles hereby incorporates fully all of the foregoing as if set forth herein and further  alleges as follows:

105.  Unnamed defendant supervisors of the Boston Police Department, collectively referred to here as John Doe and Jane Doe, acting under color of law with deliberate indifference to the rights of criminal suspects, failed to train and supervise adequately defendants Keough, Mulligan, Rufo, Hanley Johnson and Bogdan.  In so doing, these defendants acquiesced in, condoned, or encouraged the individual defendants engaging in unconstitutional misconduct, including the use of unduly suggestive identification procedures, the fabrication of evidence, and the suppression of exculpatory material evidence from the prosecutor.

106.  The failure of these defendants to supervise and train the named defendants amounted to the deliberate indifference, or intentional misconduct, which proximately and directly caused harm to Mr. Charles.

**Count VII
42 U.S.C. sec. 1983
Monell Claim Against Defendants Suffolk
County and Suffolk County District Attorney's Office
For Failure to Train and Supervise Prosecutors**

107.  Plaintiff Charles hereby incorporates fully all of the foregoing as if set forth herein and further alleges as follows:

108.  Defendants Suffolk County and Suffolk County District Attorney's Office, by and through their policy makers, created and maintained a policy, custom, or practice of failing to train and supervise their employees and agents, including Defendant Campo and Zanini in conducting constitutionally adequate identification procedures and in ensuring that unreliable, discredited, and improper identification techniques not be used. This failure to train and supervise directly and proximately caused Mr. Charles to suffer constitutional deprivations and thus caused the injuries and damages set forth above.

**Count VIII**
**State Tort Law Claims Against**
**Defendant Keough, Mulligan, PlaRufo,**
**Rufo, Campo, Hanley Johnson, Bogdan**
**Bogdan and Zanini For Malicious Prosecution**

109.    Plaintiff Charles hereby incorporates fully all of the foregoing as if set forth herein and

further alleges as follows:

110.    When Mr. Charles was arrested, the only inculpatory evidence was the unreliable

identifications of Karen and Shannon, which was the result of police pressure rather than

their own memory.  Karen and Shannon's misidentification did not provide probable

cause.

111.    Defendants Keough, Mulligan, Rufo, Campo, Hanley Johnson, Bogdan and Zanini, all

state actors acting under the color of law, commenced or caged to be commenced a

criminal proceedings instituted with malice and without probable cause against Mr.

Charles.  They used improper and unduly suggestive techniques and they wrongfully

pressured Karen and Shannon into falsely identifying Mr. Charles as her rapist.

They then failed to disclose material exculpatory evidence, including that the

identifications were conducted in an unduly suggestive manner and that serological

evidence excluded Mr. Charles (contrary to the fabricated evidence the prosecution

presented).

110.    The criminal action ultimately terminated in Mr. Charles' favor on May 14, 2001,

when his conviction was vacated on the grounds of actual innocence due to

conclusive comparative DNA tests.

As approximate result of the defendants' conduct, Mr. Charles was arrested,

prosecuted, forced to endure an unfair trial and wrongful conviction, and wrongly

imprisoned for more than nineteen years.  He suffered injuries and damages as set forth above.

## CLAIMS FOR DAMAGES

111.    The defendants' actions deprived Mr. Charles of his civil rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and under the laws of the Commonwealth of Massachusetts.

112.    The defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad faith, and malicious acts, misdeeds, and omissions caused Mr. Charles to be falsely arrested, maliciously prosecuted, unfairly tried, wrongfully convicted, and wrongfully imprisoned for more than nineteen years, together with all of the other injuries and damages as set forth above.

113.    All of the alleged acts misdeeds, and omissions committed by the defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, or with bad faith.  The conduct of the individual defendants meet all of the standards for imposition of punitive damages.

**THEREFORE**, Ulysses Rodriguez Charles prays as follows:

A.    That the court enter judgment in favor of Mr. Charles and against the defendants on all Counts of the complaint;

B.    That the court award compensatory damages to Mr. Charles and against the defendants, jointly and severally, in an amount to be determined at trial;

C.    The court award punitive damages to Mr. Charles and against the nonmunicipal defendants, jointly and severally, in an amount to be determined at trial, in order

that such award will deter similar proscribed conduct in the future;

D.      That the court award to Mr. Charles and against the defendants, jointly and

severally, pre-judgment interest on all sums awarded him in this action;

E.      That the court award to Mr. Charles and against the defendants, jointly and

severally, recovery of his costs concerning this action, including reasonable

attorney's fee pursuant to 42 U.S.C. sec. 1988; and,

F.      That the court grant Mr. Charles any such other relief to which he may be entitled.

**RESPECTFULLY SUBMITTED,**

Ulysses Rodriguez Charles
47 Larchmont St,
Dorchester, MA 02124


May 14, 2004

0038-003-103763