# EXHIBIT 1

**RETURN OF SERVICE**

I this day summoned the within named

to appear as within directed by delivering to ____ Shannon ▬▬▬▬▬▬

in hand,-- ~~leaving at~~

abode, to wit: No. ▬▬▬▬▬ ____   _____ Street,

in the ▬▬▬▬ _____ District of said ▬▬▬▬▬▬   an attested

copy of the subpoena together with ___ $88.00 ___ fees for attendance and travel

Service and Travel        _____

Cop.                      *Police Officer, Constable, Deputy Sheriff*

Pd. Witness

Motor Vehicle             It being necessary I actually used a

                          motor vehicle the distance of _____
                          miles in the service of this process


                          _____
                          *Police Officer, Constable, Deputy Sheriff*

Subscribed and sworn to before me   Jill LeBlanc
                                    _____

This  25th          day of   Sepetmber    20 06

                                              Notary Public

JILL M. LeBLANC
Notary Public
Commonwealth of Massachusetts
My Commission Expires
July 21, 2011

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

ULYSSES RODRIGUEZ CHARLES,

Plaintiff,

v.

CITY OF BOSTON, STANLEY BOGDAN,
JOHN MULLIGAN, WILLIAM KEOUGH,
PAUL RUFO, KATHLEEN HANLEY
JOHNSON, and JOHN DOE and JANE DOE,
supervisors in the Boston Police Department,

Defendants.

C.A. No. 04-10986-NG

## SUBPOENA TO TESTIFY AND PRODUCE DOCUMENTS

TO:    SHANNON ⸺⸺⸺

GREETINGS:

YOU ARE HEREBY COMMANDED, in accordance with the provisions of Rule

45 of the Federal Rules of Civil Procedure, to appear and testify at the taking of a

deposition upon oral examination in the above-captioned case, at the offices of Paragon

Law Group LLP, 4th Floor, 184 High Street, Boston, MA 02110 on **October 17, 2006**

beginning at 10:00 a.m. Your testimony shall be transcribed by a notary public or other

person authorized by law to administer oaths.

YOU ARE FURTHER REQUIRED to produce at the same place the documents

and objects identified on the attached Schedule A at or before 9:00 a.m. on **October 6,**

**2006**.

FAILURE to appear according to the command of this subpoena may subject you

to a penalty, damages, in a civil suit and punishment for contempt of Court.

DATED: September 25, 2006
Boston, Massachusetts

Kevin J. O'Connor (BBO# 555250)
Mayeti Gametchu (BBO# 647787)
John Pagliaro (BBO# 634483)
PARAGON LAW GROUP, LLP
184 High Street
Boston, MA 02110
Tel. (617) 399-7950

ATTORNEYS FOR PLAINTIFF

ULYSSES RODRIGUEZ CHARLES

## Federal Rule of Civil Procedure 45, Parts C & D

(c) Protection of Persons Subject to Subpoenas.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

2

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) Duties in Responding to Subpoena.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

3

## SCHEDULE A

### Definitions

The terms used in this Schedule have the meanings given below:

"Charles" means Ulysses Rodriguez Charles, the Plaintiff in this action.

"BPD" means the Boston Police Department and includes its agents, employees, beneficiaries, attorneys, representatives and all other persons acting on its behalf.

"City" means the City of Boston and includes its agents, employees, beneficiaries, attorneys, representatives and all other persons acting on its behalf.

"District Attorney" means the Office of the District Attorney for the Suffolk District and includes its agents, employees, beneficiaries, attorneys, representatives and all other persons acting on its behalf.

"Crimes" refers to the crimes committed on December 8, 1980 in Brighton, Massachusetts, for which Charles was convicted.

"Investigation" means the investigation conducted by the BPD into the crimes of December 8, 1980 for which Charles was tried and convicted, and includes, without limitation, all work performed by Stanley Bogdan, John Mulligan, Charles Campo, Kathleen Hanley Johnson, Paul Rufo, William Keough, the BPD and the District Attorney, up to the time of Charles's Conviction (defined below).

"Trial" means the trial that led to Charles' conviction for the crimes.

"Conviction" means the convictions of Charles entered on February 14, 1984.

"Concerning" means referring to, describing, evidencing, or constituting.

"Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

"Documents" includes any writings, drawings, graphs, charts, photographs, phonorecords, and other data compilations from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form.

### Requests for Documents

1. All documents concerning communications between you and the BPD concerning the Crimes, Trial, or Conviction.

2. All documents concerning communications between you and the District Attorney concerning the Crimes, Trial, or Conviction.

3. All documents concerning communications between you and the City concerning the Crimes, Trial, or Conviction.

4. All documents concerning communications between you and the Massachusetts Attorney General's Office concerning the Crimes, Trial, or Conviction.

5. All documents concerning communications between you and the BPD concerning the pending law suits brought by Charles concerning his Conviction for the Crimes.

6. All documents concerning communications between you and the District Attorney concerning the pending law suits brought by Charles concerning his Conviction for the Crimes.

7. All documents concerning communications between you and the City concerning the pending law suits brought by Charles concerning his Conviction for the Crimes.

8. All documents concerning communications between you and the Massachusetts Attorney General's Office concerning the pending law suits brought by Charles concerning his Conviction for the Crimes.

9. All documents concerning communications between you and Karen ●▬▬or Valerie ▬◤concerning the Crimes, Trial, Conviction , or the pending law suits brought by Charles concerning his Conviction for the Crimes.

10. All documents concerning communications between you and any news medium concerning the Crimes, Trial, Conviction , or the pending law suits brought by Charles concerning his Conviction for the Crimes.

0038-002-102798.DOC

5

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ULYSSES RODRIGUEZ CHARLES,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF BOSTON, STANLEY BOGDAN,<br>JOHN MULLIGAN, WILLIAM KEOUGH,<br>PAUL RUFO, KATHLEEN HANLEY<br>JOHNSON, and JOHN DOE and JANE DOE,<br>supervisors in the Boston Police Department,<br><br>Defendants. | C.A. No. 04-10986-NG |

### SUBPOENA TO TESTIFY AND PRODUCE DOCUMENTS

TO:     **SHANNON** ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

GREETINGS:

YOU ARE HEREBY COMMANDED, in accordance with the provisions of Rule 45 of the Federal Rules of Civil Procedure, to appear and testify at the taking of a deposition upon oral examination in the above-captioned case, at the offices of Paragon Law Group LLP, 4th Floor, 184 High Street, Boston, MA 02110 on **May 14, 2007** beginning at 10:00 a.m. Your testimony shall be transcribed by a notary public or other person authorized by law to administer oaths.

YOU ARE FURTHER REQUIRED to produce at the same place the documents and objects identified on the attached Schedule A at or before 10:00 a.m. on **May 14, 2007**.

FAILURE to appear according to the command of this subpoena may subject you to a penalty, damages, in a civil suit and punishment for contempt of Court.

DATED: May 4, 2006
Boston, Massachusetts

Kevin J. O'Connor (BBO# 555250)
Mayeti Gametchu (BBO# 647787)
PARAGON LAW GROUP, LLP
184 High Street
Boston, MA 02110
Tel. (617) 399-7950

ATTORNEYS FOR PLAINTIFF

ULYSSES RODRIGUEZ CHARLES

## Federal Rule of Civil Procedure 45, Parts C & D

(c) Protection of Persons Subject to Subpoenas.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

    (i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

    (ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

    (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) Duties in Responding to Subpoena.

    (1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

    (2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A

### Definitions

The terms used in this Schedule have the meanings given below:

"Charles" means Ulysses Rodriguez Charles, the Plaintiff in this action.

"BPD" means the Boston Police Department and includes its agents, employees, beneficiaries, attorneys, representatives and all other persons acting on its behalf.

"City" means the City of Boston and includes its agents, employees, beneficiaries, attorneys, representatives and all other persons acting on its behalf.

"District Attorney" means the Office of the District Attorney for the Suffolk District and includes its agents, employees, beneficiaries, attorneys, representatives and all other persons acting on its behalf.

"Crimes" refers to the crimes committed on December 8, 1980 in Brighton, Massachusetts, for which Charles was convicted.

"Investigation" means the investigation conducted by the BPD into the crimes of December 8, 1980 for which Charles was tried and convicted, and includes, without limitation, all work performed by Stanley Bogdan, John Mulligan, Charles Campo, Kathleen Hanley Johnson, Paul Rufo, William Keough, the BPD and the District Attorney, up to the time of Charles's Conviction (defined below).

"Trial" means the trial that led to Charles' conviction for the crimes.

"Conviction" means the convictions of Charles entered on February 14, 1984.

"Concerning" means referring to, describing, evidencing, or constituting.

"Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

"Documents" includes any writings, drawings, graphs, charts, photographs, phonorecords, and other data compilations from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form.

### Requests for Documents

1. All documents concerning communications between you and the BPD concerning the Crimes, Trial, or Conviction.

2. All documents concerning communications between you and the District Attorney concerning the Crimes, Trial, or Conviction.

3. All documents concerning communications between you and the City concerning the Crimes, Trial, or Conviction.

4. All documents concerning communications between you and the Massachusetts Attorney General's Office concerning the Crimes, Trial, or Conviction.

5. All documents concerning communications between you and the BPD concerning the pending law suits brought by Charles concerning his Conviction for the Crimes.

6. All documents concerning communications between you and the District Attorney concerning the pending law suits brought by Charles concerning his Conviction for the Crimes.

7. All documents concerning communications between you and the City concerning the pending law suits brought by Charles concerning his Conviction for the Crimes.

8. All documents concerning communications between you and the Massachusetts Attorney General's Office concerning the pending law suits brought by Charles concerning his Conviction for the Crimes.

9. All documents concerning communications between you and Karen ⬛⬛⬛ or Valerie⬛⬛⬛ concerning the Crimes, Trial, Conviction , or the pending law suits brought by Charles concerning his Conviction for the Crimes.

10. All documents concerning communications between you and any news medium concerning the Crimes, Trial, Conviction , or the pending law suits brought by Charles concerning his Conviction for the Crimes.

0038-002-103691.doc

5

## PROOF OF SERVICE

| DATE SERVED: | May 8th 2007 Shannon | PLACE |
|---|---|---|

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| Shannon | Personal/in-hand |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| Chris M Page | Process Server |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

_____
SIGNATURE OF SERVER

11 Beacon St Boston MA
ADDRESS OF SERVER

# EXHIBIT 2

5-48

1    A    He just told me not to say anything.

2    Q    Yeah. And?

3    A    And that he would see me back at the office.

4         That's all.

5    Q    Uh huh. And in fact you didn't say anything to

6         anyone. Is that correct?

7    A    Excuse me?

8    Q    As a matter of fact, you didn't say anything to

9         anyone?

10   A    I did not say anything to anybody.

11   Q    No. Okay.

12                      KAREN, how long have you

13        been wearing those glasses?

14   A    I've worn glasses since I was in First Grade.

15   Q    And you wear them for all purposes?

16   A    Yes, I do.

17   Q    For reading, driving?

18   A    Working.

19   Q    Going to the movies?

20   A    Yes.

21   Q    And would it be fair to say that you were wearing

22        the glasses the evening of December 8th?

23   A    Yes, I was.

24   Q    Okay. Were you wearing the glasses all during the

25        evening of December 8?

UC 6336

5-49

1    A    No.

2    Q    At what point in time did you remove or were your

3         glasses removed?

4    A    I really don't remember when.

5    Q    Was it when you were in the hallway?

6    A    I really -- I had them on when I was in the hallway

7         and when I left the apartment.  I really do not

8         remember when.

9    Q    Did you lose possession of your glasses when

10        you were on the couch?

11   A    I don't remember when I lost them.

12   Q    Were you wearing your glasses when your head was

13        covered by the blanket?

14   A    I don't remember.

15   Q    When you were taken from the living room to the

16        bedroom, was your head still being covered by

17        the blanket or coat?

18   A    He just kept telling us to look straight ahead.

19        No, it wasn't covered exactly.

20   Q    It wasn't covered exactly?

21   A    Well, he told me to lift up the collar to my coat

22        and keep  looking straight ahead.

23   Q    What happened to the blanket that was over your head?

24   A    I don't know.

25   Q    Did you see that blanket again later that evening?

UC 6337

# EXHIBIT 3

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

BRIGHTON MUNICIPAL COURT
NOS. 6580, 2818,2819
AND 2820

COMMONWEALTH        )
                    )
        V.          )    COMMONWEALTH'S ANSWER TO DEFENDANT'S
                    )    MOTION FOR IDENTIFICATION EVIDENCE
CHARLES RODRIGUEZ)

Now comes the Commonwealth and states in answer
to defendant's Motion for Identification evidence that
Ms. Karen          viewed a photographic display and
identified the defendant. Neither Ms. Valerie
nor Ms. Shannon          have identified the defendant.

Respectfully submitted,

For the Commonwealth

Rosalind Henson Miller,
Assistant District Attorney
Boston Municipal Court
Old Court House, Rm. 273
Boston, Mass. 02108
Tel. 617/725-8727

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                    BRIGHTON MUNICIPAL COURT
                                               NOS. 6580, 2818,2819
                                               AND 2820

COMMONWEALTH          )
                      )
        V.            )    SUPPLEMENT TO COMMONWEALTH'S ANSWER
                      )    TO DEFENDANT'S MOTION FOR IDENTIFICA-
CHARLES RODRIGUEZ)        TION EVIDENCE

Now comes the Commonwealth and states in answer

to defendant's Motion for Identification evidence that

Ms. Karen         viewed a photographic display and

identified the defendant. All three victims viewed the

same photographic display which contained the defendant's

picture. Neither Ms. Valerie     nor Ms. Shannon

    ., have identified the defendant.

                        Respectfully submitted,

                        For the Commonwealth

                        Rosalind Henson Miller,
                        Assistant District Attorney
                        Boston Municipal Court
                        Old Court House, Rm. 273
                        Boston,MA 02108
                        Tel. No. 617/725-8727

# EXHIBIT 4

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
DEPARTMENT OF THE
TRIAL COURT

COMMONWEALTH     *
                        *

v.                             *
                        *
                        *

RODRIGUEZ U. CHARLES *
     Defendant         *
                        *

INDICTMENT NOS.

035492-45
036181-84

## AFFIDAVIT OF VICTIM

I, Karen █████████ to hereby depose and say as follows:

1.    I was raped twice on December 8, 1980, by Rodriguez Charles, who forced me, at the point of a screwdriver, from my building's hallway into the apartment I shared with Shannon █████ and Valerie █████

2.    When the defendant raped me vaginally, I was wearing a long woolen coat which remained between me and Shannon's bed throughout the rape.

3.    When he raped me anally, I was not on Shannon's bed.

4.    I never engaged in consensual sexual relations on Shannon's bed.

5.    Shannon and I were roommates for three months before the rape. We had been friends for at least one and a half or two years before that.

6.    Shannon dated several men, for short periods of time, during the months before the rape.

7.    Shannon and I sometimes went to bars together, and I saw Shannon meet men who she would then bring home with her. On some occasions when we were out together, I became drunk. This, and the fact that twenty years have passed, make it impossible for me to remember with specificity descriptions

of men that Shannon dated, or how they appeared when I would see them with her in our apartment.

8.    I saw men leave Shannon's room and the apartment at 3:00 or 4:00 A.M.

9.    I saw a man wearing Shannon's bathrobe in our apartment on one occasion.

10.    I do not remember ever wearing Shannon's robe, but I cannot exclude the possibility that I may have, if, for example, I had forgotten to take my own robe to the bathroom when I was showering.

11.    I do not remember hearing any noises coming from Shannon's room when she had a man staying with her.

12.    I think that Shannon dated an African-American man who worked as a bouncer at the Metro club.

Signed this ___8___ day of November, 2000, under the pains and penalties of perjury.

Karen

Sworn to and subscribed before me this
8th day of November, 2000.

Notary Public
My Commission expires: 01.31.01

1   A   They were off in another room by themselves.

2   Q   So you viewed the lineup separately?

3   A   Yes.

4   Q   Could you describe the individuals that were

5       standing in that lineup if you will?

6   A   They were all black, and ages -- you know -- between

7       middle 20s to early 30s.

8   Q   While inside the lineup room, if you will, what

9       directions were you given with regard to viewing

10      the lineup?

11  A   They were told to turn to the right, to face front,

12      and to turn to the left.

13  Q   Were you told to view each individual first before

14      trying to make an identification?

15  A   Yes.

16  Q   Would it be fair to say that each individual in the

17      lineup stepped forward, turned to the left, turned

18      the right, and then stepped back?

19  A   Yes.

20  Q   And at the end of that sequence, after all the

21      individuals had stepped forward and had stepped back,

22      were you asked to make an identification?

23  A   Yes.

24  Q   At that time, what did you say?

25  A   I said that it had been too long.

5-27

1    Q   Now, after you viewed that lineup, where did you go?

2    A   I was put off to a separate room.

3    Q   Now, did you view the lineup first, second or third?

4    A   First.

5    Q   Could you describe your emotional state at that time?

6    A   Scared.

7    Q   After leaving the lineup and you were brought to

8        the other room, at some point did someone enter

9        the room that you were in?

10   A   Yes.

11   Q   Who was that?

12   A   You.

13   Q   Could you tell us what happened exactly upon my

14       entering the room?

15   A   I said that "I think it was No. 4, but it had been

16       too long and I was scared to say anything."

17   Q   Had I said anything to you upon my entering the

18       room?

19   A   No.

20

21         (Bench Conference as follows...

22             MR. CAMPO:   This is the photograph

23    of the lineup.  I'm going to be offering it at this

24    time.  I just wanted to make the Court aware of it.

25            MR. GILDEN:   That is a photograph of

UC 6315

1    A    Yes.

2    Q    Now, was the light still on at that point?

3    A    Yes.

4    Q    What happened when he came back into the bedroom?

5    A    He grabbed me by my ankles.

6    Q    And what did he do?

7    A    And he pulled me down towards the door of

8         Shannon's room.

9    Q    How was your body situated on the bed at that time?

10   A    I was like leaning over the bedpost.

11   Q    Would it be fair to say that you were bent over

12        the rear of the bed?

13   A    Yes.

14   Q    And what did Mr. Charles do at that point?

15   A    He raped me anally.

16   Q    And what did you do?

17   A    I screamed a little but tried not to scream to loud

18        because I was scared.

19   Q    Did he say anything to you?

20   A    Yes, he told me not to scream or he'd kill me.

21   Q    And how long did that take?

22   A    It felt like forever. Oh, God, I don't know five,

23        seven, ten minutes.

24   Q    What did he do after that?

25   A    He told me to get back up on the bed. I think he

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

# EXHIBIT 5

6-12

1  Q  How were you dressed at that point?

2  A  I was in a maroon bathrobe, floor-length bathrobe.

3  Q  Were you wearing anything under the bathrobe?

4  A  No, I wasn't.

5  Q  How were you positioned on the bed at this time?

6  A  I'm still sitting up in bed.

7  Q  Were your hands in front of you?

8  A  Yes, they were.

9  Q  What did he say?

10  A  Well, he asked me -- he said -- at that point, he said,

11     "I know this isn't going to bother you.  I know you're

12     not a virgin."  That's when he proceeded to pull down

13     his pants.  First of all, he pulled up my bathrobe

14     around my waist.

15  Q  What did he do after he pulled your bathrobe up?

16  A  Then he did rape me vaginally.

17  Q  How long a period of time did this take?

18  A  It was a matter of minutes, two or three minutes.

19  Q  Do you know whether or not he ejaculated?

20  A  No, he did not.

21  Q  What did he do after that?

22  A  He got off the bed and zipped up his pants.  Then he

23     proceeded -- then he left the room and closed the door

24     again.  The lights were still out at that point.

25  Q  At some point did he return?

UC 6036

1          (Mr. Campo publishes photograph to jury.)

2          THE COURT:  We're going to take the morning

3     recess.

4          (Recess)

5          MR. CAMPO:  May I continue, Your Honor?

6          THE COURT:  You may.

7  Q  SHANNON , I show you this maroon bathrobe and ask

8     you if you can identify that for us?

9  A  Yes, that's the bathrobe that I was wearing.

10  Q  I ask you to look at this here and tell us if you

11     recognize that?

12  A  Yes.  This was the bottom sheet on the bed.

13          MR. CAMPO:  I move to offer these, Your Honor.

14          MR. GILDEN:  No objection.

15          THE COURT:  Okay.

16          MR. CAMPO:  Exhibit 18 and Exhibit 19, the

17     robe being 18, the sheet being 19.

18               (Robe was marked Exhibit No. 18 and

19               was received into evidence.)

20               (Sheet was marked Exhibit No. 19

21               and was received into evidence.)

22  Q  SHANNON , with regard to the sheet that I just

23     showed you, are you familiar with that sheet?

24  A  Yes, I am.

25  Q  Are you familiar with the stain that appears on that

# EXHIBIT 6

**CELLMARK**

DIAGNOSTICS

20271 Goldenrod Lane · Germantown, Maryland 20876

Telephone: (301) 428-4980  (800) USA-LABS
Administration Fax: (301) 428-4877
Laboratory Fax: (301) 428-7946

## AMENDED REPORT OF LABORATORY EXAMINATION

May 28, 1999
*Amended on October 12, 1999*

Ms. Julie Ann Boyden
Attorney at Law
P.O. Box 988
Easton, MA 02334

Re: Cellmark Case No. F991025

EXHIBITS:

Polymerase chain reaction (PCR) testing was performed on the following item which was received for analysis on May 19, 1999:

One purple-top tube of blood labelled *"Rodriguez Charles..."*

RESULTS:

DNA isolated from the item listed above was amplified using the PCR and typed for HLA DQA1, the LDL receptor (LDLR), glycophorin A (GYPA), hemoglobin G gammaglobin (HBGG), D7S8, and group specific component (GC) using the AmpliType® PM+DQA1 PCR Amplification and Typing Kit. The types detected for the purple-top tube of blood labelled Charles Rodriguez and the types previously reported for the material cutting labelled stained sheet and the material cuttings labelled robe in the **Report of Laboratory Examination** dated May 7, 1999, are listed below:

| ALLELES DETECTED | | | | | | |
|---|---|---|---|---|---|---|
| **SAMPLE** | **DQA1** | **LDLR** | **GYPA** | **HBGG** | **D7S8** | **GC** |
| Sheet (non-sperm fraction) | **2, 4.1**, 1.2 | B | AB | **AB** | AB | ABC |
| Sheet (sperm fraction) | 1.2, 4.1 | B | AB | A | AB | AB(C) |
| Robe (non-sperm fraction) | 2, 4.1 (1.1) | B(A) | AB | AB | AB | AC |
| Robe (sperm fraction) | 1.1, 4.1 | AB | B | A | B(A) | AC |
| *Rodriguez Charles* | 1.1, 1.2 | B | AB | C | A | A |

The results shown in parentheses are below the intensities of the control dots. These results may be due to the presence of DNA from more than one individual or to technical artifacts.

The results listed above in bold print are darker than the other results observed at that locus.

*Accredited by the American Society of Crime Laboratory Directors/Laboratory Accreditation Board*

*Cellmark Diagnostics, Inc. is a subsidiary of Lifecodes Corporation*

Report for Cellmark Case No. F991025
*October 12, 1999*
Page Two

CONCLUSIONS:

The data indicate that DNA from more than one individual was obtained from the non-sperm fraction of the material cutting labelled stained sheet. *Rodriguez Charles* is excluded as a source of the DNA obtained from the non-sperm fraction of the material cutting labelled stained sheet.

The data indicate that DNA from more than one individual may have been obtained from the non-sperm fraction of the material cutting labelled robe. *Rodriguez Charles* is excluded as a source of the DNA obtained from the non-sperm fraction of the material cutting labelled robe.

*Rodriguez Charles* is excluded as the source of the DNA obtained from the sperm fraction of the material cutting labelled stained sheet and the sperm fraction of the material cutting labelled robe.

EVIDENCE DISPOSITION:

In the absence of specific instructions, evidence will be returned to the submitting agency by Federal Express or other appropriate carrier.

Jacki J. Higgins
Staff DNA Analyst

Charlotte J. Word, Ph.D.
Deputy Laboratory Director

If expert witnesses are needed for depositions or court testimony, please notify us by telephone at 301-515-6155 at least four weeks in advance.

*Amended portions of the report are shown in italics.*

CELLMARK

DIAGNOSTICS

20271 Goldenrod Lane · Germantown, Maryland 20876

Telephone: (301) 428-4980 (800) USA-LABS
Administration Fax: (301) 428-4877
Laboratory Fax: (301) 428-7946

## REPORT OF LABORATORY EXAMINATION
April 17, 2001

Ms. Julie Ann Boyden
Attorney at Law
P.O. Box 276
North Easton, MA 02356

Re: Cellmark Case No. F991025

### EXHIBITS:

Polymerase chain reaction (PCR) testing was performed on the following items which were
received for analysis on April 4, 2001:

Material cutting labelled "...Bottom Rear..."

Material cutting labelled "...Inside, Back..."

Material cutting labelled "...control..."

### RESULTS:

DNA isolated from the items listed above was amplified using the PCR and typed for HLA
DQA1, the LDL receptor (LDLR), glycophorin A (GYPA), hemoglobin G gammaglobin
(HBGG), D7S8, and group specific component (GC) using the AmpliType® PM+DQA1 PCR
Amplification and Typing Kit. The types detected for the samples listed above and the types
previously reported for the tube of blood labelled Rodriguez Charles in the **Amended Report of
Laboratory Examination** dated October 12, 1999, are listed below:

Report for Cellmark Case No. F991025
April 17, 2001
Page Two

| ALLELES DETECTED | | | | | | |
|---|---|---|---|---|---|---|
| SAMPLE | DQA1 | LDLR | GYPA | HBGG | D7S8 | GC |
| Bottom Rear (non-sperm fraction) | 2, 4.1 * | B* | AB | AB | AB | AC |
| Bottom Rear (sperm fraction) | 1.1, 4.1 | AB | B | A | B | AC |
| Inside, Back (non-sperm fraction) | 2, 4.1 * | B | AB | AB | AB | C* |
| Inside, Back (sperm fraction) | 1.1, 1.2, 2 (4.1) | B(A) | AB | AB | AB | AC(B) |
| Control (non-sperm fraction) | 2, 4.1 * | AB | AB | AB* | AB | AC* |
| Control (sperm fraction) | 2,4.1,1.1˙ | AB | AB | AB | AB | ABC |
| Rodriguez Charles | 1.1, 1.2 | B | AB | C | A | A |

The results shown in parentheses are below the intensities of the control dots. These results may be due to the presence of DNA from more than one individual or to technical artifacts.

The results listed above in bold print are darker than the other results observed at that locus.

˙This sample contains DNA from a least two sources; the 1.2 HLA DQA1 type, if present, may not be detected by this testing.

*In addition to the types listed above, results were obtained that were below the intensities of the control dots. These results may be due to the presence of DNA from more than one individual or to technical artifacts.

CONCLUSIONS:

The data indicate that DNA from more than one individual was obtained from the non-sperm fraction of the material cutting labelled bottom rear. Rodriguez Charles is excluded as a source of the DNA obtained from the non-sperm fraction of the material cutting labelled bottom rear.

Rodriguez Charles is excluded as the source of the DNA obtained from the sperm fraction of the material cutting labelled bottom rear.

Rodriguez Charles is excluded as the source of the DNA obtained from the non-sperm fraction of the material cutting labelled inside, back.

Report for Cellmark Case No. F991025
April 17, 2001
Page Three

The data indicate that DNA from more than one individual was obtained from the sperm fraction of the material cutting labelled inside, back. Rodriguez Charles is excluded as a source of the DNA obtained from the sperm fraction of the material cutting labelled inside back.

The data indicate that DNA from more than one individual was obtained from the non-sperm fraction of the material cutting labelled control. Rodriguez Charles is excluded as a source of the DNA obtained from the non-sperm fraction of the material cutting labelled control.

The data indicate that DNA from more than one individual was obtained from the sperm fraction of the material cutting labelled control. Rodriguez Charles is excluded as a source of the DNA obtained from the sperm fraction of the material cutting labelled control.

EVIDENCE DISPOSITION:

In the absence of specific instructions, evidence will be returned to the submitting agency by Federal Express or other appropriate carrier.

Jacki J. Higgins
DNA Analyst II

Lisa L. Grossweiler
DNA Analyst IV

If expert witnesses are needed for depositions or court testimony, please notify us by telephone at 301-515-6155 at least four weeks in advance.

cc:    Mr. Stephen Hrones
       Hrones and Garrity
       Lewis Wharf- Bay 232
       Boston, MA 02110-3927

       Mr. Jack Zanini
       Suffolk County District Attorney's Office
       BBO# 563839
       One Bulfinch Place
       Boston, MA 02114

# EXHIBIT 7

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CRIMINAL ACTION
NOS. 035492-45
035181-84

COMMONWEALTH

vs.

RODRIGUEZ CHARLES

MEMORANDUM OF DECISION AND ORDER
ON DEFENDANT'S MOTION FOR NEW TRIAL

The defendant, Rodriguez Charles, was convicted in 1984 of entering a dwelling, while armed, with intent to commit a felony; three counts of unlawful confinement; four counts of aggravated rape; and robbery. The defendant now moves for a new trial pursuant to Mass. R. Crim. P. 30(b) on several grounds, including newly discovered DNA evidence, unavailable at the time of his trial, which excludes him as the donor of any biological evidence found at the scene. For the reasons set forth herein, specifically, the newly discovered DNA evidence and the Commonwealth's failure to disclose a potentially exculpatory statement by one of the victims, the defendant's motion is ALLOWED.

## PROCEDURAL HISTORY

Following his conviction on February 14, 1984, the defendant was sentenced to four consecutive terms of eighteen to twenty years at the Massachusetts Correctional Institute at Walpole for the aggravated rapes. In addition, the defendant was sentenced to eighteen to twenty years for robbery, and eighteen to twenty years for entering a dwelling armed and making an assault with intent to commit a felony, both terms to run concurrently with his first sentence for aggravated rape. Finally, for each conviction of unlawful confinement, the defendant was sentenced to a term of nine to ten years to run concurrently with the first sentence for aggravated rape.

The defendant appealed his conviction on the grounds of improper denial of his motion to suppress, improper admission of certain evidence, improper jury instructions, failure to conduct a voir dire or give a curative instruction regarding the fact that jurors had seen the defendant in shackles, prosecutorial misconduct, and ineffective assistance of counsel.[1] The Supreme Judicial Court affirmed the defendant's convictions in Commonwealth v. Charles, 397 Mass. 1 (1986). Of relevance to this motion, the defendant argued on appeal that the trial judge erred in failing to

---

[1]The defendant was represented by different counsel on appeal.

2

give a requested jury instruction which highlighted the difficulty of an individual identifying members of a race different from his own. Id. at 8 & n. 10.  The Supreme Judicial Court held that the judge's instruction on identification was proper and it was within the trial judge's discretion to deny the defendant's request. Id. at 8.

Subsequently, the defendant filed his first motion for a new trial alleging prosecutorial misconduct, loss or destruction of potentially exculpatory evidence, prejudicial error in the Commonwealth's closing argument, and ineffective assistance of counsel.[2]  This court (Connolly, J.) denied the motion on April 17, 1996.  The defendant argued that he was entitled to a new trial because the Commonwealth lost or destroyed potentially exculpatory evidence which included vaginal swabs that contained sperm samples found in the victims. The court disagreed, concluding that there was no evidence that the Commonwealth ever had the sperm samples in its possession and, therefore, could not be charged with failing to preserve the samples for testing.

The defendant appealed the court's denial of his motion for a new trial to the Appeals Court.  The Appeals Court has stayed that appeal pending the outcome of the current motion for new trial.

---

[2]The defendant was represented by the same counsel who represented him on the direct appeal.

3

BACKGROUND

The facts of the case are set out in detail in Commonwealth v.
Charles, 397 Mass. 1, 3-5 (1986). Here, the court will recite only
those facts necessary to decide this motion. On December 8, 1980,
three roommates, Karen, Shannon, and Valerie,[3] were raped in their
apartment in Brighton by a single assailant described as a thin
black man, five feet nine inches tall, with "scruffy" black hair
and a beard, wearing a tan trench coat. The assailant raped Karen
and Shannon on Shannon's bed. Shannon, who was wearing a maroon
bathrobe at the time, was raped vaginally, and Karen was raped both
vaginally and anally. The assailant raped Valerie orally.

The sheet from Shannon's bed and the robe worn by Shannon
during the assault were tested for physical evidence, and stains
were found on each. At trial, the Commonwealth's expert, Stanley
Bogdan (Bogdan), a senior criminalist qualified as an expert in the
field of serology, testified that microscopic tests performed on
these stains did not detect the presence of any sperm cells. An
absorption-inhibition test performed by Bogdan indicated that the
stains were from a Group O secretor. The jury heard evidence that
the defendant was a Group B secretor, Shannon was a Group O
secretor, and Karen was a Group O non-secretor. In addition,
Shannon testified that the stain found on her bathrobe and a stain

---

[3]These are the names by which the Supreme Judicial Court
referred to the victims. See Commonwealth v. Charles, supra at 3.

4

on her bed sheet existed prior to the rape.

Forensic serologist John Cope Abbott (Abbott) also testified that he performed forensic tests on the sheet and robe, and that these tests did not indicate the presence of spermatozoa on any of the areas of the sheet and robe he examined. Abbott testified that the stains on the robe and the sheet were not seminal fluid or not consistent with seminal fluid

Shannon and Valerie testified that the rapist did not ejaculate, while Karen testified that she did not know whether or not he had ejaculated. Vaginal swabs had been taken from Shannon and Karen at Beth Israel Deaconess Hospital on the day of the assault, but the swabs were apparently misplaced. The Commonwealth and defense counsel entered into a stipulation that the vaginal swabs taken from Shannon and Karen were examined microscopically and tests indicated that no sperm was found.

The jury also heard evidence that the day following the assaults, Shannon and Karen identified the defendant after viewing approximately one hundred and fifty photographs of black males between the ages of twenty and thirty. Valerie was not able to select any photograph as the assailant. At the probable cause hearing on June 1, 1981, Karen and Shannon testified that the assailant had a distinctive accent. The defendant is from Trinidad, West Indies. On November 3, 1983, all three victims attended a

lineup at the Boston police headquarters.[4]    Shannon and Valerie were unable to identify the assailant.    Karen did not make an identification during the lineup, stating that it had been too long since the incident.  However, immediately after the lineup, Karen told the prosecutor that she thought the assailant was No. 4 (the defendant).    Finally, Karen identified the defendant, who was seated among the spectators, at trial.

Subsequent to the defendant's trial, the defendant learned that Shannon and Karen's medical records revealed that spermatozoa was detected on the vaginal swabs. In addition, the medical records revealed that at least two of the complainants had had consensual sexual intercourse anywhere from three days to two months before the incident.  To this date, the vaginal swabs taken from Shannon and Karen have not been located by the Beth Israel Deaconess Hospital.

In 1998, after the court's denial of the defendant's first motion for a new trial,    the defendant arranged, with the cooperation of the Commonwealth, to have cuttings of evidence found at the crime scene analyzed for the presence of DNA by Cellmark Diagnostics(Cellmark).  Cellmark analyzed the cuttings and found the presence of two sperm fractions, one found on the robe and one found on the sheet.  The two sperm fractions did not match each

---

[4]The defendant did not appear at his arraignment and was not arrested on a default warrant until 1983.

6

other and thus were donated by two different men.  Cellmark compared the DNA of the sperm fractions to DNA obtained from the defendant and determined that they did not match.  The defendant was thus excluded as the source of the sperm fractions.

In addition, as a result of this court's order, the defendant was granted access to the Commonwealth's files in this case.  Notes taken by the district attorney revealed that Valerie, who was orally raped, stated that she believed that the assailant was circumcised.  The defendant is not circumcised.  This potentially exculpatory evidence had not been previously disclosed to the defendant.

## DISCUSSION

A motion for a new trial pursuant to Mass. R. Crim. P. 30(b) may be granted if it appears that justice may not have been done. Commonwealth v. Pike, 431 Mass. 212, 218 (2000); Commonwealth v. Stewart, 383 Mass. 253, 257 (1981).  The granting of a motion for a new trial is addressed to the sound discretion of the judge. Commonwealth v. Moore, 408 Mass. 117, 125 (1990); Commonwealth v. Stewart, supra at 257.

## I. Newly Discovered DNA Evidence

The defendant first contends that the sperm found on the robe and sheet and the DNA tests excluding him as the source of that

7

sperm constitutes newly discovered evidence entitling him to a new trial.    The Commonwealth argues that this court should not even consider the DNA evidence in its determination of whether the defendant is entitled to a new trial because such evidence is precluded at trial under the rape-shield statute, which makes inadmissible specific instances of a victim's sexual conduct, except "evidence of the victim's sexual conduct with the defendant or evidence of recent conduct of the victim alleged to be the cause of any physical feature, characteristic, or condition of the victim" which may be admissible. G.L. c. 233, § 21B (1998).

The Commonwealth argues that the DNA evidence is inadmissible under G.L. c. 233, § 21B because it reveals the sperm of two different men and is thus evidence of the victim's sexual conduct. However, the defendant is not offering the DNA evidence to show the victims' sexual behavior; rather, he seeks to show that someone else, not he, assaulted the victims.    "No positive of law other than normal considerations of relevancy stands in the way of the admission of misidentification evidence." Commonwealth v. Cardoza, 29 Mass. App. Ct. 645, 649 (1990), rev. den., 409 Mass. 1103 (1991).    "When a defendant offers exculpatory evidence regarding misidentification, prejudice ceases to be a factor, and relevance should function as the admissibility standard." Id. (concluding that the defendant's proffer of a pubic hair found on the victim that was not from the defendant, to show that another person

8

attacked the victim, did not fall under the rape shield statute and
was admissible). Compare Commonwealth v. Martin, 424 Mass. 301, 313
(1997) (concluding that it was within the judge's discretion to
exclude  under G.L. c. 233, § 21B evidence of semen stains not
belonging to the defendant on the victim's bedspread, where
identity was not an issue because the defendant was the victim's
former lover). Therefore, the defendant may properly offer and this
court may consider the DNA evidence as part of the motion for new
trial.

A defendant seeking a new trial on the basis of newly
discovered evidence must establish both that the evidence is newly
discovered and that it casts real doubt on the justice of the
conviction. Commonwealth v. Pike, supra at 218;  Commonwealth v.
Truong, 34 Mass. App. Ct. 668, 673, rev. den.; 416 Mass. 1104
(1993). Newly discovered evidence is evidence that was unavailable
at the time of trial and could not have been discovered with
reasonable diligence. Commonwealth v. LeFave, 430 Mass. 169, 176
(1999).   In addition, the newly discovered evidence must be
credible. Commonwealth v. Pike, supra at 218.

The issue in this case is not whether the DNA evidence was
available at the time of the defendant's trial or whether the DNA
evidence is credible.  It is undisputed that DNA analysis was not
available at the time of the defendant's trial. Massachusetts did
not accept as reliable the PCR-based method of DNA analysis until

9

1997. See Commonwealth v. Vao Sok, 425 Mass. 787, 799-802 (1997).
Further, the Commonwealth does not challenge the credibility of
the test results. Cellmark is a reputable facility which has been
used by the Commonwealth in other cases. See Commonwealth v.
Rosier, 425 Mass. 807, 809 (1997). Rather, the pivotal issue is
the probative value of the new DNA evidence.

To warrant a new trial, newly discovered evidence must be
material and carry a measure of strength in support of the
defendant's position. Commonwealth v. Pike, supra at 218;
Commonwealth v. Moore, supra at 126. Thus, newly discovered
evidence that is cumulative of evidence admitted at trial tends to
carry less weight than new evidence that is different in kind.
Commonwealth v. Moore, supra at 126; Commonwealth v. Grace, 397
Mass. 303, 306 (1986). The judge must find that there is a
substantial risk that the jury would have reached a different
conclusion had the evidence been admitted at trial. Commonwealth v.
Lo, 428 Mass. 45, 53 (1998); Commonwealth v. Truong, supra at 673.
The judge need not conclude that the verdict would have been
different; rather, the issue is whether the new evidence would
probably have been a real factor in the jury's deliberations.
Commonwealth v. Moore, supra at 126; Commonwealth v. Ramirez, 46
Mass. App. Ct. 925, 926 (1999).

The Commonwealth argues that the DNA evidence at issue here is
merely cumulative and corroborative of Bogdan's testimony that

10

microscopic testing revealed that the defendant was not the donor of the stains found on the robe and sheet. However, the newly discovered DNA evidence is different in kind from the microscopic evidence presented at trial for two reasons. First, PCR-based DNA evidence is highly reliable and is likely to be more persuasive to a jury than the microscopic evidence. See Commonwealth v. Vao Sok, supra at 799-803.

More importantly, the DNA evidence not only corroborates the microscopic evidence that the defendant was not the source of the stains on the robe and sheet but also rebuts the Commonwealth's theory at trial that the assailant left no physical evidence at the crime scene. This theory, bolstered by Bogdan's testimony that no sperm was detected on the robe and sheet, the victims' testimony that the assailant did not ejaculate, and the parties' stipulation that vaginal and anal swabs taken from the victims did not reveal the presence of sperm, was critical in reconciling the victims' identification of the defendant as the assailant with the fact that scientific tests excluded the defendant as the source of the biological stains at the scene. Thus, the newly discovered DNA evidence, which casts doubt upon the Commonwealth's theory at trial, is not merely cumulative of the evidence at trial. Compare Commonwealth v. LeFave, supra at 181 (concluding that an expert's proposed testimony, based on recent research, on the unreliability of child witnesses in sexual abuse cases was merely corroborative

of expert testimony that was or could have been presented at the
time of trial, and therefore, was not remarkably different in
kind); Commonwealth v. Lo, supra at 52-53 (denying a motion for a
new trial where newly discovered evidence of an expert witness's
bias was cumulative of other evidence of bias, and that witness was
not the only expert who testified that the defendant was sane).

    The presence at the crime scene of sperm from two different
men, neither of which was the defendant, is exculpatory and would
probably have been a real factor in the jury's deliberations.
Compare Commonwealth v. Fitzgerald, 402 Mass. 517, 521 (1988)
(granting a new trial in a rape case based on a newly discovered
billing record that established that the defendant had undergone a
vasectomy and thus could not have produced the sperm cells found at
the scene, despite the victim's identification of him as the
rapist).

    In reaching this conclusion, this court notes that the
probative value of newly discovered evidence depends largely on the
strength of the case against the defendant. Commonwealth v. Moore,
supra at 126; Commonwealth v. Truong, supra at 675.  The case
against the defendant was not particularly strong, with only one
victim consistently able to identify him as the assailant, another
able to identify him immediately after the crime but not at the
time of trial, and the third never able to identify him.  Our
courts have recognized that studies tend to demonstrate that

                              12

people's identification of others of the same race   is more
reliable than people's identification of others of a different
race. See Commonwealth v. Jean-Jacques, 47 Mass. App. Ct. 909, 910,
rev. den., 430 Mass. 1105 (1999) (noting that whether to give an
instruction on cross-racial identification rests in the discretion
of the judge). Further, no physical or other circumstantial
evidence tied the defendant to the crime.

Given the relatively weak case against the defendant, newly
discovered DNA evidence which excludes him as the source of the
biological stains on the victim's robe and sheet would likely have
been a real factor in the jury's deliberations. Further, because
the new evidence casts doubt upon the Commonwealth's theory that
the assailant did not ejaculate and left no physical evidence at
the scene, and establishes the presence of the sperm of two
different men on the robe and sheet, there is a substantial risk
that the jury would have reached a different conclusion had the
evidence been admitted at trial. See Commonwealth v. Truong, supra
at 674-675 (concluding that newly discovered evidence identifying
a fingerprint which did not match the co-defendant's as that of a
woman alleged to have been involved in the crime was material,
where the case against the defendant was not a powerful one).
Compare Commonwealth v. Davis, 410 Mass. 680, 682 (1991) (noting, in
the context of a defendant's post-conviction request for funds for
scientific testing, that DNA evidence which showed that hairs in

the victim's hand did not belong to the defendant was merely
cumulative of other evidence showing that the hair was not the
defendant's, in a case where the Commonwealth's evidence included
a confession by the defendant[5]); Commonwealth v. Moore, supra at
127 (denying a new trial based on newly discovered evidence
supporting the defendant's theory that someone else committed the
crime where the evidence against the defendant at trial was
powerful).    Thus, this court concludes that the newly discovered
DNA evidence is material and carries a measure of strength in
support of the defendant's position, entitling him to a new trial.

## II. Failure to Disclose Valerie's Statement

The defendant further contends that he is entitled to a new
trial because the Commonwealth failed to disclose Valerie's
statement that she believed the assailant was circumcised.    Due
process of law requires that the government disclose to a criminal
defendant favorable evidence in its possession that could
materially aid the defense against the pending charges.
Commonwealth v. Hill, 432 Mass. 704, 715 (2000); Commonwealth v.
Tucceri, 412 Mass. 401, 404-405 (1992).    Moreover, this duty to
disclose exculpatory evidence exists regardless of any ineffective
assistance of defense counsel with respect to obtaining the
evidence. Commonwealth v. Tucceri, supra at 410.    The failure of

---

[5]See Commonwealth v. Davis, 403 Mass. 575, 579-581 (1988).

14

the prosecutor to furnish exculpatory evidence in his possession requires a new trial if the evidence was material, i.e., there is a substantial risk that the jury would have reached a different conclusion if the evidence had been admitted at trial. Id. at 409-413; Commonwealth v. Bennett, 43 Mass. App. Ct. 154, 158 (1997). Where the prosecutor has denied the defendant specifically requested exculpatory evidence, the defendant need only demonstrate that a substantial basis exists for claiming prejudice from the non-disclosure. Commonwealth v. Simmons, 417 Mass. 60, 73 (1994).

In order to prevail, the defendant must establish that the evidence existed, that it tended to exculpate him, that the prosecution failed to disclose the evidence, and that it was material. Commonwealth v. Schand, 420 Mass. 783, 787 (1995). Prior to trial, the defendant specifically requested that the prosecution furnish all statements of the Commonwealth's witnesses. It is undisputed that the prosecutor's note concerning Valerie's statement existed at the time of trial, yet the statement was not disclosed. Valerie's statement that she believed her assailant to be circumcised tends to negate the guilt of the defendant, who is not circumcised, and is thus exculpatory. See Commonwealth v. Gallarelli, 399 Mass. 17, 20 (1987).

Given that the defendant's sole defense was misidentification and the only evidence against him was the victims' identification of him as the assailant, the non-disclosure of Valerie's statement

15

constitutes a substantial basis for claiming prejudice.  See
Commonwealth v. Tucceri, supra at 410 (granting a new trial based
on the commonwealth's failure to disclose a photograph showing that
the defendant had a beard when arrested minutes after a rape, where
the only contested issue at trial was the identity of the
assailant, and the victim testified that the assailant was clean-
shaven).  Evidence that goes directly to the defendant's
participation in the crime is clearly material. Commonwealth v.
Vaughn, 32 Mass. App. Ct. 435, 439, rev. den., 413 Mass. 1104
(1992). Further, even under the more stringent standard applied to
non-specific requests for exculpatory evidence, Valerie's statement
would have been a real factor in the jury's deliberations and there
is a substantial risk that the jury would have reached a different
conclusion if the evidence had been admitted at trial.
Consequently, the defendant is entitled to a new trial.

### III. Issues Relating to the Lost Vaginal Swabs

Finally, the defendant argues that the newly discovered DNA
evidence makes it apparent that the vaginal swabs were potentially
exculpatory and material to his defense.  The defendant  thus
argues that the charges must be dismissed because he was prejudiced
by the loss or destruction of the swabs.  This is precisely the
same argument that was considered and rejected by the court in the
defendant's prior motion for a new trial. Judge Connolly reasoned
that "there is no indication that the Commonwealth ever had such

16

samples in their possession and, therefore, the Commonwealth cannot be charged with failing to preserve the samples for testing." Generally, the defendant cannot raise issues in a motion for a new trial that have already been raised and addressed, or could have been raised, on direct appeal or in an earlier motion for a new trial. Commonwealth v. Watson, 409 Mass. 110, 112 (1991), citing Commonwealth v. Harrington, 379 Mass. 446, 449 (1980). This court declines to revisit the issue of whether the Commonwealth was culpable for the loss of the vaginal swabs.

However, the defendant's supplemental motion further contends that the prosecutor's failure to disclose the medical records indicating the presence of sperm on the vaginal swabs requires a new trial. Judge Connolly touched briefly on this issue in the prior motion for a new trial, stating that because there was no indication that the Commonwealth was ever in possession of the sperm samples, the prosecutor had no duty to disclose them to defense counsel. He further concluded that "[e]ven assuming that the Commonwealth possessed these records, their non-disclosure is not a sufficient basis to grant a new trial."

The court has discretion to rehear an issue that has already been raised and addressed in an earlier motion for a new trial, but such discretion should only be exercised in those extraordinary cases where, upon sober reflection, it appears that a miscarriage of justice might otherwise result. Commonwealth v. Gagliardi, 418

17

Mass. 562, 565 (1994); Commonwealth v. Watson, 409 Mass. 110, 112
(1991). Here, the defendant contends that the prosecutor's failure
to disclose the existence of the medical records indicating the
presence of sperm on the vaginal swabs takes on a new significance
in light of the newly discovered DNA evidence. This court agrees,
and therefore will consider whether the failure to disclose the
medical records warrants a new trial.

In order to prevail on a motion for a new trial on this basis,
the defendant must establish that the evidence existed, that it
tended to exculpate him, that the prosecution failed to disclose
the evidence, and that it was material. Commonwealth v. Schand,
supra at 787. It is undisputed that the medical records, which are
dated December 8, 1980, existed at the time of trial.    Further,
the presence of sperm on the vaginal swabs is exculpatory in that
it casts doubt on the Commonwealth's theory at trial that the
assailant did not ejaculate and left no physical evidence at the
crime scene, a theory which was critical in reconciling the
victims' identification of the defendant with the fact that
scientific tests excluded him as the source of the biological
stains at the scene.

On the record before this court, however, it is unclear
whether the prosecution was in fact aware of the medical records
yet failed to disclose them to the defendant. If the defendant
could establish this to be the case, it would furnish yet another

18

ground for a new trial, as there is a substantial risk that the jury would have reached a different conclusion if the presence of sperm on the vaginal swabs taken from the victims had been in evidence at trial. See Commonwealth v. Moore, supra at 126; Commonwealth v. Truong, supra at 675 (both noting that the importance of newly discovered evidence depends on the strength of the case against the defendant). Given that the defendant has failed to meet his burden of showing that the prosecution failed to disclose the evidence, this court does not rely on the vaginal swab evidence as an independent basis for granting the motion for a new trial.

Therefore, because the newly discovered DNA evidence is exculpatory and would likely have been a real factor in the jury's deliberations, and because the Commonwealth failed to disclose Valerie's potentially exculpatory statement that she believed the rapist was circumcised, this court is persuaded that justice may not have been done in this case.[6] Consequently, the court in its discretion concludes that the defendant is entitled to a new trial.

---

[6]Given this court's resolution of these issues, it is not necessary to address the defendant's remaining arguments with respect to ineffective assistance of counsel for failure to appeal the sufficiency of the evidence, the prosecutor's failure to disclose a prior inconsistent statement by Shannon concerning the stains, and the recent discovery that Shannon filed a civil lawsuit prior to the criminal trial. Finally, this court will not revisit the trial judge's failure to give a cross-racial identification instruction, as that issue was squarely addressed in the defendant's direct appeal.

19

## ORDER

For the foregoing reasons, it is hereby <u>ORDERED</u> that the defendant's motion for new trial be <u>ALLOWED</u>.

Barbara J. Rouse
Justice of the Superior Court

DATED: May 11th, 2001

Stephen Hrones and
Julie Boyden for The
defendant. Jack Zanini,
and Amanda Lovell for
The Commonwealth (Suffo

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
No. 035492-45
035181-84

COMMONWEALTH

v.

RODRIGUEZ U. CHARLES

## NOLLE PROSEQUI

Now comes the Commonwealth in the above-captioned case and enters a nolle prosequi pursuant to Mass. R. Crim. 16(a). The Commonwealth states as follows the reasons in support thereof:

1. The defendant was convicted in 1983 of raping three women in an apartment in Brighton in December of 1980. He was identified by photograph and in person by two of the three women. The Supreme Judicial Court upheld the conviction on appeal and the first motion for new trial was denied in 1996.

2. Although the DNA test results may be exculpatory, they do not exonerate the defendant. Whether he committed these crimes, as the first jury determined beyond a reasonable doubt, will never be known with certainty. The absence of Charles' DNA does not mean he was not the rapist - as the facts presented at trial are otherwise convincing of his guilt.

CLERK/MAGISTRATE
JOHN A. NUCCI
FILED

01 MAY 17 AM 11: 19

SUFFOLK COUNTY
FOR CRIMINAL BUSINESS
SUPERIOR COURT

3. The results of the DNA testing were possible because the District Attorney and Boston Police Department voluntarily preserved the few remaining pieces of cloth, from a sheet and bathrobe, that had DNA material on them, and made these available to for testing by Cellmark Laboratory.

4. The fact that defendant's DNA was not on the cloth was not an unexpected result, as defendant's blood type and that of the stains on the cloth were not the same, as the jury was told at the time of the trial in 1984. At trial an independent expert, as well as a technician from the Boston Police Crime Lab, did not detect any sperm on the cloth and the jury was advised of this fact, and information that the rapist had not ejaculated. The judge who decided the motion for new trial, however, felt that the information that sperm was present at the scene of the crime, and that it was multiple sources, but not the defendant, should be presented to a jury at a new trial.

5. The trial exhibits no longer exist.

6. Despite the impact which these crimes, and the overturning of the verdicts, had on the victims, two of the victims are willing to testify in a new trial, including the victim who identified defendant as her rapist by photograph, at a line up, and in court.

7. The third victim of these rapes, committed on December 8, 1980, is not able to participate in a retrial at this time.

8. In light of the difficulties inherent in retrying a case 17 years after the first verdict of guilt, and 20 years after the rapes, exacerbated by the lack of trial exhibits and the current unavailability of at least one witness, it is not in the interests of justice for the Commonwealth to further prosecute this case.

Respectfully submitted
For the Commonwealth.

RALPH C. MARTIN, II
DISTRICT ATTORNEY

By:

John P. Zanini
Legal Counsel
To the District Attorney
Assistant District Attorney
BBO# 563839

Amanda Lovell
Assistant District Attorney
One Bulfinch Place
Boston, MA 02114
(617) 619-4000

Dated: May 16, 2001

# EXHIBIT 8

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
DEPARTMENT OF THE
TRIAL COURT

| | |
|---|---|
| COMMONWEALTH    * | |
|                    * | |
| v.                 * | INDICTMENT NOS. |
|                    * | |
|                    * | 035492-45 |
| RODRIGUEZ U. CHARLES * | 036181-84 |
|     Defendant      * | |
|                    * | |

## AFFIDAVIT OF VICTIM

I, Shannon·              to depose and say as follows:

1.    I was a victim in the above captioned matter, and at the time of trial was known as Shannon

2.    During the period of time from September through December, 1980, I engaged in consensual relations, including sexual intercourse, with two men who were not the defendant, Rodriguez Charles.

3.    These relations occurred in my apartment, in my bedroom, during the time from September through December of 1980.

4.    At this time I do not recall the exact day or date before the rape upon which I last had intercourse with one or both of these men.

5.    At this time I do not recall the exact day or date prior to being raped by the defendant Rodriguez Charles on which I laundered either my bathrobe or my bed sheet, but during that period of time it was not unusual for several weeks to pass, if not longer, between launderings, particularly because there was no washer and dryer inside the apartment.

C.A.18

6.   It is my belief that the two DNA samples, one on the shredded bathrobe and
     one on a shredded sheet about which I had been advised, could have come
     from the two men with whom I was having consensual sexual relations at that
     time. as Rodriguez Charles did not ejaculate when he raped me.

        Signed this _/0ᵗʰ_ day of April, 2000, under the pains and penalties of

perjury.

                                        _Shannon_ (signature)
                                        Shannon

C.A.19

# EXHIBIT 9

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
DEPARTMENT OF THE
TRIAL COURT

| | |
|---|---|
| COMMONWEALTH | * |
| | * |
| v. | * |
| | * |
| | * |
| RODRIGUEZ U. CHARLES | * |
| Defendant | * |
| | * |

INDICTMENT NOS.

035492-45
036181-84

### AFFIDAVIT OF VICTIM

I, Karen ▮▮▮▮ to hereby depose and say as follows:

1.    I was a victim in the above captioned matter, and the man who raped me was Rodriguez Charles, the defendant in this case.

2.    My identifications of Mr. Charles by way of his photograph, at the line up, and at the trial, were based on my independent knowledge, recollection and recognition of the rapist.

3.    Between September and December of 1980 my roommate Shannon ▮▮▮▮ [now Shannon ▮▮▮▮ was to the best of my knowledge and belief having consensual sexual relations with at least two different men.

4.    Between September and December of 1980 I did my laundry approximately every two weeks, and Shannon did her laundry less frequently than I did mine, as the apartment in which we were living did not have a washer or dryer.

5.  Approximately two weeks prior to the rapes we had a birthday party for our roommate, Valerie ████ at which there were perhaps as many as one hundred people in our apartment throughout the course of the party.

6.  Amongst these people were many Hispanic friends, heterosexual, and homosexual friends, and while I do not recall any particular activity in Shannon's bedroom at that time, it is certainly possible that some person or persons were in the bedroom behind close doors having sexual relations or engaging in other activities.

7.  Between the time when I was raped in my apartment at 1626 Commonwealth Avenue and the trial, I moved to an apartment on Park Drive, some distance from the apartment in which I was raped. The night before the trial I received a threatening phone call with words to the effect that I should rethink whether I was going to testify because the caller knew where I lived and that I should check under my bed at night and be careful when I walked down Park Drive.

8.  That same night, immediately after I received that call, the fire alarm went off and I waited in my apartment until the police had arrived outside before I left my apartment.

Signed this _11th_ day of April, 2000, under the pains and penalties of perjury.

Karen ████

Signed before me on this
11th day of April 2000.

Notary Public

# EXHIBIT 10

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
DEPARTMENT OF THE
TRIAL COURT

COMMONWEALTH    *
    *
v.    *    INDICTMENT NOS.
    *
    *    035492-45
RODRIGUEZ U. CHARLES *    036181-84
    Defendant    *
    *

## AFFIDAVIT OF VICTIM

I, Valerie ████ to hereby depose and say as follows:

1. I was a victim in the above captioned matter.

2. Between September and December of 1980 my roommate Shannon ████
   [now Shannon ████ was to the best of my knowledge and belief having
   consensual relations with at least two different men.

3. Between September and December of 1980 I did my laundry approximately
   every two weeks, and Shannon did her laundry less frequently than I did mine.

4. The apartment in which we were living did not have a washer or dryer.

5. Approximately two weeks prior to the rape, at my birthday party, there were
   as many as one hundred people in the apartment throughout the course of the
   party, and amongst these people were many Hispanic friends, heterosexual,
   and homosexual friends. and while I do not recall any particular activity in
   Shannon's bedroom at that time, it is certainly possible that some person or

persons were in the bedroom behind close doors having sexual relations or engaging in other activities.

Signed this ___/0___ day of April, 2000, under the pains and penalties of perjury.

Valerie

My Commission Expires
February 28, 2002

Constance King

# EXHIBIT 11

**BostonPolice**
Crime Laboratory Unit
1 Schroeder Plaza
Boston, MA 02120

CONFIDENTIAL

July 24, 2000

Case # 7293        CC #  01906416 .    Date of Incident: 12/8/80    District: D-14

Incident: Rape

Victim:  Shannon L.

Suspect:  Rodriguez Charles

Investigator:    Det. W. Keough
                 Sexual Assault Unit

### DNA REPORT

On 7/18/00 Forensic Technologist Julie Lynch obtained evidence items pertaining to case # 7293 for DNA analysis. The item to be examined was as follows:

Saliva Sample of Alan

## METHODS

DNA was extracted from Saliva Sample of Alan        using the Organic DNA Extraction from Whole Blood/Bloodstains/Saliva protocol. The procedure is described in the DNA lab manual. The amount of DNA recovered from each sample was determined using the QuantiBlot Human DNA Quantitation Kit, and a known quantity of each sample DNA was typed using the AmpliType PM + DQA1 PCR Amplification and Typing Kit.

000063

RESULTS

**CONFIDENTIAL**

Table 1: 7293

| DESCRIPTION | DQA1 | LDLR | GYPA | HBGG | D7S8 | GC |
|---|---|---|---|---|---|---|
| Saliva Sample of Alan | 2,4.1 | A,A | A,B | B,B | A,B | B,C |

All controls gave the expected results.

## CONCLUSIONS

Alan       is excluded from being the possible source of the DNA extracted from the sperm fractions of the Sheet and the Robe. (See Report of Laboratory Examination, May 28, 1999, Cellmark Case No. F991025.)

Please contact me if you have any questions regarding the DNA analysis performed on this case.

Respectfully submitted,

Reviewed by,

*Julie K Lynch*

*Joseph Varlaro*

Julie K. Lynch
Forensic Technologist

Joseph Varlaro
Senior Criminalist

C.C. A.D.A. Jack Zanini

000064

2

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                      SUPERIOR COURT
                                                 NO.035492-45,
                                                 035181-84

COMMONWEALTH

v.

RODRIGUEZ CHARLES

## NOTICE OF INFORMATION RECEIVED AND FILED UNDER SEAL

Pursuant to this Court's order of June 30, 2000, and the rape shield statute, G.L. c. 233, § 21B, this document is filed under seal. Attached hereto is a motion to impound. The Commonwealth hereby reports that it has received information regarding Alan⬤⬤ whose name and blood type were found in the office case file; suggesting that he might have been considered a possible donor of the stains on the sheet and or robe at the time that this case was tried. As reported to this Court, ALAN's DNA was tested by the Boston Police Department in July, 2000, and he was excluded as a source of the sperm found on the samples tested by Cellmark from the robe and the bed sheet. The Commonwealth located and spoke with ALAN, who confirmed that he had had a consensual sexual relationship with the victim in the room and on the bed where two of the rapes occurred. He did not remember when the relationship was but he did recall that a short time after their relationship ended, he had been treated at a hospital. With his consent, the Commonwealth learned from the hospital that he was admitted on November 23, 1980. The victims were raped on December 8, 1980.

UC 5166

2

This information was relayed to counsel for the defendant in a telephone conversation on October 18, 2000.

Respectfully Submitted
For the Commonwealth,

RALPH C. MARTIN, II
DISTRICT ATTORNEY

JOHN P. ZANINI,
Assistant District Attorney
For The Suffolk District
BBO#: 563839
One Bulfinch Place
Boston, Ma 02114
(617) 619-4070

AMANDA LOVELL
Assistant District Attorney
For The Suffolk District
BBO#: 563839
One Bulfinch Place
Boston, Ma 02114
(617) 619-4070

Dated: October 23, 2000

UC 5167

# EXHIBIT 12



5525 Mounes Street, Suite 101
New Orleans, LA 70123
Phone: 800-256-4106
Fax: 504-734-9787
e-mail: forensic@reliagene.com

September 26, 2007

COPY

Mayeti Gametchu
Wolf Block Schorr and Solis-Cohen LLP
One Boston Place, 40th Floor
Boston, MA 02108

RE:    **Charles vs. Commonwealth of Massachusetts**
       **Cellmark Case #F991025**
       **ReliaGene Technologies File #F0022656/FR-239**

Dear Ms. Gametchu:

My name is Gina Pineda and I currently serve as Reliagene Technologies' Assistant Forensic Director and Technical Leader. ReliaGene is a leading private DNA laboratory and research facility specializing in human genetic identification. I have over ten years of experience in forensic DNA analysis and management. I possess a Master of Science degree in Pathology with a concentration in forensic DNA from the Louisiana State University Health Sciences Center. I am an Associate Member of the American Academy of Forensic Sciences.

ReliaGene was asked by your firm to perform two tasks:

1.    A document review of DNA work performed in the above referenced case by Cellmark DNA Laboratory summarized in three reports from Cellmark dated May 7, 1999, May 28, 1999 (amended on October 12, 1999), and April 17, 2001. I was also asked to render a scientific opinion regarding the interpretation of these test results.

2.    STR and Y-STR analysis on the sperm and non-sperm fraction DNA extracts generated and used by Cellmark on robe cuttings 04 and 05. I was asked to perform Y-STR testing in order to determine whether the DNA observed by Cellmark in these samples, namely from the sperm fractions, came from males. The Y-STR test is a test for genetic markers only on the Y chromosome and is, therefore, specific to male individuals only. Therefore, an interpretable male profile can be obtained even from samples containing large amounts of female DNA and small amounts of male DNA. Because the results of this test don't involve any female DNA, it can easily be used to determine the number of male donors present in a sample. In addition, I was asked to perform STR testing so that the results could be uploaded into the CODIS database to check for hits to individuals in the database. The STR test is the conventional, routinely used type of DNA test that involves testing 13 to 15 genetic markers on the non-gender chromosomes. The gender specific marker Amelogenin tested during the STR analysis performed by ReliaGene was also able to provide information regarding gender.

The documents received and reviewed include a 116-page Cellmark case file copy containing lab worksheets, photographic copies of the PM/DQA1 dot blots, photos of evidence, and various correspondence. Also reviewed were the CVs and job descriptions of the Cellmark report signers, Lisa Grossweiler, Jacki Higgins, and Charlotte Word.

I concur with the findings contained in Cellmark's case file.

ReliaGene File #F002265/FR-239                                                September 26, 2007

Cellmark performed the DNA testing using the PM/DQA1 PCR method. As stated in the reports, Charles is excluded as a DNA donor in the samples tested. The items tested include the following:

- A semen stain on a sheet (item 01)
- A semen stain from a robe (item 02)
- Various semen stains from the same robe (item 04, Bottom Rear of Robe and item 05, Inside Back of Robe)
- Control sample of same robe (item 06)
- Blood sample of Rodriguez Charles (item 03)

A differential extraction was employed by Cellmark with respect to each of samples 01, 02, 04, 05, and 06 in this case. Differential extraction refers to a specialized extraction method performed on semen stains in which sperm cells are separated from non-sperm cells. This method results in two fractions – a sperm fraction (eventually compared to a suspect or other male individuals) and a non-sperm fraction . Epithelial cell DNA is typically found in the non-sperm fraction of a differential extraction and in articles of clothing or bed sheets, usually originates from shed skin cells from the wearer or from the person whose skin came into direct contact with the item. I understand from a court document signed by both parties in this case that one of the victims wore the robe during her sexual assault, and this victim, as well as another victim, were sexually assaulted on the bed sheet, which, based on the court document, also belonged to the first victim and was on her bed.

Cellmark microscopically observed sperm cells in each of the sperm faction samples for samples 01, 02, 04, 05, and 06. The DNA from the sperm fraction of item 01 (sheet) revealed the presence of primarily one person. The DNA from the epithelial fraction of item 01 revealed the presence of two people. The DNA from the sperm fraction of 02 (robe) was primarily from one person, different than the person in the sperm fraction of 01. The DNA from the epithelial fraction of 02 was primarily from one person, with the second person as a minor contributor.

Mr. Charles (03) is excluded as a source of the DNA tested in all of the 01 and 02 samples, including the DNA in the sperm fractions.

Although the type of testing performed by Cellmark could not specifically test the gender of the DNA observed, the extraction process described above resulting in sperm fractions where sperm cells were observed in every single sperm fraction makes it highly probable, certainly to a reasonable degree of scientific certainty, that the gender of the DNA from the sperm fractions is male. It is also likely to be the case, to a reasonable degree of scientific certainty, that the male DNA from the sperm fractions came from sperm cells, which were observed microscopically post-differential extraction in each sperm fraction. Further supporting this conclusion is the fact that no epithelial cells were observed post-differential extraction in the sperm fractions and the fact that sperm cells, which come from male semen donors, in my experience are very robust.

As with samples 01 and 02, Mr. Charles (03) is also excluded as a source of the DNA from the 04 (Bottom Rear of Robe), the 05 (Inside Back of Robe), and the 06 (Control) samples, including the DNA from the sperm fractions.

It is my understanding that the gender of the DNA observed in the sperm fractions has been questioned in this case. Accordingly, ReliaGene conducted gender specific testing on items 04 and 05. (ReliaGene could not do further DNA testing on items 01 and 02 as the DNA extracts generated by Cellmark were depleted by Cellmark's testing).

The gender specific testing performed by ReliaGene -- Y-STR and STR -- revealed that the one DNA donor observed by Cellmark in the 04 sperm fraction is, in fact, a male donor.

The Y-STR and STR testing revealed that the two or more DNA donors observed by Cellmark in the 05 sperm fraction are, in fact, male donors.

With regard to the epithelial fractions, the STR testing revealed the primary donor observed by Cellmark in the 04 epithelial fraction is a female donor. In addition, the Y-STR test revealed that the male observed in the 04 sperm fraction is the same (minor) male observed in the 04 epithelial fraction.

September 26, 2007

The STR testing revealed that the primary DNA donor observed by Cellmark in the 05 epithelial fraction is a female donor. The Y-STR testing revealed that the mixture of males observed in the 05 sperm fraction are the same male mixtures observed in the 05 epithelial fraction.

The Y-STR tests confirm the Cellmark PM/DQ and the ReliaGene STR test results as to the number of contributors in the 04 and 05 sperm fraction samples. One male donor is present in robe cutting 04 and at least two male donors are present in robe cutting 05. (It is possible that the sperm donor from robe cutting 04 is also included in 05 as a third contributor.) It is therefore impossible that the DNA detected by Cellmark in the sperm fractions is not coming from male individuals.

Based upon the results and conclusions drawn from ReliaGene's Y-STR and STR testing of robe cuttings 04 and 05 and Cellmark's PM/DQ testing of sheet cutting 01 and robe cutting 02, a total of at least three sperm donors are present in the sheet and robe extracts. Among the other reasons I've discussed, my opinion is based upon the following information:

1.  A single sperm donor detected in the sperm fraction of the semen stain from sheet (01). Although ReliaGene could not test Cellmark's extracts from sheet cutting 01 because they were depleted by the testing, this donor is highly likely, and certainly to a reasonable degree of scientific certainty, to be male.

    This opinion is based upon the differential extraction process, Cellmark's post-differential extraction microscopic observation of sperm cells in every sperm fraction, and the nature of sperm cells in general, all of which are discussed above, as well as the fact that ReliaGene's testing of the sperm fractions for robe cuttings 04 and 05 confirmed that every sperm fraction profile detected by Cellmark with respect to those samples was, in fact, male.

2.  A single sperm donor detected in the sperm fraction of the semen stains from robe cutting 02 and 04. The donor from robe cutting 04 is conclusively male. The sperm fraction donor in 04 and 02 is the same individual.

3.  At least two sperm donors in robe stain 05, one of which could be the single sperm donor from sheet cutting 01.

    Because of the depletion of the extract from sheet cutting 01, ReliaGene did not independently test the sample. The Cellmark PM/DQ results of the sperm fraction of sheet cutting 01 would be sufficient to exclude an individual as a contributor to 05. However, comparison of the testing reveals that 01 cannot be excluded as one of the two sperm donors in 05 and may, in fact, be one of the two 05 sperm donors.

In addition, based upon the results from the epithelial fractions, the testing reveals the presence of one predominant female. The PM/DQ testing reveals the predominant presence of one donor in the epithelial fractions, consistent with each other. The Amelogenin gender identification marker in the STR testing reveals a female as the major donor in the epithelial fractions of robe stains 04 and 05. Furthermore, the major component of the STR profiles from the epithelial fractions of robe stains 04 and 05 are consistent with each other. This female is highly likely to be one of the victims.

Finally, an STR CODIS uploadable profile was obtained from the sperm fractions of both items tested from the robe, stains 04 and 05.

If you have any further questions, please call me at 504-378-9640.

Sincerely,

Gina Pineda, M.S.
Forensic Assistant Director / Technical Leader

# EXHIBIT 13

```
Volume:                    1
Pages:                    88
Exhibits:                  0
Exhibits Marked for ID     2
```

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS                      SUPERIOR COURT DEPARTMENT
                                 OF THE TRIAL COURT

* * * * * * * * * * * * * * * *
                              *
ULYSSES R. CHARLES,           * CIVIL ACTION NO.
          Plaintiff          * 2005-00876
                              *
          VS                  *
                              * TESTIMONY OF:
COMMONWEALTH OF MASSACHUSETTS,*
          Defendant          * VALERIE, KAREN and
                              * REBUTTAL: DR. ROBERT BARATZ
                              *
* * * * * * * * * * * * * * * *

* * * * * * * * * * * * * * * * * * * * * * *
  BEFORE:  THE HONORABLE RAYMOND J. BRASSARD
* * * * * * * * * * * * * * * * * * * * * * *

                    Tuesday, October 23, 2007
                    Suffolk Superior Court
                    Three Pemberton Square
                    Boston, MA  02108

*Ellen M. Blake, Professional Court Reporter*

Eblakereporting@aol.com - 781.724.4813

```
1   A.   It was a two-bedroom apartment; one bathroom,
2        with a living room and a kitchen.
3   Q.   How did you arrange the bedrooms?
4   A.   Well, Shannon had -- there was a far bedroom
5        with a balcony, Shannon had that bedroom; Karen
6        had the second bedroom, it didn't have a
7        balcony; and then we had, like, a sofa bed in
8        the living room and that's where I slept.
9   Q.   How old were you, at that point, in 1980?
10  A.   I was --
11  Q.   In the fall of 1980.
12  A.   In the fall of 1980 I was 20 when we moved into
13       the apartment; I turned 21 not soon after.
14  Q.   How long had you known Karen before moving into
15       that apartment in September of 1980?
16  A.   Probably about six months, or so.
17  Q.   How long had you known Shannon?
18  A.   A little less; probably just a couple of
19       months.
20  Q.   Were you aware of Shannon's dating habits
21       during that fall of 1980?
22  A.   Yes.
23  Q.   Could you describe them?
24  A.   Well, Shannon was a friendly, social girl.  And
```

```
 1           you have to remember in the 80s, it was okay to
 2           be a friendly, social person.  So; you know, we
 3           would go out clubbing and Shannon would meet
 4           people.  She was very out-going; so, you know,
 5           she liked boys.
 6    Q.     And did you observe boys or men spending the
 7           night at the apartment with Shannon?
 8    A.     Yes.
 9    Q.     Could you describe the frequency of that?
10    A.     I would, probably, say pretty much every
11           weekend.
12    Q.     And did you make any assumptions about what
13           behavior was occurring between Shannon and the
14           men?
15    A.     Yes.
16    Q.     And what assumptions did you make?
17    A.     Well, generally, that they were having sexual
18           relations.
19    Q.     And why did you assume that?
20    A.     Well, the next morning they would come out of
21           her bedroom; sometimes wearing her bathrobe.
22    Q.     Can you estimate, to the best of your memory;
23           for the three to four weeks before December 8,
24           1980, how many sexual relationships Shannon
```

```
1        had?
2    A.  I would probably say at least four.
3    Q.  Okay.  Did you ever observe anyone other than
4        Shannon wearing her bathrobe, at that time?
5    A.  Yes.
6    Q.  And who did you observe?
7    A.  It was one of her friends that she had staying
8        over.
9    Q.  Was that a male or a female?
10   A.  A male.
11   Q.  Did you ever have parties in your apartment?
12   A.  Yes, we had my birthday party.
13   Q.  And when is -- "was" your birthday, I guess I
14       should say?
15   A.  November 2nd.
16   Q.  Okay.  Did you have a party on your birthday in
17       1980?
18   A.  Oh, yes.  We had a very, very large party.
19   Q.  Could you describe the party?
20   A.  Well, it was my 21st birthday party and we had
21       friends -- we had a lot of friends in Boston;
22       so we handed out invitations.  We probably had
23       about 120 people -- between, 100, and I would
24       say, 150.
```

| | | |
|---|---|---|
| 1 | Q. | And do you remember, approximately, when the |
| 2 | | party was? |
| 3 | A. | I don't remember the day, no.  I think it was |
| 4 | | like the week after my birthday; but I'm not |
| 5 | | positive about the day. |
| 6 | Q. | Were there any people in Shannon's bedroom the |
| 7 | | night of the party? |
| 8 | A. | Oh, yes.  There were people throughout the |
| 9 | | apartment, and the next morning I had to get up |
| 10 | | early and meet my family for brunch and there |
| 11 | | were people sleeping on the balcony outside of |
| 12 | | Shannon's bedroom. |
| 13 | Q. | In your apartment on Commonwealth Avenue was |
| 14 | | there a washer and dryer in your apartment? |
| 15 | A. | Yes.  There was a laundry room down in the |
| 16 | | basement, and it was not someplace you wanted |
| 17 | | to go alone.  It was really dark and you had to |
| 18 | | go through a narrow hallway and it was kind of |
| 19 | | mildewy [sic], and so -- yeah, unless -- We |
| 20 | | tried not to go down there alone. |
| 21 | Q. | Did you do your laundry very often? |
| 22 | A. | Not really. |
| 23 | Q. | How often? |
| 24 | A. | Well, it could be up to two to three weeks. |

# EXHIBIT 14

```
Volume:                      1
Pages:                      88
Exhibits:                    0
Exhibits Marked for ID       2
```

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS                          SUPERIOR COURT DEPARTMENT
                                     OF THE TRIAL COURT


```
* * * * * * * * * * * * * * * *
                              *
ULYSSES R. CHARLES,           * CIVIL ACTION NO.
            Plaintiff         * 2005-00876
                              *
        VS                    *
                              * TESTIMONY OF:
COMMONWEALTH OF MASSACHUSETTS,*
            Defendant         * VALERIE, KAREN and
                              * REBUTTAL: DR. ROBERT BARATZ
                              *
* * * * * * * * * * * * * * * *
```


```
* * * * * * * * * * * * * * * * * * * * * *
  BEFORE:  THE HONORABLE RAYMOND J. BRASSARD
* * * * * * * * * * * * * * * * * * * * * *
```



                     Tuesday, October 23, 2007
                     Suffolk Superior Court
                     Three Pemberton Square
                     Boston, MA  02108

*Ellen M. Blake, Professional Court Reporter*

Eblakereporting@aol.com - 781.724.4813

```
 1                        WITNESS: Okay.
 2                        THE COURT: It doesn't project
 3         very well; I'm sorry.
 4                        WITNESS: That's okay.
 5                        THE COURT: That's better.
 6    Q.   During the fall of 1980 from Labor Day weekend;
 7         after you had moved in with Shannon, were you
 8         familiar with her dating relationships?
 9    A.   Yes.
10    Q.   Could you describe them?
11    A.   Well, she dated quite a few different guys.  I
12         didn't always know who they were.
13    Q.   How did you know that?
14    A.   We'd see different guys come out of her
15         bedroom, you know, on the weekend or during the
16         course of the weekend.
17    Q.   Okay.  So when you say, "Dating," what are you
18         describing?
19    A.   "Dating" you know, they slept over -- I mean, I
20         don't know what went on, but I mean they did
21         stay over.
22    Q.   Okay.  Did you make any assumptions about her
23         sexual relationship with these people?
24    A.   Well, yeah.
```

| | | |
|---|---|---|
| 1 | Q. | What was your assumption? |
| 2 | A. | That she was sleeping with them. |
| 3 | Q. | Okay.  And if you take the period of time from |
| 4 | | approximately one month before December 8, |
| 5 | | 1980, can you estimate how many different men |
| 6 | | Shannon had sexual relations with? |
| 7 | A. | I would say three to four. |
| 8 | Q. | And what makes you think that? |
| 9 | A. | Just because I saw three or four different guys |
| 10 | | during that course of that time. |
| 11 | Q. | Did you have a washer and dryer in your |
| 12 | | apartment? |
| 13 | A. | No, we did not.  We had to go out to do our |
| 14 | | laundry or go downstairs.  It wasn't the best |
| 15 | | place to go do laundry, downstairs. |
| 16 | Q. | Do you know how often Shannon did her laundry? |
| 17 | A. | Not that often. |
| 18 | Q. | Okay.  How often would you estimate? |
| 19 | A. | Maybe every two to three weeks. |
| 20 | Q. | Did you -- I guess I'd like to draw your |
| 21 | | attention back to December 8, 1980.  Did you |
| 22 | | leave your apartment at some time that evening? |
| 23 | A. | Yes. |
| 24 | Q. | At approximately what time? |